# 23-6440(L)

## 23-6474(Con)

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

———◆◆◆———

### UNITED STATES OF AMERICA,

*Appellee,*

—v.—

### MARC ELEFANT, SADY RIBEIRO, ADRIAN ALEXANDER,

*Defendants,*

### GEORGE CONSTANTINE, ANDREW DOWD,

*Defendants-Appellants.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF & SPECIAL APPENDIX OF DEFENDANT-APPELLANT DR. ANDREW DOWD

---

Michael K. Krouse
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000

John P. Elwood
Kolya D. Glick
Matthew L. Farley
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
john.elwood@arnoldporter.com

*Counsel for Defendant-Appellant Andrew Dowd*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................i

TABLE OF AUTHORITIES ......................................................iv

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................ 7

STATEMENT OF THE ISSUES ................................................ 7

STATEMENT OF THE CASE ................................................... 8

I.    PRE-TRIAL PROCEEDINGS ........................................... 8

    A.   *Duncan*: The First Indictment and Trial ............................ 8

    B.   *Duncan*: The Court "Urges" "Pursuing" Doctors ................... 9

    C.   *Constantine*: The Second Indictment ................................. 11

    D.   The Court Denies Dowd's Motion for Recusal ..................... 12

    E.   The Court Denies a Bill of Particulars ............................... 13

II.   TRIAL PROCEEDINGS ................................................. 14

    A.   Evidence ..................................................................... 14

        1.   Cooperating Conspirators ........................................ 15

        2.   Patient Evidence and Testimony ............................... 21

        3.   Document-Based Witnesses ..................................... 25

    B.   Erroneous Evidentiary Rulings ........................................ 26

        1.   Arce: Professional Fraud Investigator ....................... 26

        2.   Dowd's Tax Information .......................................... 29

3. Dr. Roth and Unproven Ethical Violations ................. 30

C. Closing Argument and Verdict ............................................. 33

III. SENTENCING AND POST-TRIAL MOTIONS ............................ 34

SUMMARY OF ARGUMENT .................................................... 35

STANDARD OF REVIEW .......................................................... 37

ARGUMENT ................................................................................. 38

I. THE DISTRICT COURT ERRED IN DENYING RECUSAL ....... 38

II. THE DISTRICT COURT'S REFUSAL TO ORDER A BILL OF
PARTICULARS PREJUDICED DOWD'S DEFENSE ................. 42

A. The District Court Erred in Denying a Bill of Particulars .. 43

B. Dowd Was Prejudiced by Denial ........................................... 48

III. THE DISTRICT COURT IMPROPERLY ALLOWED
INADMISSIBLE EVIDENCE AND ITS ERRORS WERE NOT
HARMLESS .............................................................................. 52

A. The Court Erroneously Permitted Lay Testimony from a
Professional Insurance-Fraud Investigator ......................... 53

1. Arce Exceeded the Scope of Proper Lay Testimony .... 53

2. The Error Was Not Harmless ..................................... 59

B. The District Court Erroneously Admitted Evidence Dowd
Underreported *Some* Income ................................................ 61

1. Dowd's Tax Returns Did Not Conceal the Source of
his Income .................................................................... 62

2. The Improper Tax Evidence Was Not Harmless ........ 65

C. The Court Erroneously Permitted Expert Testimony
Concerning Unproven Ethical Violations ............................ 67

1.  Testimony Suggesting an Unproven Violation of Medical Ethics Is Not Probative, but Highly Prejudicial ...................................................................... 68

2.  The Ethics Testimony and Jury Instruction Were Not Harmless ............................................................ 72

D.  The Weak Evidence Against Dowd Precludes Harmlessness .......................................................... 73

CONCLUSION ............................................................................. 75

CERTIFICATE OF COMPLIANCE ............................................ 77

CERTIFICATE OF SERVICE ..................................................... 78

SPECIAL APPENDIX ................................................................. 79

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Fulminante,*
  499 U.S. 279 (1991) ......................................................... 37

*Bank of China, New York Branch v. NBM LLC,*
  359 F.3d 171 (2d Cir. 2004) ........................................ 54, 56

*Cefalu v. United States,*
  234 F.2d 522 (10th Cir. 1956) ..................................... 44, 45

*Donziger v. United States,*
  143 S. Ct. 868 (2023) ...................................................... 40

*Francolino v. Kuhlman,*
  365 F.3d 137 (2d Cir. 2004) ............................................ 41

*Hynes v. Coughlin,*
  79 F.3d 285 (2d Cir. 1996) .............................................. 66

*Liteky v. United States,*
  510 U.S. 540 (1994) ........................................................ 38

*In re Murchison,*
  349 U.S. 133 (1955) .................................................... 40, 41

*O'Rourke v. Eastern Airlines, Inc.,*
  730 F.2d 842 (2d Cir. 1984) ............................................ 68

*Ruan v. United States,*
  142 S. Ct. 2370 (2022) .................................................... 51

*Salve Regina College v. Russell,*
  499 U.S. 225 (1991) ........................................................ 68

*Satterwhite v. Texas,*
  486 U.S. 249 (1988) ........................................................ 59

*State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*,
No. 21-CV-5523, 2022 WL 1606523
(E.D.N.Y. May 20, 2022) ..................................................................... 69

*United States v. Akers*,
No. 7:19-CR-7, 2019 WL 4934948 (E.D. Ky. Oct. 7, 2019) ................ 70

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) ......................................................... 52, 61

*United States v. Antar*,
53 F.3d 568 (3d Cir. 1995) ...................................................................... 40

*United States v. Atuana*,
816 F. App'x 592 (2d Cir. 2020) ............................................................ 62

*United States v. Babichenko*,
No. 18-CR-258, 2022 WL 596728 (D. Idaho Feb. 28, 2022) .............. 63

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) ...................................... 37, 38, 42, 44, 45

*United States v. Cabrera*,
13 F.4th 140 (2d Cir. 2021) ........................................................... 54, 55

*United States v. Cruz*,
363 F.3d 187 (2d Cir. 2004) ................................................................. 55

*United States v. Cummings*,
858 F.3d 763 (2d Cir. 2017) ........................................................... 65, 72

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1988) ................................................................ 42

*United States v. Donziger*,
38 F.4th 290 (2d Cir. 2022) .................................................................. 40

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003) .................................................................... 58

*United States v. Ferguson*,
676 F.3d 260 (2d Cir.2011) .................................................................. 57

*United States v. Figueroa,*
618 F.2d 934 (2d Cir. 1980) ............................................................ 74

*United States v. Forrester,*
60 F.3d 52 (2d Cir. 1995) .......................................................... 52, 59

*United States v. Galatis,*
849 F.3d 455 (1st Cir. 2017) ............................................................ 57

*United States v. Garcia,*
291 F.3d 127 (2d Cir. 2002) ............................................................ 52

*United States v. Garcia,*
413 F.3d 201 (2d Cir. 2005) .................................................. 54, 56, 58

*United States v. Gilan,*
967 F.2d 776 (2d Cir. 1992) ............................................................ 52

*United States v. Grinage,*
390 F.3d 746 (2d Cir. 2004) ............................................................ 59

*United States v. Haynes,*
729 F.3d 178 (2d Cir. 2013) ............................................................ 54

*United States v. Jean-Baptiste,*
166 F.3d 102 (2d Cir. 1999) ...................................................... 38, 61

*United States v. Kaplan,*
490 F.3d 110 (2d Cir. 2007) ...................................................... 37, 42

*United States v. LaFlam,*
369 F.3d 153 (2d Cir. 2004) ...................................................... 62, 64

*United States v. Litwok,*
678 F.3d 208 (2d Cir. 2012) ...................................................... 65, 67

*United States v. Lovaglia,*
954 F.2d 811 (2d Cir. 1992) ...................................................... 37, 39

*United States v. Martin,*
796 F.3d 1101 (9th Cir. 2015) .................................................... 63, 64

vi

*United States v. McGinn,*
   787 F.3d 116 (2d Cir. 2015) .............................................................. 38

*United States v. Nachamie,*
   91 F.Supp.2d 565 (S.D.N.Y. 2000) ................................................... 43

*United States v. Nektalov,*
   461 F.3d 309 (2d Cir. 2006) .............................................................. 58

*United States v. Provenzano,*
   615 F.2d 37 (2d Cir. 1980) ................................................................ 73

*United States v. Rajaratnam,*
   No. 09-CR-1184, 2010 WL 2788168
   (S.D.N.Y. July 13, 2010) ................................................................... 43

*United States v. Salameh,*
   152 F.3d 88 (2d Cir. 1998) ................................................................ 68

*United States v. Savin,*
   No. 00-CR-45, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ................. 43

*United States v. Scop,*
   846 F.2d 135 (2d Cir. 1988) ........................................................ 55, 57

*United States v. Scott,*
   677 F.3d 72 (2d Cir. 2012) .......................................................... 38, 68

*United States v. Shellef,*
   507 F.3d 82 (2d Cir. 2007) ................................................................ 65

*United States v. Stirling,*
   571 F.2d 708 (2d Cir. 1978) .............................................................. 69

*United States v. Tolliver,*
   451 F. App'x 97 (3d Cir. 2011) .......................................................... 57

*United States v. Valenti,*
   60 F.3d 941 (2d Cir. 1995) ................................................................ 63

*United States v. Wedd,*
   993 F.3d 104 (2d Cir. 2021) .............................................................. 42

*Vine St. Clinic v. HealthLink, Inc.*,
856 N.E.2d 422 (Ill. 2006) ............................................... 69

*Zervos v. Verizon N.Y., Inc.*,
252 F.3d 163 (2d Cir. 2001) .............................................. 37

## Statutes

18 U.S.C. § 1341 ................................................................ 12

18 U.S.C. § 1342 ................................................................ 12

18 U.S.C. § 1343 ................................................................ 12

18 U.S.C. § 1349 ................................................................ 12

18 U.S.C. § 3231 .................................................................. 7

28 U.S.C. § 455 ................................................................. 38

28 U.S.C. § 1291 .................................................................. 7

N.Y. Educ. Law § 6530 ...................................................... 70

N.Y. Pub. Health Law § 230-a ........................................... 70

## Rules

Fed. R. Evid. 401 ............................................................... 68

Fed. R. Evid. 403 .......................................................... 68, 72

Fed. R. Evid. 404 ............................................................... 72

Fed. R. Evid. 701 ............................................................... 54

Fed. R. Evid. 802 ............................................................... 59

## Other Authorities

Ruth Crawford, *Magnetic resonance imaging versus
arthroscopy in the diagnosis of knee pathology*, 84 British
Med. Bulletin 5 (Sept. 3, 2007) .......................................... 21

viii

Vassilios S Nikolaou, *MRI Efficacy in Diagnosing Internal Lesions of the Knee: A Retrospective Analysis*, 2 Journal of Trauma Management & Outcomes 9 (June 2, 2008) .........................22

## INTRODUCTION

This appeal arises from the second of two criminal trials involving a fraudulent scheme to stage trip-and-fall accidents on the property of New York businesses and file lawsuits against them. Ten defendants have now been found guilty of participating in this scheme. For nine of the defendants ("the Conspirators"), the government produced extensive evidence of their knowledge of, and intent to join, the scheme: They socialized, shared office space, exchanged money in untraceable cash payments, spoke explicitly about the staged accidents, and warned each other when the Travelers Insurance Company ("Travelers") began to investigate their scheme.

Yet, throughout a 14-day trial, the government mustered no comparable evidence as to the supposed tenth co-conspirator, Defendant-Appellant Dr. Andrew Dowd—a successful 67-year-old orthopedic surgeon with "essentially no criminal history." JA-3092.

To the contrary, the record demonstrates that the Conspirators used Dowd (like many other non-defendant doctors) to increase the value of their fraudulent lawsuits by sending him patients for medical treatment under false pretenses because: He had a "monster practice"

1

with ten offices and thousands of patients; he had worked for years providing medical care in no-fault personal injury cases; and he was not reluctant to perform arthroscopy, a low-risk, minimally invasive technique used both for treating and for diagnosing joint pain.  The Conspirators recruited fraudulent plaintiffs; instructed the plaintiffs to stage slip-and-fall accidents; directed the plaintiffs to lie to Dowd about their injuries; sent the plaintiffs to Dowd with MRI reports showing soft tissue damage; and paid the plaintiffs to tell Dowd they wanted surgery. The evidence showed that the Conspirators *themselves* understood Dowd did not know of the fraud:  They lied to Dowd, never informed Dowd that the plaintiffs' accidents were staged, and when they learned of the Travelers investigation, they discussed the investigation among themselves, but *never told Dowd* about it.

All the while, Dowd's conduct bore none of the hallmarks of a Conspirator.  He had no personal relationship with any of the Conspirators and had no contact with most of them.  He never dealt in cash and instead issued surgery-related payments in checks bearing his own (or his company's) name; deposited checks into his personal bank and investment accounts, whose year-end records he provided to his

2

accountant; declined to refer patients to the Conspirators' preferred MRI facility (which one Conspirator owned); and frequently diagnosed patients with degenerative conditions caused by age rather than traumatic injury, which *decreased* the value of the Conspirators' fraudulent lawsuits. In short, the evidence at trial demonstrated that Dowd was not a knowing member of any conspiracy.

Against that weak evidentiary backdrop, Dowd's conviction was infected by (I) the appearance of partiality; (II) the government's refusal to identify which of Dowd's patients were allegedly fraudulent; and (III) three prejudicial evidentiary rulings. Each of those errors independently requires reversal.

The district court erred in denying Dowd's motion for recusal. During the first case, and before Dowd was a defendant, the district court impermissibly blended the judicial and prosecutorial roles by "urg[ing]," "encouraging," and "ma[king] clear" its "hope" that prosecutors would "pursu[e]" Dowd and other "corrupt doctors." A reasonable observer would question the court's impartiality when the government indicted Dowd shortly after one such comment, particularly when Dowd's case was immediately reassigned to that same judge, who later declared

3

(while Dowd was awaiting trial) that Dowd's "corrupt" actions offered a "frightening insight into human nature." Having "urge[d] the government" to "pursue" Dowd, the court should not have presided over his prosecution.

Perhaps tainted by its views on Dowd's "corrupt[ion]," the district court denied Dowd's request for a bill of particulars, refusing to require the government to identify which of Dowd's many patients were allegedly fraudulent by reasoning that Dowd could gather necessary information from the previous trial record. But the evidence against Dowd was fundamentally different from the evidence in the first trial—or even the evidence against Dowd's co-Defendant, a lawyer named George Constantine who filed the fraudulent lawsuits. The government's case against Dowd relied almost exclusively on circumstantial evidence concerning Dowd's medical treatment of his *patients*—of which he had thousands—and *not* his direct communications with Conspirators. The identity of Dowd's allegedly fraudulent patients was therefore central to his defense. By refusing to provide Dowd with that critical information, the court improperly imposed on Dowd the burden of proving that his

medical treatment was "necessary" for an unidentified and shifting group of patients.

The district court also committed three evidentiary errors that affected Dowd's substantial rights.

*First*, the court committed obvious legal error under Rule 701 when it allowed a professional insurance-*fraud* investigator to testify as a purported lay witness in a criminal *fraud* trial. That witness, Travelers fraud investigator Tara Arce, offered almost no proper lay testimony. Instead, leveraging her experience in law enforcement and private insurance-fraud investigations, she educated the jury about the "red flags" indicating fraudulent insurance claims. She then highlighted that she had found those red flags *in this case*. Because the court instructed the jury on "conscious avoidance" *scienter*, Arce's "red flags" testimony amounted to a professional fraud expert interpreting the evidence and declaring that Dowd was guilty.

*Second*, the district court misapplied Rule 404(b) by admitting evidence that Dowd underreported his taxable income during two of the five years of the conspiracy. While a defendant's complete failure to report income from a fraudulent source may suggest the defendant knew

that source was illicit, Dowd underreported *some* income during 2014 and 2016 yet made no effort to disguise his income source. He reported the vast majority of his income on his taxes, deposited that income into accounts bearing his own name, reported supposedly conspiratorial payments as *business expenses*, and provided his accountant year-end statements for *all* his accounts. The introduction of Dowd's tax returns was rank propensity evidence suggesting only that Dowd was a cheat, predisposed to criminal behavior.

*Third*, the Court permitted improper testimony and argument that Dowd violated medical ethics rules by paying referral fees for patients. The government's expert, Dr. Neil Roth, testified that referral fees generally are impermissible under state medical ethical rules; but neither he nor any other witness testified that Dowd violated those rules. The government introduced no evidence that the New York Medical Board believed that Dowd paid improper referral fees; nor did it explain how to distinguish improper referral fees from permissible administrative fees. Instead, the government simply declared that Dowd had paid improper referral fees, telling the jury that Dowd knowingly risked his medical license by making those payments.

These evidentiary errors were far from harmless; they formed the bedrock of the government's weak, circumstantial case against Dowd. The court also instructed the jury that all three pieces of evidence could be considered for the ultimate question: whether Dowd actually knew that his patients had staged their accidents in furtherance of a scheme to file fraudulent lawsuits. Without that evidence, there is at least a "substantial likelihood" that the result of trial would have been different. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231 and entered a judgment of conviction on April 25, 2023. JA-3096. Dowd timely appealed. JA-3103. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether a reasonable observer would entertain significant doubt that justice could be done where a court that "urge[d]" the government to "pursue" an investigation presided over the resulting prosecution.

2. Whether the district court hindered Dowd's preparation of his defense by denying his motion for a bill of particulars and failing to compel the government to identify which of Dowd's thousands of patients the government alleged to be fraudulent.

3. Whether the district court abused its discretion in admitting (a) testimony from a professional fraud investigator of "red flags" indicating fraud; (b) evidence that Dowd underreported some of his income during two years, or (c) testimony regarding the professional rules governing medical doctors; and, if so, whether that erroneous admission was harmless.

## STATEMENT OF THE CASE

## I. PRE-TRIAL PROCEEDINGS

### A. *Duncan*: The First Indictment and Trial

In 2018, the government indicted five individuals—Peter Kalkanis, Bryan Duncan, Kerry Gordon, Robert Locust, and Ryan Rainford—on charges of mail fraud, wire fraud, and conspiracy. *United States v. Duncan*, No. 18-CR-289 (S.D.N.Y.), ECF 2. Kalkanis and Gordon pleaded guilty and became cooperating witnesses for the government. Duncan,

8

Locust, and Rainford proceeded to trial before the Honorable Sidney H. Stein.

Kalkanis was the conspiracy's ringleader; he directed a team of "runners" and "case managers" to recruit fraudulent plaintiffs to stage accidents at New York businesses. JA-1946-47, JA-1955-56, JA-2055-56. The runners and case managers led the fraudulent plaintiffs through emergency-room visits, meetings with lawyers, chiropractor appointments, and MRIs before delivering them to a rotating set of physicians for treatment.

At the *Duncan* trial, Kalkanis testified that every person involved—including runners, lawyers, and doctors like Dowd—was aware the lawsuits were fraudulent. *See, e.g.*, *Duncan* Tr.1064-72, ECF 159. The jury convicted all three runners. Their appeals remain pending before this Court *sub nomine United States v. Rainford*, Case Nos. 20-359, 20-2695, 20-2993, 21-1753 (oral argument heard May 1, 2023).

## B.  *Duncan*: The Court "Urges" "Pursuing" Doctors

Throughout *Duncan*, the runners deflected culpability by arguing that Kalkanis and the lawyers and doctors (including Dowd) were most

culpable.  JA-125.  The court repeatedly urged the government to pursue

the doctors and lawyers.  At Duncan's sentencing, the court stated:

> Of course, most of the money went to you, Kalkanis, the funders, the lawyers, and the doctors.
>
> And *I would urge the government to continue their investigation here*, because, based on this testimony, the lawyers and the doctors were heavily involved in this.

JA-158 (emphasis added).

At Locust's sentencing, the court agreed with defense counsel that

"the worst people involved in this conspiracy were people who had never,

ever been prosecuted."  JA-183.  The court stated:

> *I made it clear to the government during the trial and at other proceedings in this case, that the government is pursuing the corrupt lawyers, the corrupt doctors who were involved in this scheme. . . .  I would hope the government is following through on a continuing investigation.*  I don't know whether they are or not. . . .
>
> [T]here are certainly a number of people here in this conspiracy *who were above*—in the conspiracy—the defendants who have been tried.

JA-183-84 (emphases added).

10

## C. *Constantine*: The Second Indictment

Shortly after the court "urge[d] the government" to "investigat[e]" and "pursu[e] the corrupt . . . doctors," the government brought the *Constantine* Indictment, charging five individuals, including Dowd. It accused lawyers George Constantine and Marc Elefant of "commenc[ing] personal injury lawsuits" against property owners without "disclos[ing] that the Patients had either deliberately fallen or never fallen at the Accident Sites." JA-51. In a superseding indictment, the government charged Adrian Alexander, who owned a facility that performed the fraudulent plaintiffs' MRIs and a litigation funding company that paid their legal and medical fees. JA-71-74. The Indictment alleged that Dowd and Dr. Sady Ribeiro conducted "surgeries regardless of the legitimate medical needs of the Patients," JA-72, to "maximize the value of [the lawyers'] Fraudulent Lawsuits," JA-74.

The allegations against the two doctors were factually distinct. The Indictment relied on Ribeiro's *own* inculpatory communications, such as one Ribeiro email stating "I will play very honest 'game' with you . . . I see the patient and I generate a very good dictation that justifies the treatment-there is a cost for that and I hope a profit." JA-73. The trial

evidence showed Ribeiro directing recipients to "delete" emails discussing fraudulent cases.  JA-802-03.

The Indictment cited no such communications from Dowd.  It rested principally on Dowd's treatment of patients, as well as hearsay testimony from an FBI agent that Kalkanis "had told Dr. Dowd that the patients' actions were staged."  JA-3018.  The government failed to offer any such evidence at trial:  Neither Kalkanis nor anyone else testified that Dowd knew of the staged accidents.

The Indictment charged Dowd with: two counts each of mail fraud (18 U.S.C. §§ 1341, 1342) and wire fraud (18 U.S.C. §§ 1343, 1342), two counts of conspiracy to commit mail fraud (18 U.S.C. § 1349), and two counts of conspiracy to commit wire fraud (18 U.S.C. § 1349).  JA-76-84.

### D.   The Court Denies Dowd's Motion for Recusal

*Constantine* was randomly assigned to the Honorable Loretta Preska.  JA-10.  Two days later, the government submitted a related-case letter on the *Duncan* docket.  *Duncan*, ECF 363.  That same day, *Constantine* was reassigned to Judge Stein without explanation.  JA-10.

Elefant, Alexander, and Ribeiro pleaded guilty.  At Alexander's plea hearing, the court again commented on the culpability of individuals like

Dowd, "[h]ighly educated professionals—doctors, lawyers" who "were involved in a scheme that boggles the mind," providing a "frightening insight into human nature." JA-221-22. Dowd and his co-defendants were then awaiting trial.

After reviewing Alexander's plea minutes and the prior sentencing transcripts, Dowd moved for Judge Stein's recusal. JA-122. The court denied the motion orally, JA-305, and memorialized its decision after trial, JA-3019. The court recited that it was not required to recuse based on evidence presented during court proceedings and that courts commonly evaluate defendants' comparative fault. JA-3023-24. While the court recognized that expressing a desired outcome would be a basis for recusal, it held that merely encouraging an investigation of "corrupt doctors" "without any particular goal as to the result" did not meet that standard. JA-2022-24.

### E. The Court Denies a Bill of Particulars

Dowd moved pre-trial for a bill of particulars, asking that the court require the government to identify "patients treated by Dowd alleged to have been involved in the 'staged trip-and-fall accidents' which form the basis of the charged fraudulent scheme." Def.'s Mot. for Bill of

Particulars 1, ECF 62.  The court denied Dowd's motion, reasoning that there had already been extensive discovery and Dowd could rely on the *Duncan* record to prepare his defense.  JA-111-12.  Even though *Duncan* involved no medical witnesses, no defendant doctors, and no experts, the court concluded that *Duncan* provided a "very specific roadmap to what this trial is going to look like."  JA-100.

## II.  TRIAL PROCEEDINGS

Dowd and Constantine's 14-day trial lasted from November 28 to December 16, 2022.

### A.  Evidence

The government introduced 16 witnesses against Dowd, falling into three categories:  (1) two cooperating Conspirators, Kalkanis and Gordon, who both also testified in *Duncan*; (2) five fraudulent plaintiffs (out of an alleged 316) who participated in Kalkanis's staged-accident scheme and whom Dowd treated after they lied to him about their injuries; and (3) witnesses with no personal knowledge of Dowd's actions.  Constantine presented no case, and Dowd offered one witness: orthopedic expert Dr. Stuart Springer.  JA-2465-2563.  Only three of the 17 *Duncan* witnesses testified in Dowd's trial.

## 1. Cooperating Conspirators

Kalkanis and Gordon were both familiar with personal injury lawsuits long before their conspiracy began. Both Conspirators explained that the same basic procedures they used during the fraud scheme are commonplace in legitimate personal injury lawsuits in New York City.

The Conspirators testified that it is common for litigation finance companies to provide loans to aid plaintiffs with their personal injury lawsuits and advance medical and legal fees. JA-983-84, JA-2048-49. It is common for a doctor to repeatedly work with a specific personal injury lawyer, and vice versa. JA-2054. And the use of runners, drivers, and case managers is ubiquitous in personal injury cases. JA-2176, JA-976-77.

From Gordon's perspective, the process for documenting and filing a personal injury lawsuit generally did not change when it began with a staged accident rather than a real one: The patient went to an emergency room and then proceeded to a lawyer, a chiropractor, physical therapy, and an MRI facility before going to a doctor and receiving surgery. JA-

723, JA-968-70. Gordon would even purchase lists of patients from hospitals to identify injured individuals as prospective clients. JA-883.

Kalkanis, the scheme's mastermind, had been a chiropractor before losing his license for misconduct; during that time, he would refer possible slip-and-fall plaintiffs to his friend Constantine, and Constantine would return the favor. JA-1946, JA-1951. Before 2012, most of those cases were "legitimate," JA-2059, and Kalkanis and Constantine maintained a close professional relationship until the Travelers investigation caused a rift, JA-2002-03. Kalkanis even worked out of the basement of Constantine's office. JA-1962-63.

By 2012, Kalkanis was working as a broker for litigation funding companies. JA-1953. In early 2013, Kalkanis and Constantine "mutually" developed the scheme to start orchestrating "fake cases" in addition to legitimate ones. JA-2057-59. These "fake" cases fit two distinct fact patterns: The fraudulent plaintiffs had either (1) injured themselves at another location and then staged a fall on a business's property, *e.g.*, JA-676-77, or (2) pretended to fall and were not injured at all, *e.g.*, JA-461. The government's references to allegedly fraudulent

patients never differentiated between the two categories. *See* JA-3240-3323.

The scheme was designed to make staged accidents look like ordinary personal injury cases: Runners who had located prospective plaintiffs and accident sites would instruct those plaintiffs to fall in particular locations. JA-481, JA-1955. The fraudulent plaintiffs would then call an ambulance and go to the emergency room. JA-1958. After initial treatment, they would be referred to Kalkanis, who knew from the runner that they had staged their fall. JA-1958, JA-1972; JA-1632-33. Kalkanis would interview the fraudulent plaintiffs, coach them through their "accidents," and send them upstairs to Constantine to start the legal intake process. JA-1973.

After the fraudulent plaintiffs hired a lawyer, Kalkanis directed them to a chiropractor because "[c]hiropractors always, always order[] MRIs." JA-2000. Kalkanis would primarily use Astoria Medical Imaging, an MRI facility Alexander owned. JA-1990. Kalkanis knew, through Alexander, that the MRI report would indicate a need for surgery regardless of whether the plaintiff was actually injured. JA-1990.

17

Thus, by the time a fraudulent plaintiff saw a doctor, they generally had a documented emergency room visit, a chiropractor referral, an MRI report indicating a need for surgery, and a history of physical therapy. JA-1958-59, JA-2000; JA-723. Kalkanis also used a vast network of chiropractors and doctors, of whom Dowd was just one. *See* JA-3240-3323, JA-911, JA-1339, JA-2000 (referencing 19 non-defendant doctors and chiropractors).

Kalkanis admitted that he had longstanding relationships with the Conspirators. JA-2204 (2005 for Alexander); JA-2205 (2007 for Gordon). In particular, Kalkanis shared a "very close" social and "close[ly] intertwined" financial relationship with Ribeiro. JA-2205. Kalkanis helped Ribeiro with things like banking and finding office space; unlike Dowd, Ribeiro was struggling financially and "needed money." JA-2205.

Kalkanis and Gordon consistently communicated with the Conspirators about the scheme. They discussed incentivizing patients to attend appointments, JA-814, finding fraudulent plaintiffs, JA-806-07, locating staged accidents sites, JA-745-51, and structuring funding agreements, JA-803. Yet despite Kalkanis's testimony that Constantine

18

and others were fully aware of the fraudulent nature of many cases, JA-1949, Kalkanis *never* offered any such testimony regarding Dowd.

The scheme between Kalkanis and Constantine continued from 2012 to 2015, when Travelers initiated an investigation into some of Constantine's lawsuits. JA-2003. Kalkanis warned the Conspirators about the investigation. JA-2228-29. But Kalkanis never told Dowd—alone among all the defendants—about the investigation. JA-2228-31.

In short, Dowd was different from the Conspirators. Kalkanis met Dowd at the end of 2013, after the scheme was underway. At the time, Kalkanis was looking for "more doctors" and had heard that Dowd had a "huge orthopedic practice," was experienced in the personal injury world, and did a great deal of no-fault work. JA-2211; *see* JA-3115. In a contemporaneous email, Kalkanis explained that, given Dowd's large practice, he hoped Dowd would refer patients to Alexander's MRI facility, to attorneys, and to Alexander's litigation funding company. JA-2212. At trial, though, Kalkanis conceded that Dowd did not refer a *single patient* to the MRI facility. JA-2213.

Unlike the Conspirators, Dowd operated through traceable, arms-length financial transactions. Dowd received between $9,000 and

$11,000 from litigation funding companies for the surgeries he performed. JA-1288. From the surgical payment, Dowd then paid his expenses, including $2,100 to use the surgical facility and a $1,000 check to Kalkanis, JA-1995; JA-3142-43, both of which Dowd documented as business expenses on his taxes, JA-1922.

Kalkanis and Gordon interacted very little with Dowd. Gordon testified that he sat in on a few patient meetings with Dowd, and on at least one occasion, watched Dowd perform a physical examination on a patient. JA-782. Gordon testified that there was once a disturbance in the lower lobby of Dowd's office building when one of the patients became unruly. JA-787-88. Gordon also testified that some unidentified patients appeared to have used drugs or alcohol, JA-734-35, but no one testified that those patients ever saw Dowd, much less that they were under the influence when they saw him. Kalkanis clarified that only 2-3 patients (of hundreds) who hired Constantine showed signs of substance abuse. JA-1977.

The government introduced a few isolated written communications between Kalkanis and Dowd. For instance, in the only email that the Indictment discussed, Kalkanis asked Dowd to change a medical report

to add a shoulder injury for a patient who had been diagnosed with a knee injury. JA-3110. While Dowd later saw the same patient again and found that the patient had a shoulder injury, Dowd never changed the initial report, JA-3111-14, and the government failed to call that patient at trial or show the patient's records to its expert, JA-1448.

### 2. Patient Evidence and Testimony

Dowd saw thousands of patients over the course of the conspiracy's half-decade. JA-1336, JA-3115, JA-1341, JA-3108; *see* JA-2211-2212 (noting "huge" practice). Given the size of his practice, Dowd's staff handled all administrative work, JA-2220, while Dowd saw patients and performed surgeries, mostly simple arthroscopies.

The testimony showed that the risk from an arthroscopy is "extremely low," JA-2558, and that the procedure, which involves only a small incision, is minimally invasive. The procedure is used both as a treatment and a diagnostic technique for joint pain. JA-1360; JA-2490-91.[1] Through that process, a doctor can more accurately diagnose the

---

[1] Dowd's expert witness, Dr. Springer, opined that that even after an MRI, arthroscopy remains an appropriate diagnostic technique for many knee injuries. JA-2490-91. That view has been widely accepted in the medical community. *See, e.g.*, Ruth Crawford, *Magnetic resonance*

patient's condition and, if necessary, perform additional procedures, such as meniscectomies to treat meniscus tears, JA-1522-23, chondroplasties to repair damaged cartilage, JA-2486, or synovectomies to remove inflamed membranes, JA-1459.

Of the thousands of patients that Dowd saw over the conspiracy's five-year period, the government submitted a list of just 316 patients that had interacted with Kalkanis, JA-3240-3323, some of whom were undisputedly "legitimate," not fraudulent, JA-2122-23. In a different summary exhibit, however, the government alleged that Dowd performed *287* surgeries, again without identifying which ones were allegedly fraudulent. JA-3335. That summary did not account for the 13 patients that allegedly had multiple surgeries, JA-3240-3323, which would have brought the total number of individual patients allegedly involved in the scheme to 274. Whatever the precise number may be (the government

---

*imaging versus arthroscopy in the diagnosis of knee pathology*, 84 British Med. Bulletin 5, 15 (Sept. 3, 2007) ("The MRI examination techniques recommended in the literature at present are not able to replace arthroscopy for diagnosis of cartilage damage in the knee."); Vassilios S Nikolaou, *MRI Efficacy in Diagnosing Internal Lesions of the Knee: A Retrospective Analysis*, 2 Journal of Trauma Management & Outcomes 9 (June 2, 2008) ("[I]t is concluded that arthroscopy still remains the gold standard in diagnosing the internal knee lesions").

never says), it averages to approximately one surgery per week over the relevant time period, meaning about 1 or 2 of Dowd's approximately 50 weekly patients had some connection to Kalkanis. JA-2785-86.

Despite grand claims of "carloads" of "fake" patients throughout trial, JA-73, the government called just five of Dowd's patients to testify.[2] As willing participants in the fraud, those patients shared common traits. All arrived at Dowd's office with positive MRI reports. JA-3193 (Jones), 3201 (Norwood), JA-3218 (Walker), JA-3182 (Barton), JA-3167 (Barbour). All told Dowd they had real injuries and were in pain. JA-3189 (Jones), JA-3198 (Norwood); JA-3208 (Walker), JA-3178 (Barton), JA-3164 (Barbour). And all *chose* to have surgery performed, *e.g.*, JA-1173 (Walker testifying, "I wanted my knee fixed"), a fact that was notable because, as the medical experts agreed, arthroscopy is an "elective procedure." JA-2484; *accord* JA-1601 (Roth).

Four of the five patients had *actual* knee injuries when they saw Dowd. Two—Erica Barton and Malike Walker—were in pain from prior knee injuries. JA-676-77, JA-1264. After arthroscopy, both Barton and

---

[2] A patient named Dexter Baldwin also testified, but a non-defendant doctor—Dr. Norman Sveilach—performed Baldwin's arthroscopy. JA-1736.

Walker were confirmed to have meniscus tears in postsurgical reports. JA-3176, JA-3210.[3]  Two others—Kasheem Jones and Willie Barbour—testified they were not experiencing knee pain when Dowd examined them.  JA-463 (Jones); JA-2302 (Barbour).  Instead, both lied to Dowd that they *were* experiencing pain and wanted surgery, JA-3189 (Jones); 2302-06 (Barbour), and their stories were backed by positive MRI reports, JA-3193 (Jones); JA-3167 (Barbour).  Regardless, both Jones and Barbour had meniscal tears that they were unaware of, a fact confirmed by postsurgical reports.  JA-3187 (Jones); 3162 (Barbour).

---

[3] In denying Dowd's Rule 29 motion, the district court relied on Walker's testimony that Dowd offered to give Walker a scar without surgery.  JA-3028.  But Walker's testimony was so utterly implausible that no reasonable juror could have relied on it to conclude that Dowd had actual knowledge of the scheme, particularly when it is undisputed that Walker had a torn meniscus and wanted surgery.  JA-1173, JA-3210.  For one thing, Walker was a drug dealer who was "not sure" of Dowd's name at trial.  JA-1153-54.  For another, no person with knowledge of surgical procedures, which require submitting photographs of the procedure to insurance companies for litigation (and indeed every patient file contains such photos), and require the presence of numerous surgical staff, would make such an offer.  *See* JA-1269-71 (Walker was unaware procedure would be photographed).  That even the government disbelieves the story is apparent from the fact that the discovery material contains no indication the government *ever* asked Gordon about Walker's claim that Gordon had told him Dowd would make the offer.

The fifth patient was Keona Norwood. Norwood lied to Dowd about knee pain and presented with an MRI report indicating a meniscal tear. JA-3198-99, JA-3201. Upon operating, however, Dowd observed no such tear and correctly noted the lack of a tear in his postoperative report. JA-1493, JA-3197.

### 3. Document-Based Witnesses

The remaining seven government witnesses had no firsthand knowledge of the scheme. Most were simply used to introduce documents or summarize data. *See, e.g.*, JA-1785-1847 (statistician McKay); JA-1276-1353, JA-2394-2449 (FBI Special Agent Luciani and government paralegal Gutierrez, summary witnesses). For example, FBI forensic accountant Darren Jones summarized Dowd's financial records, explaining they were "easy to track" because he deposited the vast majority of them into his bank. JA-2380-82; *see* JA-2340-94.

Over Dowd's objections, the government also called professional, expert, and quasi-expert witnesses whose testimony suggested that Dowd had a propensity to commit unlawful or unethical acts: Travelers insurance fraud investigator, Tara Arce; Dowd's accountant, Robert Martin; and the government's medical expert, Dr. Neil Roth.

## B. Erroneous Evidentiary Rulings

### 1. Arce: Professional Fraud Investigator

Dowd moved pre-trial to exclude Tara Arce's testimony under Rule 701, arguing that she was an undisclosed expert and would offer improper lay testimony. Def's Mot. to Exclude Expert Test., ECF 113. During trial, Dowd separately moved to exclude Arce's testimony because it was based on hearsay documents reviewed during her investigation. Def's Mot. to Exclude Hearsay Test., ECF 142. The court recognized that Arce's testimony came "pretty close" to saying that there "was indicia of fraud," JA-331, but ultimately allowed her testimony.

Arce, the professional insurance-fraud investigator, then testified as a lay witness over the course of two days. Arce explained her extensive background in insurance fraud investigations: 14 years as a "claim investigator for the major case unit" at Travelers, where she "investigate[d] organized *fraud*," JA-1066 (emphasis added); experience as a "claim investigator for Prudential healthcare national anti-*fraud* division," JA-1066 (emphasis added); and work as an "investigative analyst" for the "New Jersey Office of Insurance *Fraud* Prosecutor," JA-1066-67 (emphasis added).

Based on her experience, Arce detailed patterns that she considers to be "red flags" indicating fraud in insurance claims. JA-1080. According to Arce, the "red flags" associated with fraudulent "slip-and-falls include: [1] unwitnessed accidents, [2] late reporting, [3] no medical treatment at the [injury] scene, [4] no incident report to the insured, [5] questionable medical records or incomplete medical records, . . . [6] funding company involvement with high interest rates, and . . . possible provider attorney relationships. " JA-1080.

Arce had no medical training, but she also detailed "red flags" to look for in a claimant's medical records, such as repeated use of the same medical provider, JA-1080, JA-1084, or surgery not preceded by conservative treatment like physical therapy or acupuncture, JA-1076. Arce opined: "If there is no MRI report, then there is no justification for the surgery." JA-1077.

Before Arce's second day of testimony, the court noted that it was "concerned about Ms. Arce." JA-1098. The court prohibited Arce from testifying about the contents of Traveler's medical reports and the lack of "incident reports" for some of Constantine's cases. JA-1114-15. But it expressly overruled objections to testimony that relied on Arce's "25 years

27

in the insurance fraud industry," saying: "I don't care about that." JA-1113.

The court thus permitted Arce to testify without qualification about "red flags" indicating fraudulent insurance claims. JA-1080. Arce explained that her "major case" investigation into Constantine began after a claims handler identified "red flags" on "multiple slip-and-fall" claims that Constantine had filed with Travelers. JA-1067, JA-1086. After previously overruling multiple objections, JA-1081-85, the court instructed the jury to disregard that *single* reference to "red flags" indicating fraud. JA-1087.

Arce testified that she referred Constantine's cases to the New York Department of Financial Services and the National Insurance Crime Bureau because she was required to make such a referral whenever Travelers has a "potentially suspicious claim or a confirmed fraudulent claim." JA-1124-26.

Arce implied that Dowd was central to her fraud investigation, JA-1089, and Arce's testimony was central to Dowd's prosecution, JA-2700; but Dowd was the doctor for just five of Constantine's 41 Travelers claims, JA-1147.

## 2. Dowd's Tax Information

The government sought to introduce evidence that Dowd underreported income during some years he operated on Kalkanis's patients. Gov't Mot. in Limine, ECF 107. Dowd objected under Rules 404 and 403 and sought to introduce evidence that he later filed an amended tax return including the allegedly unreported income. Def.'s Opp. to Mot. in Limine, ECF 109. The court overruled the objections, permitted the government to introduce the evidence through Dowd's long-time accountant Robert Martin, and excluded evidence of Dowd's remedial efforts. JA-1915-16.

Unlike the Conspirators, who insisted on using cash, *see* JA-1999-2000 (Ribeiro); JA-978 (Gordon), Martin explained that Dowd used traceable checks, *see* JA-1943 (Dowd income); JA-1943-44 (Dowd payments). Even when Dowd cashed checks, he did so not at anonymous check-cashing shops, but at his own bank. *See*, *e.g.*, JA-1920. These traceable check transactions included payments to Kalkanis, which Dowd reported as business expenses on his tax returns. JA-1922.

Dowd provided Martin with year-end statements for *all* of his bank and investment accounts. JA-1914. But although Dowd deposited almost

all Kalkanis-related income into his own accounts, some of Dowd's deposits were not reported as income because the investment account statements did not separately reflect deposits. JA-1918-20. Martin testified, however, that the partial underreporting occurred during just *two* of the conspiracy's five years: 2014 and 2016. JA-1918-22 (2014); 1925-27 (2016). The government offered no evidence (and never argued) that Dowd underreported income during the other years the conspiracy operated: 2013, 2015, and 2017.

The court instructed jurors that while Dowd was "not on trial" for tax fraud, it could consider underreporting to assess Dowd's "knowledge . . . of the crimes that are charged." JA-1921.

### 3. Dr. Roth and Unproven Ethical Violations

Dr. Roth is an orthopedic surgeon and frequent government witness whom the government paid to review 83 allegedly fraudulent medical files, each hand-selected by the prosecutors. JA-1448. Dowd was not the treating physician for 10 of those files, meaning the government showed Roth just 73 of Dowd's 316 allegedly fraudulent patient files. *Compar*e JA-3153-55, *with* JA-3240-3323.

Dowd objected to Roth's testimony about prohibitions on paying referral fees. JA-1326-32. The court overruled the objection. JA-1331. Roth then testified that, under ethical rules, a surgeon may not "provide any form of compensation in exchange for patient referrals," and that doing so would be a violation of professional rules. JA-1365. Roth noted that the "range of consequences" for violating those rules, "could be having your license censored, revoked, suspended, [or] fines." JA-1365. Roth did not testify about how the professional rules defined a "referral fee," or whether paying administrative fees to a case manager or runner qualified as a "referral" under the professional rules. Nor did Roth testify that Dowd ever paid a referral fee or violated any professional rule.

During Roth's testimony, the court instructed the jury that Dowd was not on trial for a violation of "professional rules" and that Dowd was "only on trial for the crime that's . . . charged in the indictment." JA-1366. The court offered another limiting instruction when the government accused Dowd of ethical violations in closing argument, saying: "Those [ethical] rules are given to you only for the purpose of whether it's helpful on [defendants'] state of knowledge, whether they knew or didn't know what was happening." JA-2880-81.

31

Dowd objected to any jury instruction concerning the ethics rules, arguing that such an instruction would draw undue attention to the improper testimony. Def.'s Opp. to Gov's Charge Request 4, ECF 152. The government proposed an extensive instruction on the medical ethics rules, JA-339-40, and Dowd proposed an alternative instruction as a fallback, JA-2624-25. The court ultimately instructed the jury that it could "consider the testimony on these [medical] ethical rules to the extent you find it sheds light on whether or not Dr. Dowd acted knowingly and with the intent to defraud." JA-2935-98.

Roth also offered his views about what he called "best practices" in orthopedic medicine. Roth testified that "a conservative treatment plan" represented the "best practice for the mechanism of injury of a trip-and-fall." JA-1378. Roth explained that his "conservative plan" generally entailed six to eight weeks of physical therapy before performing surgery. JA-1378.

Roth testified that he tried to avoid surgery, JA-1427-28, based on his beliefs that patients "generally" don't want surgery, and physical therapy provides an opportunity to determine whether they could improve without surgery, JA-1378. Roth contrasted his "conservative"

treatment plan with Dowd's use of surgical "arthroscopy as a diagnostic tool" on certain patients. JA-1485. Roth agreed that diagnostic arthroscopy was "exceptionally safe" and a minimally invasive way of determining whether abnormalities exist, and to repair them. JA-1360. But given other diagnostic techniques available, Roth testified "that is not what is done today" under "best practices." JA-1485.

### C. Closing Argument and Verdict

The central questions in this case were whether Dowd (1) willfully participated in a scheme to defraud, with (2) knowledge of "its fraudulent nature" and "general scope and purpose." JA-2919, JA-2929. Over Dowd's objection, the court allowed the government to proceed on a theory not that he actually knew about the fraud, but that he "consciously avoided" learning of it. JA-2964. It instructed the jury that, if it found that Dowd "was aware of a high probability that a crime was being committed, and that [Dowd] took deliberate actions to avoid confirming this fact, such as by purposely closing his eyes to it or intentionally failing to investigate," then the jury could treat that "as the equivalent of knowledge." JA-2946.

The testimony that Dowd sought to exclude featured prominently in the government's closing. For instance, the government finished its closing argument by hearkening to Arce's testimony, urging the jury to "think of the red flags," the "bright red flags" indicating guilt. JA-2700. As to Dowd's taxes, the government argued:

> The only point of that is that Dr. Dowd, he hid, he hid over a million dollars of dirty money that he got from this scam. That's the point. He hid it. And he hid that because he knew he was perpetrating a fraud.

JA-2881-82. And as for ethical rules, the government argued that the fact that the fraudulent patients were a tiny part of Dowd's "monster practice" was irrelevant because he had every reason to focus on patients obtained by violating his ethical duties and risking his license. JA-2880-81.

The jury convicted Dowd and Constantine on all counts.

## III. SENTENCING AND POST-TRIAL MOTIONS

After denying Dowd's Rule 29 Motion for Acquittal, JA-3025, the court sentenced Dowd to 102 months of imprisonment. Recognizing that Dowd poses no threat to the public, however, the court subsequently granted Dowd's motion for bail pending appeal. JA-3105. In doing so, it

recognized that, in the event the court's rulings were "determined to have been incorrect, an appellate court could find that the cumulative effect of those errors was to improperly influence the jury as to an essential element of the offense—the defendant's knowledge that the scheme was fraudulent—and could thus warrant reversal or a new trial for one or both defendants." JA-3107.

## SUMMARY OF ARGUMENT

Dowd was indicted just six weeks after the district court had "made it clear" that it wanted the government to "pursu[e] the corrupt lawyers, the corrupt doctors," identified in *Duncan*. At the government's suggestion, the case was immediately reassigned, and the court that had "urge[d]" Dowd's investigation presided over his prosecution, meanwhile declaring—while Dowd awaited trial—that his conduct "boggle[d] the mind" and offered "a frightening insight into human nature." Under these circumstances, the district court abused its discretion in denying recusal.

The district court also relied on *Duncan* in erroneously denying Dowd's motion for a bill of particulars, suggesting that the *Duncan* trial (of non-doctors) provided Dowd with sufficient information to defend

35

against the allegation that he had performed "medically unnecessary" surgeries. It did not, and the government capitalized on the resulting ambiguity by presenting an ever-shifting, now-you-see-it-now-you-don't set of allegedly fraudulent plaintiffs: The government tallied 316 of Dowd's patients on one list, but cooperating Conspirators explained that some were "legitimate"; the government showed its medical expert a list of 83 patients, but Dowd never treated 10 of them; the government offered five of Dowd's patients to testify, but four had *actual knee injuries* and Dowd properly diagnosed the fifth with a degenerative injury, not trauma; finally, the government identified 62 fraudulent plaintiffs in Dowd's PSR and then sought restitution based on 55 patients (none of whom testified at trial). Placing the burden on Dowd to prove the "necessity" of his medical treatment—having no idea which patients among hundreds would be at issue—was fundamentally prejudicial and requires reversal.

Unlike the nine Conspirators—including Dowd's co-Defendant, Constantine—Dowd was convicted based on circumstantial evidence alone. Three portions of that circumstantial evidence were highly improper and affected Dowd's substantial rights: (1) purported lay

testimony from a professional fraud investigator who opined on the ultimate question by identifying "red flags" indicating fraud; (2) evidence suggesting Dowd was a part-time tax cheat; and (3) evidence of uncharged and unproven professional ethics violations.

## STANDARD OF REVIEW

A district court's denial of a recusal motion is reviewed for abuse of discretion. *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992). A district court necessarily abuses its discretion when "its decision rests on an error of law . . . or a clearly erroneous factual finding." *United States v. Kaplan*, 490 F.3d 110, 118 (2d Cir. 2007) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)). An improper failure to recuse is a structural error not amenable to harmless error review. *See Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

The denial of a bill of particulars is reviewed for abuse of discretion. *United States v. Bortnovsky*, 820 F.2d 572, 573 (2d Cir. 1987). The court need not order a bill of particulars when the information sought is provided "in the indictment or in some acceptable alternate form," but a court abuses its discretion when the "failure to compel the Government

to reveal crucial information" hinders the defense's preparation for trial or improperly imposes a burden of proof on the defendant. *Id.* at 574-75.

Challenges to evidentiary rulings are reviewed for abuse of discretion, and must be reversed if "manifestly erroneous" or resting on legal error. *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015). "An error in the admission of evidence may be deemed harmless only if it is highly probable that the error did not contribute to the verdict." *United States v. Scott*, 677 F.3d 72, 85 (2d Cir. 2012) (quoting *United States v. Jean-Baptiste*, 166 F.3d 102, 108 (2d Cir. 1999)).

## ARGUMENT

## I.   THE DISTRICT COURT ERRED IN DENYING RECUSAL

The district court abused its discretion in denying Dowd's recusal motion. The federal recusal statute, 28 U.S.C. § 455(a), requires recusal to avoid even the *appearance* of judicial bias. Thus, while opinions formed "in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible," *Liteky v. United States*, 510 U.S. 540, 555 (1994), recusal is still appropriate where a district court could reasonably be perceived as

having expressed a desire to see a particular outcome as to a specific defendant, *see Lovaglia*, 954 F.2d at 815 ("Recusal is appropriate when a judge expresses a personal bias concerning the outcome of the case at issue."). The court improperly denied Dowd's recusal motion for at least three reasons.

*First*, the court's comments created the appearance of impropriety by impermissibly blending the judicial and prosecutorial roles. The court was not adjudicating any active case or controversy when it "made it clear to the government during the trial and at other proceedings" its "hope" "that the government is pursuing . . . the corrupt doctors who were involved in this scheme," JA-183-84, or when the court "urge[d] the government to continue their investigation" into the "doctors," JA-158. There were no doctors—much less "corrupt doctors"—then before the court. To a reasonable observer, the court's comments expressed a desire, even a *directive*, for *future* conduct by a coordinate branch of government: the investigation and prosecution of individuals, including Dowd.[4] *See*

---

[4] There is no dispute that the court's comments referred to Dowd, as they were made in response to testimony offered during the *Duncan* trial, wherein Kalkanis singled out Dowd and Ribeiro for purportedly knowing involvement in staged trip-and-fall accidents. *See* Def's Reply in Supp. of Recusal Mot. 2, ECF 103.

*United States v. Antar*, 53 F.3d 568, 578 (3d Cir. 1995) (requiring recusal where district judge expressed desire for particular "goal" in a criminal case).

The judicial role consists of neutrally adjudicating controversies that parties bring before the court. As the Supreme Court has explained: "Having been a part of [the accusatory] process a judge cannot be, *in the very nature of things*, wholly disinterested in the conviction or acquittal of those accused." *In re Murchison*, 349 U.S. 133, 137 (1955) (emphasis added); *see also Donziger v. United States*, 143 S. Ct. 868, 868-69 (2023) (Gorsuch, J., dissenting from denial of cert.); *cf. United States v. Donziger*, 38 F.4th 290, 315 (2d Cir. 2022) (Menashi, J., dissenting) (opining that "the district court went beyond reviewing the executive branch's decision about instituting a prosecution" when it "appointed a prosecutor and instituted the prosecution itself").

It is no comfort that the court added as an afterthought, "I'm not the prosecutor, I'm the judge." JA-3022. To a reasonable observer, the only reason to reiterate that self-evident fact was to underscore the seriousness of a statement directed to another branch of government. A reasonable person would conclude that a judge who feels strongly enough

40

to seek to influence decisions concededly outside his purview may not be able to set aside his feelings about the case. *See In re Murchison*, 349 U.S. at 137. Such a conclusion would appear all the more reasonable after the court declared that Dowd's actions were "corrupt," JA-184, "boggle[d] the mind," and provided a "frightening insight into human nature"—long before Dowd ever stood trial, JA-221-22.

*Second*, timing reinforces the appearance of impropriety. Within six weeks of the court "urg[ing]" the government to pursue "corrupt" doctors like Dowd, the government made that "hope" a reality by indicting Dowd. When the case was randomly assigned to another judge, the government promptly suggested reassignment to the judge who had "urge[d]" further action. To a reasonable observer, that timeline indicates that the court either influenced the prosecutor's decision, or the prosecutor sought out the court that had "urged" Dowd's prosecution, or both. *Cf. Francolino v. Kuhlman*, 365 F.3d 137, 140 (2d Cir. 2004) (noting that "the practice of judge-shopping used in [New York County] raises serious concerns about the appearance of partiality").

*Third*, the district court's expression of its "hope," JA-183, and "urg[ing]," JA-158, that the prosecutors conduct further investigations

41

into the "lawyers and the doctors," JA-122, exceeded the legitimate scope of any then-pending matter before the court. While it is true that "judges are often called upon to sentence one or more co-defendants while others are still awaiting trial," *United States v. Wedd*, 993 F.3d 104, 117 (2d Cir. 2021), neither the court nor the government cited any authority extending that rule to situations where the court "urg[ed]" action regarding *unindicted non-parties*—and then reached out to preside over their prosecution. Under these circumstances, the court abused its discretion by refusing to recuse. *See Kaplan*, 490 F.3d at 118.

## II. THE DISTRICT COURT'S REFUSAL TO ORDER A BILL OF PARTICULARS PREJUDICED DOWD'S DEFENSE

Under Criminal Rule of Procedure 7(f), a bill of particulars "is appropriate to permit a defendant to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)). A bill of particulars is often warranted in document-heavy conspiracy cases, where the government has not identified which particular transactions it seeks to prove were illegal. *See Bortnovsky*, 820

42

F.2d at 574-75 (bill of particulars necessary where burden of proof "impermissibly was shifted" to defendants because "defense counsel . . . were left unguided as to which documents would be proven falsified").[5]

## A. The District Court Erred in Denying a Bill of Particulars

This case presents the precise problem that a bill of particulars is intended to remedy. Dowd's practice had ten offices across New York, JA-1336, JA-3115, JA-1341, JA-3108; *see* JA-2211-12, and he treated *thousands* of patients over the conspiracy's half-decade. Dowd's income from the alleged scheme was approximately 17% of his revenue during this period. JA-2984. Dowd thus had legitimate defenses that the patients he treated from Kalkanis's scheme (1) were in need of medical attention; and/or (2) represented such a tiny fraction of his patients that he would not have noticed the "patterns" or "red flags" in patient files

---

[5] *See also United States v. Rajaratnam*, No. 09-CR-1184, 2010 WL 2788168, *3 (S.D.N.Y. July 13, 2010) (bill of particulars required for "complex" insider trading conspiracy case); *United States v. Savin*, No. 00-CR-45, 2001 WL 243533, *3 (S.D.N.Y. Mar. 7, 2001) (requiring government to disclose witness lists and details of alleged fraudulent transactions); *United States v. Nachamie*, 91 F.Supp.2d 565, 571-72 (S.D.N.Y. 2000) (bill of particulars required where government had "not yet informed the defendants which of the [submitted Medicare] claims were false and in what way they were false").

that the government later identified. The court's denial of a bill of particulars materially affected Dowd's ability to present those defenses, improperly placing the burden on Dowd to prove a negative—that his medical treatment was "necessary"—rather than requiring the government to demonstrate fraud.

This Court will reverse when the refusal to order a bill of particulars prejudiced the defendant's ability to prepare a defense or improperly shifted the burden to the defendant. *See Bortnovsky*, 820 F.2d at 574-75. In *Bortnovsky*, this Court reversed when the district court denied a bill of particulars after the government identified 15 alleged burglaries but refused to specify which were fraudulently reported as insurance claims. *Id.* Likewise in *Cefalu v. United States*, the Tenth Circuit reversed a conviction for jury tampering when the "indictment failed to give the name or other identity of the single juror influenced, intimidated, or impeded," out of a pool of 100 potential jurors. 234 F.2d 522, 524 (10th Cir. 1956).

Reversal follows *a fortiori* from *Bortnovsky*. Just as Dowd was accused of treating fake injuries from fake accidents to support fake lawsuits, the defendants in *Bortnovsky* were charged with staging fake

44

burglaries to submit fake insurance claims. 820 F.3d at 574. While the government's theory of fraud encompassed 15 burglaries in *Bortnovsky*, here it involved more than *300 patients*. *Id.* at 574-75; *see Cefalu*, 234 F.2d at 524 (jury-interference allegation for 100-person venire required bill of particulars). Just as the government failed to distinguish between the real and fraudulent burglaries in *Bortnovsky*, it likewise failed to distinguish between the "legitimate" and "fraudulent" patients Dowd saw. 820 F.3d at 574-75. Accordingly, in *Bortnovsky*, as here, the defendants "were forced to establish their innocence by proving that eight of the [insurance claims] put before the jury, which even the Government was uncertain were fake, actually occurred." *Id.* at 574.

The scope of Dowd's alleged fraud was an ever-changing target, effectively shifting the burden to him to prove the legitimacy of his medical practice. *See id.* The indictment identified just two fraudulent patients: one who was never treated by Dowd and the other who did not testify at trial and whose records the government never showed to its expert. JA-41, JA-68; JA-3153-55. Before trial, the government produced interview notes of just 15 patients, while simultaneously alleging a conspiracy involving hundreds. Def.'s Mot. for Bill of Particulars 4, ECF

68. Then, at trial, the government introduced a spreadsheet of 316 Dowd patients with Kalkanis connections. JA-3240-3323. Yet both Kalkanis and Gordon acknowledged that some unidentified individuals among those 316 patients were "legitimate." *E.g.*, JA-1041-42. Compounding the confusion, legitimate patients went through the *exact same* process as the fraudulent ones. JA-968-70. And the government *never identified* which patients fell into which category.

From the universe of 316 patients (some admittedly "legitimate"), the evidence showed that Dowd performed surgery on approximately 274. *See supra* at 22-23. The government then cherry-picked from that list to select 83 patient files for its expert to review (without explaining why it chose those files). JA-1448. (Curiously, 10 of the 83 were not even Dowd patients.) But it called just *five* of Dowd's patients to testify.

Meanwhile, the government elicited testimony of vague purported red flags, including that two or three of Constantine's (unidentified) clients used drugs or alcohol. JA-1977. Throughout trial, the government asserted that Dowd saw "carloads of [Kalkanis] patients" week-in and week-out. JA-433-34, JA-2879-80. The court similarly rested its Rule 29 opinion on the finding that Dowd performed "*hundreds*

of unnecessary surgeries," without naming a *single patient* who received such a surgery. JA-3027 (emphasis added). And after trial, the government illustrated its arbitrary selection of patients by seeking restitution for a different set of 55 individuals. *See* Restitution Order, ECF 287. Without a bill of particulars, Dowd was required to defend against an ever-shifting—but always large—group of patients to prove his innocence.

The district court justified its denial of a bill of particulars, in part, by noting that Dowd had evidence from the *Duncan* trial to help prepare his defense. JA-99-100. But the *Duncan* record only accentuates the ambiguity. There, Kalkanis testified that he had approximately 300 cases and "as high as" 80% of the cases were fraudulent. *Duncan* Tr.1222. Under questioning from the court, Kalkanis then said "a majority" of the cases was fraudulent. *Duncan* Tr.1222. The record indicates that testimony was based on a binder of just 40 patient-intake forms. *Duncan* Tr.1026.

In one defendant's PSR, the government inflated the fraudulent plaintiff number to 400, a figure that a judge of this Court could not confirm, and for which the government could not provide support.

47

*Rainford*, Oral Arg. at 41:42-42:53 (May 1, 2023). Moreover, the government conceded that it had included at least one non-fraudulent settlement in its restitution calculation. *Rainford*, U.S. Br. at 68. Dowd should not have been required to pick through the convoluted *Duncan* record when even the government cannot accurately identify which patients were involved in the charged conspiracy.

## B. Dowd Was Prejudiced by Denial

As a doctor, Dowd was uniquely prejudiced by the district court's error. The district court (and the government) repeatedly used the word "fake" to describe any patient that Kalkanis sent to Dowd, including both (1) patients who were not injured but lied to Dowd about being injured, and (2) patients who *were* injured but who lied about the location or cause of their injury. JA-3019-22. The distinction was important for Dowd: If a patient came to him with a meniscus tear, the accident location was immaterial, as Dowd's job was to treat patients, not file lawsuits. Three features of the trial further illustrate the prejudice of the denial of a bill of particulars.

*First*, among the 10 defendants, Dowd is the only one for whom the government provided no direct evidence showing knowledge of *any*

48

staged accident. In contrast, for defendants like Constantine, whose emails and texts (and co-conspirator testimony) evinced a clear intent to join and participate in the fraudulent slip-and-fall scheme, the difference between a fake injury and a fake accident site was immaterial; they both yielded fraudulent lawsuits. *E.g.*, JA-2076. Yet despite the government's extensive investigation into a half-decade-long conspiracy, it could not muster any equivalent evidence as to Dowd; Dowd's conviction rested on circumstantial evidence *alone*.

*Second*, without a bill of particulars identifying Dowd's allegedly "fake" patients, the court impermissibly permitted the government to blur the line between disputed medical judgments and criminal liability. The Indictment rested on allegations of "medically unnecessary" surgeries, JA-68-87, and therefore depended on an individualized determination of whether a procedure was "medically necessary" for a *specific* patient. But the lone Dowd patient referenced in the Indictment did not testify, and the government did not even show that patient's medical record to its expert. JA-3153-55.

The five Dowd patients who *actually* testified lied to Dowd about their injuries, including their symptoms and their pain levels. JA-685-

49

86.  Four of those five patients had legitimate soft-tissue injuries that the post-surgical reports demonstrated were not "fake" at all.  *Supra* at 23-24.  And for the one uninjured patient who testified (Norwood), Dowd diagnosed her with a degenerative condition that *reduced* the potential value of any lawsuit, JA-1391, JA-1493; even the *government's* medical expert did not disagree with that diagnosis.  JA-1492-94.

Moreover, while Roth opined that Dowd was *generally* too quick to perform surgery, JA-1377-78, the number of days between initial visits and surgeries varied greatly between individual patients, JA-3240-3323.  And while Roth opined that it is *generally* "best practice" to pursue a conservative approach and order months of physical therapy before surgery, JA-1377-78, he described the arthroscopic surgeries Dowd performed as "elective" procedures that patients experiencing pain could legitimately decide to have without waiting, JA-1601; *see* JA-2482, JA-2513.

In short, the "necessity" of medical treatment turns on highly individualized determinations, including the patients' own desires and risk tolerance.  By refusing to order a bill of particulars, the district court forced Dowd to defend against the generalities of Roth's "best practices"

opinions rather than specific allegations concerning specific individuals whose treatment fell so far outside accepted medical practice that the jury could infer criminal intent. *Cf. Ruan v. United States*, 142 S. Ct. 2370, 2375 (2022) (emphasizing requirement of subjective knowledge of wrongdoing when prosecuting doctors for unlawfully prescribing opioids).

*Finally*, the district court's "conscious avoidance" instruction exacerbated the prejudice of the government's vague theory of liability. In finding the evidence sufficient to establish Dowd's guilt, the court cited testimony that the patients arrived by the "carload," and that some smelled of marijuana or alcohol. JA-3029. But there is no evidence that Dowd—who saw an enormous volume of patients in his ten offices—was aware of those facts. In fact, *neither Kalkanis nor Gordon* could remember which plaintiffs were real and which were fraudulent. JA-877, JA-885, JA-2122. Without a bill of particulars to identify those patients, Dowd was improperly required to shoulder the burden of proving that his treatment of *all* those patients were legitimate.

## III. THE DISTRICT COURT IMPROPERLY ALLOWED INADMISSIBLE EVIDENCE AND ITS ERRORS WERE NOT HARMLESS

The district court abused its discretion in admitting three types of prejudicial evidence that drove at the "heart of a critical issue": Whether Dowd knew his patients had staged their accidents and were lying to him about their injuries. *See United States v. Forrester*, 60 F.3d 52, 64-65 (2d Cir. 1995).

Because the government sought to prove Dowd's knowledge exclusively through circumstantial evidence, including disputes over "medical necessity," the risk of that prejudicial evidence "substantially influenc[ing] the jury" was acute. *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008); *see United States v. Gilan*, 967 F.2d 776, 782 (2d Cir. 1992) (where "[t]here was no direct evidence of [defendant's] knowledge," the challenged evidence "would certainly have figured prominently in the jury's consideration of the issue"); *United States v. Garcia*, 291 F.3d 127, 145 (2d Cir. 2002) (finding error was not harmless because the remainder of the evidence was "largely circumstantial and not so overwhelming").

None of the court's errors was harmless; each independently warrants reversal.

## A. The Court Erroneously Permitted Lay Testimony from a Professional Insurance-Fraud Investigator

Arce's testimony was improper in three ways. First, she offered improper lay testimony concerning the specialized work of insurance-fraud investigations and the "red flags" she looks for when investigating such fraud. Second, she *applied* her expert experience in this case, opining that those "red flags" appeared in Constantine's cases (five of which included Dowd), which would be improper testimony even from an expert. Third, she relied on hearsay documents from Travelers claim files to reach her opinions. Arce's testimony—which directly related to the ultimate question of Dowd's criminal liability—was highly prejudicial.

### 1. Arce Exceeded the Scope of Proper Lay Testimony

**Improper lay testimony.** Arce's testimony depended on her decades of experience as a professional fraud investigator, and it far exceeded the scope of proper lay testimony. Because the government failed to disclose or qualify Arce as an expert, her testimony violated Rule 701(c), which "prevent[s] a party from conflating expert and lay opinion

53

testimony" and "thereby conferring an aura of expertise on a witness without satisfying" Rule 702 or Federal Rule of Criminal Procedure 16. *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005); *see* Fed. R. Evid. 701, advisory committee's note to 2000 Amendment (explaining Rule 701 precludes lay witnesses from expressing opinions resting in any way on specialized knowledge).

Lay testimony based on specialized professional experience violates Rule 701(c) because it is not based on the witness's perceptions or first-hand knowledge. *See United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013) (lay testimony of Customs and Border Protection officer improper because "based on knowledge . . . acquired inspecting other cars at the border"); *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (bank employee's lay testimony regarding fraudulent transactions improper when "based on [his] experience and specialized knowledge in international banking"); *United States v. Cabrera*, 13 F.4th 140, 150 (2d Cir. 2021) (officer's lay testimony that defendant was "more experienced than your average drug dealer" improper because it "drew upon his special knowledge and experience as a DEA detective"). Indeed, testimony concerning the work and practices of fraud investigators or law

54

enforcement agents is ordinarily admitted if witnesses have been qualified as "experts."[6] Arce should have been treated no differently.

On the stand, the government inquired about Arce's 25 years of experience in fraud investigations, and her testimony rested on that experience. JA-1066-69, JA-1077-78. The government asked questions like, "What is insurance?," JA-1067-68, and elicited detailed testimony about the claims process, independent medical review of claimed injuries, the litigation process, and the "business decision[s]" insurers make in settling claims, JA-1075-79. None of that information is within the ken of a lay person; if it were, Arce would not have needed to explain it to the jury. *See Cabrera*, 13 F.4th at 150 (information a "lay person is unfamiliar with" is province of expert witnesses).

Arce also testified about how to differentiate fraudulent claims from "legitima[te]" ones: By identifying various "red flags" and "pattern[s]" that she believed—based on her years of experience—indicated that a claim is fraudulent. JA-1079-80, JA-1122. These flags included

---

[6] *See, e.g.*, *United States v. Cruz*, 363 F.3d 187, 192-93 (2d Cir. 2004) (discussing application of Fed. R. Evid. 702 to law enforcement officials); *United States v. Scop*, 846 F.2d 135, 138 (2d Cir. 1988) (SEC investigator testified as expert witness).

"unwitnessed accidents, late reporting, no medical treatment at the loss scene, no incident report to the insured, questionable medical records or incomplete medical records." JA-1080. Discerning those sorts of patterns can come *only* from years of experience in the insurance industry and cannot be equated to "lay" knowledge. *See Bank of China*, 359 F.3d at 182 (requiring exclusion of evidence "reflect[ing] specialized knowledge because [witness] has extensive experience" in industry).

Though Arce has no medical training, she cautioned the jury to be suspicious of surgery not preceded by conservative treatment like physical therapy, chiropractic therapy, or acupuncture. JA-1076. Arce then declared, "[i]f there is no MRI report, then there is no justification for the surgery." JA-1077. Neither the court nor the government provided any basis to find that Arce was qualified to testify on the medical propriety of procedures.

**Ultimate Issue.** Even if Arce had been qualified as an expert, her testimony improperly told the jury "what inferences to draw from" the evidence. *Garcia*, 413 F.3d at 214 (citation omitted). After informing the jury about the "red flags" associated with "slip-and-fall" accidents, JA-1080, Arce then testified that *Constantine's claims* bore those "red flags,"

56

JA-1086. In other words, Arce applied her expertise in fraud investigations to opine on the ultimate question *in this case*: whether there was sufficient indicia of fraud. *See United States v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988) (experts may not "offer opinions embodying legal conclusions").

Expert testimony may be permissible in certain fraud cases, such as where the expert helps the jury explain the complexities of Medicare fraud, *United States v. Galatis*, 849 F.3d 455, 462 (1st Cir. 2017), or other financial fraud schemes, *United States v. Tolliver*, 451 F. App'x 97, 104 (3d Cir. 2011). But under no circumstances may a witness—lay or expert—"be someone who comes in and says when people do this [then it] is fraud." *Galatis*, 849 F.3d at 462 (quoting district court). Yet that is precisely what Arce did here.

Indeed, when combined with the court's "conscious avoidance" instruction, identifying "red flags" is nothing less than saying "when people do this [then it] is fraud." *See United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir.2011) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." (quoting *United States v. Nektalov*, 461 F.3d 309, 316-17 (2d Cir. 2006)).

Under the court's conscious avoidance instruction, the jury was permitted to convict even if Dowd lacked actual knowledge of the scheme but "was aware of a high probability that a crime was being committed," and purposely "clos[ed] his eyes to it or intentionally fail[ed] to investigate it." JA-2946. By explicitly identifying "red flags" in Dowd's cases indicating a high probability of fraud, Arce's testimony "was essentially telling the jury that [s]he had concluded that [Dowd] was guilty." *Garcia*, 413 F.3d at 210.

**Improper Hearsay.** Arce's personal knowledge of the scheme was limited to the fact that: (1) Travelers investigated Constantine's lawsuits, and (2) Travelers referred the claims to law enforcement, leading to this prosecution. The defendants offered to stipulate to those facts, but the government refused. JA-331-333. The remainder of Arce's testimony relied on hearsay, including claims reports, medical reports, and second-hand analysis from Travelers "claims handlers," JA-1075-77, a feature that renders her opinion independently improper and further underscores the expert nature of her testimony. While an expert witness may rely on hearsay in some circumstances, *see United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003), a lay witness emphatically may

not, Fed. R. Evid. 802. The court's allowance of that testimony demonstrates that Arce testified as an expert, not a lay witness.

### 2. The Error Was Not Harmless

Arce's opinion as to the claim "red flags" amounted to a conclusion on a dispositive issue here: Whether Dowd knew or *consciously avoided* knowing that some of his clients staged the trip-and-falls. *See Forrester*, 60 F.3d at 64-65 ("error going 'to the heart' of a critical issue is less likely to be harmless") (citation omitted)).

Arce, who detailed her decades of experience, JA-1066-67, "was presented to the jury with an aura of expertise and authority which increased the risk that the jury would be swayed by [her] testimony, rather than rely on its own interpretation" of the evidence. *Grinage*, 390 F.3d 746, 751 (2d Cir. 2004). Accordingly, her testimony on the ultimate issue of whether Dowd ignored probable fraud based on the presence of "red flags" bolstered the government's case and may well have provided the basis for the jury's verdict. *See Satterwhite v. Texas*, 486 U.S. 249, 260 (1988) (finding that a psychiatrist's testimony was not harmless in part due to apparent credibility of the expert's qualifications).

The court's instruction on one occasion that the jury "disregard" Arce's testimony that "there were red flags on [Constantine's] claims," JA-1087, does not cure the prejudicial effect of that testimony. The instruction was ineffective given that Arce's testimony also noted facts that she had *previously* identified as "red flags," JA-1085-87, JA-1080, during testimony which the court had *not* struck. Moreover, the thrust of Arce's testimony was "all about red flags," JA-1094, even when she used less inflammatory language. And the Court provided no limiting instruction when Arce testified generally about "red flags in the insurance industry," JA-1080, which is precisely the kind of expert opinion about the complexities of an unfamiliar industry that lay jurors would be inclined to trust.

Importantly, Arce labelled aspects of claims of which Dowd had no knowledge as "red flags." According to Arce, the "red flags" included things like unwitnessed accidents, accidents that were reported late, or where no incident report was made to the insured. JA-1080. Dowd, as a surgeon, had no cause to ask about, let alone know details about accidents that were irrelevant to treatment.

60

Arce's two days of testimony played a prominent role at trial. *Cf. United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (placement of inadmissible evidence relevant in assessing harmlessness). The government emphasized Arce's testimony in closing argument, where it recited Arce's list of "red flags," and said Dowd's patients raised those "red flags." JA-2689; *see United States v. Jean-Baptiste*, 166 F.3d 102, 109 (2d Cir. 1999) (government's emphasis on inadmissible evidence in closing arguments cut against harmlessness). Moreover, on rebuttal, the government repeated Arce's favored term, accusing Dowd of ignoring the "bright red flags" indicating the cases were fraudulent. JA-2700. No jury instruction could cure that prejudice, which was particularly unfair as to Dowd, who was involved in only five of Constantine's 41 cases with Travelers.

## B. The District Court Erroneously Admitted Evidence Dowd Underreported *Some* Income

The district court misapplied Federal Rule of Evidence 404(b) by admitting evidence that Dowd intermittently underreported a fraction of his income from Kalkanis, without concealing the source of his income.

### 1. Dowd's Tax Returns Did Not Conceal the Source of his Income

To determine whether a district court properly admitted "other act" evidence under Rule 404(b), "the reviewing court considers whether (1) [the evidence] was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004) (citation omitted). The tax evidence flunks that test.

*First*, evidence of Dowd's intermittent underreporting of a portion of his income was not offered for any proper purpose. In overruling Dowd's objections, the district court noted that "[i]t's quite common in fraud cases" to offer evidence of a failure to pay income taxes as evidence of involvement in a criminal scheme. JA-365-66. But the court's broad statement failed to acknowledge the limitations of the cases it relied upon. Courts permit evidence of a defendant's failure to report *all* money from a specific source (or failure to file any returns), because it suggests the defendant's knowledge that the *income source* was illicit. *See, e.g.*, *United States v. Atuana*, 816 F. App'x 592, 595 (2d Cir. 2020) (discussing

62

failure to file any tax returns for companies probative of whether businesses were legitimate); *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) (failing to report any money probative of defendant's belief in legitimacy of income source).

The logic of that rule simply does not extend to Dowd's failure to report *some* surgical income in *some* years. Rather, when an individual fails to report *some* but not all of the income from "a single source," courts recognize that "[t]here is no logical connection or inference between knowledge that income is fraudulent and the decision to report only some of it for tax purposes." *United States v. Babichenko*, No. 18-CR-258, 2022 WL 596728, at *2 (D. Idaho Feb. 28, 2022). "Indeed, the only inference that arises is that defendants did not pay taxes on some of their income," suggesting only a proclivity for criminal behavior. *Id.*; *see United States v. Martin*, 796 F.3d 1101, 1106 (9th Cir. 2015) (reversing based on introduction of prior tax audit and "emphasiz[ing] that the government must prove a logical connection between the knowledge gained as a result of the commission of the prior act and the knowledge at issue in the charged act").

63

On this record, it is unclear how Dowd could have expected to hide his relationship with litigation funders by underreporting a small portion of his surgical income during even-numbered years, particularly when Dowd *included his supposedly unethical payments to Kalkanis as expenses on his tax returns*. JA-1922. Even the underreported income was deposited in or cashed through Dowd's own "easy to track" accounts, JA-2380, and it is undisputed that Dowd gave his accountant the year-end records he had for those accounts. How exactly Dowd was supposed to be hiding a fraudulent income stream in this way is anyone's guess.

Without any proper purpose, there is a grave risk that the jury considered this evidence "to demonstrate criminal propensity." *LaFlam*, 369 F.3d at 156. As the Ninth Circuit explained in an analogous context, "[t]here is a substantial probability that the jury took this evidence as proof that [defendant] is a liar who does not want to pay taxes and will cheat to avoid them—a theme the government emphasized at closing, and a line of thinking the evidence rules are meant to discourage." *Martin*, 796 F.3d at 1106. Such evidence inevitably dirtied up Dowd, causing prejudice without any countervailing probative value.

64

There can be no question that evidence of alleged tax evasion is severely prejudicial. *See United States v. Litwok*, 678 F.3d 208, 217 (2d Cir. 2012) (evidence regarding tax evasion was prejudicial because it permitted government to describe defendant as "a cheat, a liar, and a thief" who "had a propensity to engage in fraudulent activity"); *United States v. Shellef*, 507 F.3d 82, 101 (2d Cir. 2007) (overturning conviction where jury may have considered evidence of tax fraud "as an indication of [defendant's] general mendacity"). Thus, even if Dowd's tax underpayment had some limited probative value, that value was plainly outweighed by its prejudicial effect.

## 2.  The Improper Tax Evidence Was Not Harmless

The evidence of Dowd's tax underreporting was not harmless; it was a focal point at trial. *United States v. Cummings*, 858 F.3d 763, 778 (2d Cir. 2017) ("Unquestionably, when determining whether the erroneous admission of evidence was harmless, we consider the centrality of that evidence at trial and the number and frequency of references to the wrongly admitted evidence.").

The government called two witnesses to testify about Dowd's finances and taxes: Robert Martin, Dowd's accountant, JA-1911; and

65

Darren Jones, an FBI forensic accountant, JA-2343. The government then highlighted the tax issue in its closing, JA-2683-84, and *returned* to Dowd's tax returns during its rebuttal, emphasizing that it was a "simple" proposition to infer *scienter* from them:

> "Dr. Dowd . . . hid over a million dollars of dirty money that he got from this scam. . . . And he did that because he knew he was perpetrating a fraud. That's why he hid that money, plain and simple. He didn't provide the information about that money to his accountant, plain and simple.

JA-2882; *see also* JA-2684; *see Hynes v. Coughlin*, 79 F.3d 285, 291 (2d Cir. 1996) ("Another barometer [for the importance of wrongly admitted Rule 404(b) evidence] is whether or not the evidence was emphasized in arguments to the jury.").

The Court's limiting instruction did not cure the prejudicial effect of the tax evidence. JA-1921. The court instructed that the jury could consider the tax returns to show "the knowledge or lack of knowledge of the crimes that are charged," thereby suggesting to the jury that evidence of intermittently underreporting a portion of the income from litigation funding companies was somehow probative of Dowd's knowledge of a fraudulent slip-and-fall scheme. *Id.*

66

Such an instruction invited the jury to conflate any errors in Dowd's tax returns with criminal knowledge that the payments were derived from fraud. *See Litwok*, 678 F.3d at 212-13 (reversing conviction based on improper joinder even though district court instructed "jury that it could consider that evidence solely to determine [defendant's] intent"). That risk was grave because, throughout trial, the jury heard that the convicted Conspirators—Kalkanis, JA-2015, JA-2174-75, and Gordon, JA-829—*also* underreported or did not report income, suggesting that the failure to report taxable income was a hallmark of criminals who commit fraud.

## C. The Court Erroneously Permitted Expert Testimony Concerning Unproven Ethical Violations

The court impermissibly allowed Roth to testify about medical ethics rules prohibiting referral fees; it then permitted the government to declare that Dowd violated those rules without any support from the New York Medical Board entrusted with making those findings. This was yet another prejudicial error that cast shadows on Dowd's character without demonstrating anything about his knowledge of the staged accidents in this case.

### 1. Testimony Suggesting an Unproven Violation of Medical Ethics Is Not Probative, but Highly Prejudicial

Evidence is relevant when it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Even relevant evidence should be excluded when "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In admitting evidence, "the district court must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value." *United States v. Scott*, 677 F.3d 72, 84 (2d Cir. 2012) (quoting *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998)). Three aspects of the ethics testimony demonstrate that it was both irrelevant and highly prejudicial.

*First*, the government did *not* prove that Dowd's payments to Kalkanis violated any medical ethics rules, and Roth's testimony therefore invited the jury to speculate about unfounded ethical violations. *See O'Rourke v. Eastern Airlines, Inc.*, 730 F.2d 842, 855 (2d Cir. 1984) (speculative testimony is irrelevant), *abrogated on other grounds*, *Salve*

68

*Regina College v. Russell*, 499 U.S. 225 (1991); *United States v. Stirling*, 571 F.2d 708, 735 (2d Cir. 1978) (affirming preclusion of speculative testimony regarding whether certain activities were "wrong," "misleading," "proper," or "ethical"). No witness testified that Dowd's payments to Kalkanis violated professional ethics rules. Rather, Roth testified that paying referral fees is a violation of the professional rules governing physicians and that doing so could result in revocation of a doctor's medical license. JA-1365; *see also* JA-2508.[7]

The court, however, never defined a "referral fee." And the line between prohibited referral fees and permissible administrative payments is unclear and often contentious. *See Vine St. Clinic v. HealthLink, Inc.*, 856 N.E.2d 422, 434 (Ill. 2006) ("We agree with HealthLink that the flat fee now in place is for administrative services and not for patient referrals."); *see also State Farm Mut. Auto. Ins. Co. v. Metro Pain Specialists P.C.*, No. 21-CV-5523, 2022 WL 1606523, at *15

---

[7] While Kalkanis stated that he understood Dowd's payments as "basically a referral fee," he also described the payments as being "for the so-called management of the case," JA-2224, and Gordon testified that Kalkanis was paid as a "case manager," JA-771; *see* JA-3148-49 (listing Dowd's payments to Kalkanis as "professional fees"). Kalkanis was not qualified to (nor did he) offer any medical ethics opinion.

(E.D.N.Y. May 20, 2022) (discussing referral fees in context of no-fault licensing requirements under New York law) (appeal pending). The court's instruction that the ethics testimony could be considered for scienter, JA-2880-81, thus assumed without proof that such a violation occurred.

*Second*, the government capitalized on this prejudicial evidence in closing argument, asserting that Dowd's payments to Kalkanis were, in fact, referral fees prohibited by professional rules. But the regulation of professional medical ethics is administered by an independent medical board, *see* N.Y. Pub. Health Law § 230-a (prescribing penalties that may be imposed by the state board for professional misconduct); N.Y. Educ. Law § 6530 (defining misconduct for medical professionals), which made no finding that Dowd violated professional rules on referral fees, *cf. United States v. Akers*, No. 7:19-CR-7, 2019 WL 4934948, at *2 (E.D. Ky. Oct. 7, 2019) (admitting agreed-upon final order between doctor defendant and Kentucky Board of Medical Licensure relating directly to defendant's opioid-prescription practices).

Put simply, the entire premise of the court's implicit finding as to the relevance of this testimony—that Dowd violated ethical rules—was

neither tested nor proven, and it invited the jury to speculate that Dowd committed an ethical violation without anyone besides the prosecutor ever determining that he actually did.

*Third*, even if the government had proven that Dowd paid allegedly improper referral fees under New York rules, the admission of that violation to prove criminal knowledge improperly presumes Dowd *knowingly* committed such violations. The court suggested that testimony concerning professional ethical rules was relevant because it showed Dowd was willing to risk his medical license to participate in the conspiracy. JA-2685-86. That logical leap improperly assumes that Dowd *knew* he was violating ethical rules and did so willfully, a fact that the government did not even *attempt* to prove—and which is inconsistent with his use of checks and reporting the payments on his taxes. The court's ruling therefore provided no room for a negligent or inadvertent violation of professional obligations. *Cf.* JA-3078-79 (Dowd explaining at sentencing his belief that payments to Kalkanis were management fees, not referral fees). It *assumed* a *mens rea* that the government was required to prove beyond a reasonable doubt.

## 2. The Ethics Testimony and Jury Instruction Were Not Harmless

The allegation that Dowd breached his professional obligations is inherently prejudicial, as it suggests a propensity for dishonesty. *See* Fed. R. Evid. 403, 404(b).

Here, the unproven ethical violations were a pillar of the government's case. *See Cummings*, 858 F.3d at 778 (considering "the centrality of that evidence at trial and the number and frequency of references to the wrongly admitted evidence" in harmlessness analysis). The government made Dowd's supposed breach of ethics one of its numbered major points in closing, JA-2684-85, and returned to that theme in rebuttal, arguing that Dowd was "breaching his ethical duties to pay for these clients," "jeopardizing his medical license to pay for this specific group," JA-2880; *see* JA-2883 (arguing Dr. Springer "didn't have the context that Dr. Dowd was breaching his professional duties to pay to get these clients").

The court's instruction to the jury exacerbated the error rather than curing it, creating confusion by stating that evidence of ethical violations *could be* relevant to show knowledge. JA-2936 (instructing jury to "consider the testimony on these [medical] ethical rules *to the*

72

*extent you find it sheds light* on whether or not Dr. Dowd acted knowingly and with the intent to defraud" (emphasis added)); JA-2880-81 ("Those [ethical] rules are given to you only for *the purpose of whether it's helpful* on their state of knowledge, whether they knew or didn't know what was happening." (emphasis added)).  The instruction did not require the jury to conclude that Dowd knew the payments were unethical.  And the instruction presupposed that *all* payments related to medical services are prohibited referral fees, when they are not.

### D. The Weak Evidence Against Dowd Precludes Harmlessness

The evidence improperly admitted at trial was not harmless for three additional, overarching reasons.

*First*, the evidence against Dowd was unquestionably the weakest of all the defendants.  While the district court correctly noted that direct evidence of a conspiracy is "rare" in many cases, JA-3029-30 (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980)), the government offered direct evidence as to the nine Conspirators.  *Supra* at 11, 18-20, 29.  Yet it provided no equivalent evidence regarding Dowd.

Rather, the *direct* evidence in this case demonstrated that the Conspirators used Dowd in their scheme but did not consider him to be a

part of it. After Travelers started investigating Constantine's claims, Kalkanis—Dowd's only material contact within the conspiracy—advised all his fellow Conspirators about the investigation, but "didn't tell Andrew Dowd anything." JA-2228-31. That is compelling proof that the fraud's ringleader understood that Dowd was ignorant of the fraud.

*Second*, the government's weak case against Dowd is particularly obvious when compared to its case against Constantine, who devised the scheme with Kalkanis. Dowd's joint trial with Constantine therefore cast a shadow of guilt-by-association over Dowd and may have guided the jury to its indiscriminate guilty-on-all-counts verdict. *See United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980) (evidence properly admitted against one defendant can be prejudicial to co-defendant). Constantine retained close social ties with the other Conspirators, had known them for years, and shared office space with Kalkanis. JA-2204-05. As the lawyer filing fraudulent cases, Constantine had intimate access to all aspects of the fraudulent claims—all of the "red flags" that Arce had identified to the jury. JA-1086. The government produced no such evidence as to Dowd.

*Third*, Dowd took countless actions contrary to goals of the conspiracy. Several times, when Dowd received a patient with an MRI report noting a tear, Dowd reported no such tear in postsurgical reports; he even reported normal degenerative conditions, which *reduced* the litigation value of the case. *See, e.g.*, JA-1571; *see also* JA-1145-47 (insurers would note degenerative conditions not caused by accident). On many other occasions, Dowd did not perform *any* surgery on the patients that Kalkanis sent to him. JA-2798-99. Similarly, Dowd declined to refer patients to Kalkanis's preferred MRI facility, despite Kalkanis's desire for Dowd to do so. JA-2212-13, JA-2279. And unlike the Conspirators—who dealt in cash—Dowd paid by traceable checks and reported payments to Kalkanis on his taxes.

## CONCLUSION

For these reasons, this Court should reverse Dowd's convictions and vacate his sentence.

July 24, 2023                                  Respectfully submitted,

                                               */s/ John P. Elwood*

Michael K. Krouse                              John P. Elwood
ARNOLD & PORTER                                Kolya D. Glick
  KAYE SCHOLER LLP                   Matthew L. Farley
250 West 55th Street                           ARNOLD & PORTER
New York, NY 10019                               KAYE SCHOLER LLP
(212) 836-8000                                 601 Massachusetts Ave., NW
                                               Washington, DC 20001
                                               (202) 942-5000
                                               john.elwood@arnoldporter.com

    *Counsel for Defendant-Appellant Andrew Dowd*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,996 words in this brief.

*/s/ John P. Elwood*
John P. Elwood

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically on July 24, 2023 and will, therefore, be served electronically upon all counsel.

*/s/ John P. Elwood*
John P. Elwood

# SPECIAL APPENDIX

# SPECIAL APPENDIX INDEX

Opinion [Denying Recusal Motion],
　　Dkt. 202  (Jan. 31, 2023)................................................................. SA1

Excerpts of Motions Hearing Transcript [Denying Motion for Bill
　　of Particulars], Dkt. 71 (June 2, 2022) (Pages 1-2, 12-25) ............. SA7

Judgment in a Criminal Case, Dkt. 250 (Apr. 26, 2023).................. SA23

28 U.S.C. § 455 ................................................................................. SA30

Fed. R. Crim. P. 7 ............................................................................. SA31

Fed. R. Evid. 403 .............................................................................. SA32

Fed. R. Evid. 404 .............................................................................. SA33

Fed. R. Evid. 701 .............................................................................. SA34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 21-CR-530 (SHS) |
| v. | |
| GEORGE CONSTANTINE ET AL., | OPINION |
| Defendants. | |

SIDNEY H. STEIN, U.S. District Judge.

In October 2022, Dr. Andrew Dowd moved to recuse this Court from presiding over the impending trial of this action on the grounds that the court's impartiality might reasonably be questioned under 28 U.S.C. § 455(a). The Court denied that motion on the record during the final pretrial conference on November 17. The trial of Dr. Dowd and George Constantine, Esq., commenced on November 28 and continued through December 16, when the jury returned a guilty verdict against both defendants on counts of conspiring to commit mail fraud and wire fraud, as well as substantive mail fraud and wire fraud counts. This Opinion sets forth in fuller measure the reasons given orally by the Court for denying Dowd's motion to recuse the Court.

## I.    Statement of Facts

Dr. Andrew Dowd is an orthopedic surgeon who has been found by a jury to have participated in an elaborate and extensive fraud scheme. From 2013 to 2018, hundreds of individuals were recruited to serve as "victims" of orchestrated trip-and-fall accidents and obtain millions of dollars in personal injury damages from property owners and their insurance carriers. Five defendants who planned and operated the scheme had been indicted in April 2019 for conspiracy to commit mail and wire fraud. Defendant Peter Kalkanis managed the conspiracy, while defendants Kerry Gordon, Bryan Duncan, Robert Locust, and Ryan Rainford served as "runners" who identified accident sites, recruited patients, transported them to and from medical and legal appointments, and instructed the patients how to fake injuries. Kalkanis and Gordon pleaded guilty before trial, and Duncan, Locust, and Rainford were each found guilty following a trial in May 2019. The evidence at that trial included testimony from Kalkanis that two doctors, Sady Ribeiro and Andrew Dowd, knew full well that many of the patients they treated were involved in staged accidents, and that two lawyers, George Constantine and Marc Elefant, knew the cases they took on were staged. (18-cr-289, ECF Nos. 159, 161, Tr. 1057, 1065-66, 1072, 1212.)

Two years later, in August 2021, the Government indicted another set of five defendants in connection with their participation in the scheme: attorneys George

Constantine and Marc Elefant were indicted for allegedly filing fraudulent lawsuits on behalf of the recruited individuals to obtain personal injury settlements, while loan provider and owner of an MRI facility Dr. Adrian Alexander, Dr. Sady Ribeiro, and Dr. Andrew Dowd were charged with performing unnecessary medical procedures, including surgeries, on the participants in order to inflate the settlement values of the personal injury lawsuits. Defendants Alexander, Ribeiro, and Elefant each pled guilty prior to trial, while defendants Constantine and Dowd were tried last month and, as noted, found guilty by a jury.

Dowd claims that statements made by this Court during the earlier sentencing proceedings of Duncan and Locust as well as during Alexander's plea allocution indicate that the Court is not impartial and should recuse itself. Dowd first notes that during the trial and sentencing of Duncan and Locust, "lawyers for these defendants argued that the runners were at the bottom of the conspiracy ladder, and that the most culpable individuals – the lawyers, doctors, and funders – had gone unpunished." (18-cr-289, ECF No. 86 at 4.) He then points to the Duncan sentencing in January 2020, during which the Court "urge[d] the government to continue their investigation here," because, based on the testimony during the Duncan and Locust trial, "the lawyers and the doctors were heavily involved in this." (18-cr-289, ECF No. 252, 27:12-14.) A year later, at Locust's sentencing in July 2021, defense counsel contended that the "worst people involved in this conspiracy were people who had never, ever been prosecuted." (18-cr-289, ECF No. 368, 15:18-19.) The Court responded by saying:

> I assume, I would hope, and I made it clear to the government during the trial and at other proceedings in this case, that the government is pursuing the corrupt lawyers, the corrupt doctors who were involved in this scheme. That was a theme during the [Duncan and Locust] trial . . . I'm not disagreeing with you, but I'm not a prosecutor, I'm a judge. I would hope the government is following through on a continuing investigation. I don't know whether they are or not.

> (*Id.*, 15:23-16:8.)

Finally, at Dr. Alexander's plea allocution in August 2022, the Court noted, "[t]his is one of those cases that confounds me. Highly educated professionals - doctors, lawyers, others are involved - were involved in a scheme . . . And the funders and the lawyers and the doctors profited normally handsomely, and the patients did not. It's a frightening insight into human nature." (21-cr-530, ECF No. 79, 25:3-6.)

## II.    Discussion

28 U.S.C. § 455(a) states that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Judges generally "determine appearance of impropriety [] not by considering what a straw poll of the only partly informed man-in-the-street would show[,]

2

**SA2**

but by examining the record facts and the law, and then deciding whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988). However, because "[l]itigants are entitled to an unbiased judge; not to a judge of their choosing . . . [a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *Id.* at 1312.

When an opinion expressed by the court is based on testimony and evidence presented at trial, whether that trial concerns the defendant seeking recusal or other defendants in related proceedings, it will only represent grounds for recusal in extremely rare circumstances. The Supreme Court has held that "opinions formed by judges on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir. 1976) ("The rule of law . . . is that what a judge learns in his judicial capacity[,] whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification."). The Second Circuit has declined to require recusal when the judge "had undoubtedly formed opinions about [the defendant's] likely guilt during the course of [a co-conspirator's] trial at which the judge presided[.]" *McMahon v. Hodges*, 382 F.3d 284, 290 (2d Cir. 2004). And "[a] judge's comments during a proceeding that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008) (internal citation omitted).

The Second Circuit recently applied this standard in *United States v. Wedd*, 993 F.3d 104, 115 (2d Cir. 2021). Following the conviction at trial of a co-defendant of Wedd's, the district judge stated to counsel regarding that co-defendant's impending sentencing: "if I were to rank people in terms of their levels of culpability, [the co-defendant] would be at the very bottom of all of these defendants, including [two other co-defendants], and far below Mr. Wedd." Brief on Behalf of Defendant-Appellant Darcy Wedd, 2019 WL 2173505, at *13. Wedd argued, *inter alia*, that the district court's statement comparing the culpability of a co-defendant and Wedd "created the appearance of partiality." *Wedd*, 993 F.3d at 116.

The trial court judge denied Wedd's motion to recuse herself, and the Second Circuit affirmed, writing that "[a] judge cannot be said to have manifested partiality simply by expressing a view of a particular defendant's culpability based on information that has been presented to the court." *Wedd*, 993 F.3d at 115. The panel specifically noted that, "[i]n multi-defendant cases, judges are often called upon to sentence one or more co-defendants while others are still awaiting trial. Questions of relative culpability may sometimes be unavoidable, particularly when the defendant being sentenced claims to have played a

3

**SA3**

lesser role in an overall conspiracy." *Id.* at 117. Thus, the trial court's comments in *Wedd* did not demonstrate "'a deep-seated favoritism or antagonism that would make fair judgment impossible,'" and therefore recusal was not required. *Id.* (citing *Liteky*, 510 U.S. at 555.)

Here, in response to questions of relative culpability in a multi-defendant conspiracy, this Court stated that it assumed and hoped the Government would "pursu[e] the corrupt lawyers, the corrupt doctors," and "follow[] through on a continuing investigation" of those actors. (18-cr-289, ECF No. 368, 15:23-16:8.) The Court made plain that the source of its view that the lawyers and doctors were heavily involved in the trip-and-fall conspiracy was the testimony adduced during the Duncan trial concerning how the conspiracy functioned, and recalled that that was "a theme during the trial." (*Id.; see also* 18-cr-289, ECF No. 252, 27:10-18.)

The Court made clear that the decision of whether to investigate and charge potential defendants was not for the Court, when it said, "I'm not the prosecutor, I'm the judge," and "those people are not in front of me." (18-cr-289, ECF No. 368, 16:5-8.) As in *Wedd*, "based on information that ha[d] been presented to the court" and when speaking to co-conspirators who when "being sentenced claim[ed] to have played a lesser role in an overall conspiracy" than others, including lawyers and doctors, the Court quite appropriately opined on "questions of relative culpability." *Wedd*, 993 F.3d at 115, 117. These comments were a fair summary of the testimony adduced during the *Duncan* trial and in the course of the sentencing proceedings following that trial. No reasonable person apprised of the facts in that case, which was the source of the Court's opinion, would conclude, based on these comments, that the Court harbors the requisite "antagonism that would make fair judgment impossible" to warrant recusal.[1]

Although recusal may be appropriate "when a judge expresses a personal bias concerning the outcome of the case at issue," *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992), the Court here has not expressed any interest in seeing a particular outcome as to any specific defendant. *United States v. Diaz*, 797 F.2d 99, 100 (2d Cir. 1986) (per curiam), illustrates impermissible bias concerning the outcome of a case as distinguished from the facts here. The district judge in *Diaz*, together with the prosecutor, wrote to their U.S. Senator to suggest an amendment to the law under which Diaz's conviction of that count had been vacated on appeal, in order that the conduct of the defendant would be encompassed by its terms in the future. *See id*. When the defendant appealed, the Second Circuit determined that these acts evidenced the judge's manifest personal bias for a particular outcome: i.e., punishment of that specific defendant for a particular act. *Id*. In

---

[1] Moreover, "comments made at pretrial hearings" or other proceedings like those in question here where "no jury was present, could not prejudice petitioners at *trial*." *A.S. Goldmen, Inc. v. Phillips*, No. 05-cv-4385, 2006 WL 1881146, at *44, *55 (S.D.N.Y. July 6, 2006) *report and recommendation adopted*, 2007 WL 2994453 (S.D.N.Y. Oct. 15, 2007) (collecting cases).

contrast, stating what the evidence was in the *Duncan* trial – the asserted involvement of doctors and lawyers in the trip-and-fall conspiracy – and encouraging *investigation* of a *category* of defendants in a complex conspiracy, without any particular goal as to the result of the investigation or suggesting the guilt of any particular doctor or lawyer, as the Court did here, does not represent bias toward a specific defendant or a particular outcome. Indeed, during a pretrial conference in this case, the Court reiterated that despite its familiarity with the alleged fraud from the *Duncan* trial, its role was decidedly *not* to determine the outcome of the case against Dowd or the other defendants, reminding them that, "of course, it will be up to the jury to decide whether or not the government can prove its case beyond a reasonable doubt." (21-cr-530, ECF No. 34 at 5:21-23.)

Other cases Dowd cites are similarly inapposite.[2] In *United States v. Antar,* the Third Circuit held that the trial judge ought to have recused himself when, during sentencing of the defendant, he stated: "My object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." 53 F.3d 568, 573 (3d Cir. 1995). The circuit court determined that this constituted "in stark, plain and unambiguous language" a statement that the judge's "goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper." *Id.* at 576. Unlike in *Antar,* this Court's opinion that the role of the doctors and lawyers in this scheme warranted further investigation does not indicate that it had a goal "from the beginning" to convict Dowd.

The Third Circuit distinguished this statement requiring recusal from one that did not. After a U.S. district judge sitting in the District of Colorado refused to accept the defendant's guilty plea for insufficiently admitting criminal wrongdoing, he stated that "[t]he obvious thing that's going to happen to [the defendant] is that she's going to get convicted[.]" *United States v. Young,* 45 F.3d 1405, 1414 (10th Cir. 1995). The district court then denied a motion to disqualify on those grounds, and the Tenth Circuit affirmed, stating that "the comments reflected the judge's belief that [the defendant] was likely to be convicted if she went to trial. Such an opinion of what the jury was likely to find does not show that the judge could not possibly render fair judgment." *Young,* 45 F.3d at 1415-16. Here, the Court's opinion was not nearly as explicit as the judge's admitted opinion in *Young* in which recusal was denied.

---

[2] (*See also* 21-cr-530, ECF No. 86 at 5-6) (citing *Washington v. William Morris Endeavor Entm't, LLC,* 2014 U.S. Dist. LEXIS 41277, at *2 (S.D.N.Y. Mar. 24, 2014) (*denial* of motion for recusal on basis of ruling in another matter against same defendant, and speeches at educational programs); *United States v. Liburd,* No. 17-cr-296 (PKC), 2019 U.S. Dist. LEXIS 11850, at *24 (E.D.N.Y. Jan. 24, 2019) (*denial* of motion for recusal in which the court properly directed the course of a *Franks* hearing and admonished defense counsel in an appropriate effort to protect defendant's right to unconflicted counsel).

5

**SA5**

Moreover, "judges are frequently, and quite properly, required to make assessments of a defendant's culpability before a jury has returned a verdict." *Wedd*, 993 F.3d at 116. For example, to determine whether a coconspirator's statement that otherwise would be hearsay should be admitted, the court must determine by a preponderance "that a conspiracy existed, that the defendant and declarant were members, and that the statements were made during the course of and in furtherance of the conspiracy." *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) (citing Fed. R. Evid. 801(d)(2)(E)). "On occasion, that may also entail a finding by the judge that a yet-to-be-tried co-defendant was, in fact, a member of the charged conspiracy." *Wedd*, 993 F.3d at 117. Indeed, the Court had already had to assess the extent of Dowd's involvement in this matter ahead of his trial; specifically, the Court issued a warrant finding probable cause to search the email accounts of Dowd and others. (*See* 21-cr-530, ECF No. 96 at 2.) But just as these common pretrial assessments of a defendant's involvement do not ordinarily require the court to recuse itself from later proceedings, this Court's acknowledgment of the role of doctors and lawyers, including Dowd, in this conspiracy before Dowd was tried does not create an impression that fair judgment of Dowd by the jury during his trial would be "impossible" such that recusal is required.

Finally, while there is no explicit time limit for filing a motion for recusal, recusal applications are to be made "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim," in order to avoid waste of judicial resources and to prevent a movant from "hedging its bets against the eventual outcome." *Apple v. Jewish Hospital and Medical Center*, 829 F.2d 326, 333, 334 (2d Cir. 1987). Dowd filed this motion more than a year after this Court made the core of the comments that Dowd now challenges, and over a year after Dowd was indicted and made aware of the charges against him. The distance of this motion from the allegedly offending comments as well as the proximity to Dowd's trial provide a quintessential example of the gamesmanship that a preference for prompt filing of recusal motions is meant to avoid.

Accordingly, Dowd's motion for recusal pursuant to 28 U.S.C. § 455(a) is denied.

Dated:  New York, New York
      January 31, 2023

Sidney H. Stein, U.S.D.J.

```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                         21 Cr. 530 (SHS)

5  GEORGE CONSTANTINE, et al.,

6            Defendants.
                                       Conference
7  ------------------------------x

8                                      New York, N.Y.
                                       June 2, 2022
9                                      10:15 a.m.

10 Before:

11
                    HON. SIDNEY H. STEIN,
12
                                       District Judge
13
                       APPEARANCES
14
   DAMIAN WILLIAMS
15      United States Attorney for the
        Southern District of New York
16 BY:  ALEXANDRA N. ROTHMAN
        NICHOLAS WWILLIAM CHIUCHIOLO
17      Assistant United States Attorneys

18 COLLINS GANN MCCLOSKEY & BARRY
        Attorneys for Defendant Constantine
19 BY:  MARC C. GANN

20 BACHNER & ASSOCIATES, P.C.
        Attorneys for Defendant Elefant
21 BY:  MICHAEL F. BACHNER

22 KEVIN J. KEATING
        Attorney for Defendant Dowd
23
   ABELL ESKEW LANDAU LLP
24      Attorneys for Defendant Ribeiro
   BY:  SCOTT GLICKSMAN
25
```

1                        APPEARANCES (Continued)

2        HOGAN LOVELLS US LLP
         Attorneys for Defendant Alexander
3   BY:  SHANNON ZHANG

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  come from joint trial.

2          So for all of those reasons, as I think the Court is

3  inclined to do and has so ruled, there is no basis for

4  severance under either Rule 8 or Rule 14.

5          THE COURT:  I do agree with that.  It's really *Zafiro*

6  here that requires a serious risk that a joint trial would

7  compromise the specific right.  I have confidence in the jury

8  in the abstract because we don't have a jury.

9          I have confidence in the ability of the lawyers to

10  choose a jury that they would like to have by a judicious

11  exercise of their peremptory challenges, and I have confidence

12  in my ability to instruct the jury.

13          So I am going to deny the motion, but I appreciate

14  your bringing that point to my attention.  It's certainly

15  something that I will keep in mind as we go forward.

16          MR. BACHNER:  Thank you for hearing me, your Honor.

17          THE COURT:  Now we've got a motion for a bill of

18  particulars by Ribeiro and by Dowd.

19          I was a bit surprised by that motion.  One of the

20  reasons we've had what I consider a fulsome amount of time for

21  discovery here is the enormous record that the defendants have

22  had to work with, that is, the full record of the trial -- I'll

23  call it the Duncan trial -- in which all of these names came up

24  I'm almost certain.

25          Certainly Constantine, Elefant, and Dowd were

1   throughout that trial.  The defendants have been given a

2   tremendous number of particulars about specific patients,

3   dates, surgeries, legal advice.

4        And you add to that what I'm informed is the extensive

5   3500 material -- and I have no doubt that it's extensive given

6   my familiarity with the first trial.  I don't want to overstate

7   it, but I think the defense has been given a very specific

8   roadmap to what this trial is going to look like.  So I see

9   absolutely no need for a bill of particulars.

10       Again, I sound stronger than I normally do because I

11  think the decision is more straightforward.  The roadmap to it

12  is more straightforward.  It's really a rank request for

13  additional discovery.  And you don't really need more

14  particulars to prepare for trial to prevent surprise and to

15  interpose a plea of double jeopardy as *Bortnovsky* instructs.

16       So if anyone wants to push back on that, I'm here to

17  listen.

18       MR. KEATING:  Your Honor, Kevin Keating for Andrew

19  Dowd, and I would like to give it a shot, your Honor.

20       THE COURT:  Go ahead.

21       MR. KEATING:  Your Honor, despite what the government

22  calls a massive amount of material that's been turned over --

23       THE COURT:  Well, the defendants have been telling me

24  it's a massive amount of material because when we meet,

25  everybody says they're still going through it and there's a

1    massive amount of material.

2            MR. KEATING:  And even with that, your Honor, as it

3    stands today, we have an indictment which alleges that

4    Dr. Andrew Dowd performed hundreds of surgeries on patients who

5    had staged accidents.  That's in the indictment.  Yet, with all

6    of that material, the government has disclosed to me to date

7    approximately ten such patients out of 100, ten who have staged

8    their accidents.

9            So as the trial will evolve as it currently stands,

10   the government will open that there were hundreds of such

11   occurrences.  They will sum up on the fact that there were

12   hundreds of such occurrences.  They have an indictment which

13   alleges that very thing.

14           Peter Kalkanis -- the Court has heard testimony from

15   Mr. Kalkanis already.  Peter Kalkanis I expect will say that

16   80 percent of these cases were fake, even though he was all

17   over the block during his trial testimony.

18           At times, he said a majority.  At times, he said

19   80 percent.  When confronted with certain patient charts and

20   intake sheets, he was utterly unable to identify which were

21   fake accidents and which were not.

22           And, your Honor, here's why it matters, and I submit

23   to the Court here's why it deeply matters:  The distinction

24   between hundreds which they will allege which I have no ability

25   to defend, zero -- the government hasn't identified which of

1    these patients they're speaking of, haven't identified.

2              THE COURT:  And I take it you've gone through the

3    trial testimony and the 3500 material.

4              MR. KEATING:  Every word of it, every word of it.  In

5    terms of patients who were treated by Andrew Dowd who were

6    alleged to have engaged in staged accidents, which is the

7    entirety of this case for Andrew Dowd -- this case will turn on

8    his knowledge of whether they were staged or not.

9              And, your Honor, here's why it matters:  It is an

10   irrefutable fact that not all of these cases were staged.

11   Runners -- as the Court knows from the first trial, runners

12   refer personal injury clients --

13             THE COURT:  I think in this case you have the same

14   thing as in the other case.  In the beginning of the alleged

15   conspiracy, there were no accidents.  Right?

16             They said there were accidents.  Then later on, they

17   started to stage them because the allegations are the

18   defendants wanted it to be more realistic and they would have

19   the ambulance records and so forth.

20             MR. KEATING:  No question, your Honor.  But that's the

21   subset of cases that were indeed staged accidents.  The 3500

22   material and the trial testimony will make quite clear that

23   runners obtained cases from several sources.

24             And I'll be brief on this, your Honor.  Word of mouth

25   from the community.  Runners put themselves out there as people

1   who know personal injury attorneys, I have the best lawyer.

2   I'll bring you to my lawyer.

3           And runners refer cases to lawyers, and runners get

4   referral fees.  Whether they should or shouldn't is a separate

5   issue, but real cases.  Runners literally scour emergency

6   rooms.  It's in the 3500 material.  They drive to emergency

7   rooms.  They take patients who are leaving who have casts on,

8   who are on crutches, and they give cards to these folks, and

9   they bring them to personal injury lawyers.

10          And then, according to this indictment, some of the

11  runners at issue engaged in staged cases.  Recently we received

12  3500 material from the government.  There were ten patients,

13  all of whom had actual accidents.  So many of these folks

14  indeed engaged in actual accidents.  And then you have

15  Andrew --

16          THE COURT:  "Actual" as distinguished from "staged"?

17          MR. KEATING:  Correct.

18          THE COURT:  Just so we have the definition.

19          MR. KEATING:  Sure.  And then you have Andrew Dowd's

20  role in this.  Your Honor, Dr. Andrew Dowd -- and this is an

21  important distinction -- is probably seven layers removed from

22  the inception of this scheme.  And this goes to the bill of

23  particulars issue, your Honor.

24          For the scheme to work on a staged accident, the

25  patient takes a fall, lies to a police officer who responds,

1    lies to the ambulance attendant, goes to an emergency room,

2    lies to emergency room personnel, goes to the lawyer, lies to

3    the lawyer, goes to a chiropractor, a physical therapist, a

4    radiologist -- lie, lie, lie.

5           Eventually in this journey, the patient sees

6    Dr. Andrew Dowd.  Every person who saw Dr. Dowd, every staged

7    patient -- we know approximately ten out of hundreds -- was

8    coached to lie.

9           It's a fact.  They would go to Andrew Dowd and say, my

10   pain is 8 out of 10.  It hurts when I walk up stairs.  I've

11   been getting physical therapy.  I was in an accident.  Those

12   are the facts as it relates to --

13          THE COURT:  Just help me a little as to a proffer.

14          Was Dowd reading the MRIs?

15          MR. KEATING:  The MRI reports are real, your Honor.  A

16   radiologist has not been charged in this case, as I understand

17   it.  Reginald Dewitt, who testified at the first trial, said

18   unequivocally the MRI reports are real.

19          So far, the government has revealed no evidence that

20   the MRI reports were not real.  So Dowd has before him a

21   patient who is coached to have lied.  In the discovery, there

22   are many MRI reports which show torn meniscus, torn labrum.

23   They're all over the place.

24          Now we get back to the bill of particulars, your

25   Honor.  The difference in evidentiary power and persuasiveness

18

1    between hundreds of such cases -- that's the allegation in the

2    indictment which I have no ability to defend, zero -- and the

3    government putting on trial, putting as witnesses on trial

4    perhaps ten patients, if that's the number, who all lied to

5    Dowd.  Some of them have MRI reports, MRI reports which --

6            THE COURT:  Hold on just a moment.

7            (Pause)

8            MR. KEATING:  Some of those have positive MRI reports.

9    Andrew Dowd has an enormous orthopedic practice, an enormous

10   practice.  If he saw ten patients in a five-year period who had

11   staged their accidents and who lied to Dowd, that's this case.

12   If it's hundreds who had engaged in such conduct, I think a

13   jury might say, well, did Dowd know.

14           THE COURT:  I understand.

15           MR. KEATING:  A final point, if I may, your Honor,

16   very briefly.  I do cite the *Bortnovsky* case.  *Bortnovsky* uses

17   language such as the burden impermissibly shifted to the

18   defense, meaning I would have to prove at trial somehow, even

19   though I haven't been given a list of these patients, that

20   indeed these were real accidents.

21           *Bortnovsky* says the relevance of key events were

22   shrouded in mystery.  If they bring an indictment which alleges

23   hundreds, I ask, under what due process universe does the

24   government not have to identify those cases.

25           THE COURT:  I understand your point.  Got it.

1          MR. ABELL:  Kenneth Abell on behalf of Defendant

2    Ribeiro.

3          Your Honor, I'd just like to echo some of what

4    Mr. Keating said with respect to Defendant Ribeiro.  We have

5    been hampered in our ability to prepare for trial because we

6    have not been able to correlate the patients that the

7    government claims have been part of the scheme.  And, in

8    particular, in the indictment at paragraph 20, the government

9    alleges that just under 200 patients were treated by

10   Dr. Ribeiro as part of this fraud scheme.

11         I'm at a loss to understand, your Honor, why it's so

12   burdensome, if the government's in a position to make that

13   allegation, why it can't provide to us the specific patients to

14   which its referring.

15         And that's important for a lot of reasons, Judge.

16   That's not the entire universe of patients that were seen by

17   Dr. Ribeiro.  We don't know which patients those were.  We

18   don't know if -- we have no idea what commonality exists

19   between those just under 200 patients.

20         Was it because they had a similar procedure?  Was it

21   because they came through a specific channel?  We don't

22   understand any of that.

23         And it's important, Judge, because the patients that

24   are not alleged to have been part of that scheme, there could

25   be comparisons that we'd like to draw from the patients that

1   aren't included in the so-called "scheme" with the patients

2   that are.

3          For instance, maybe those patients had an MRI report

4   that the government feels was substantiated.  And, we'd like to

5   draw comparisons between those folks who are alleged not to

6   have been part of the conspiracy with those who are.

7          Again, your Honor, if it was an enormous burden that

8   we were asking the government to take on, maybe I would

9   understand more why the Court would be disinclined to grant us

10  that relief.

11         But because there's a specific allegation in the

12  indictment of a certain number of patients, why is it so

13  difficult for the government to tell us who those patients are?

14         THE COURT:  I understand.

15         MR. ABELL:  Thank you, your Honor.

16         MR. BACHNER:  Your Honor, I join in the motion on

17  behalf of Mr. Elefant because it's the same theory.  We don't

18  know which of his patients, which of his clients rather, are

19  considered to have been fraudulent.

20         And, your Honor, something that was said at the first

21  trial I think really dictates the significance of this.  When

22  your Honor was asked by the government in the first trial to

23  admit the intake sheets, all of the intake sheets, there was

24  very substantial argument from defense counsel why the intake

25  sheets shouldn't come in.

1    And the government's reason for wanting the intake

2    sheets in is as follows:  Ms. Rothman argued:  "Moreover, the

3    size and scale of this operation goes directly to the question

4    of knowledge, which is the key issue here, what the defendants

5    knew.  The government is allowed to offer these intake sheets

6    to prove up the scope, the scale of the operation, the

7    knowledge of the defendants."

8         It's clear, Judge, the argument that there are

9    hundreds, which is the government's theory, is it shows their

10   knowledge.  Our theory is that the lack of these patients shows

11   their lack of knowledge.  And we're unable to make --

12        THE COURT:  Wait.  Wait.

13        MR. BACHNER:  In other words, Judge, in any law

14   practice -- speaking as a lawyer, a lawyer gets clients who

15   come in, and they lie to them.  It happens in every practice.

16   If you're a plaintiffs' lawyer in a securities case --

17        THE COURT:  What's your point?

18        MR. BACHNER:  The point I'm making, Judge, is that if

19   there were ten people -- my client has been notified of ten

20   clients who were false.  If ten people out of 150 lied to him,

21   there was some realm of on the outside of the bell curve, how

22   much reasonableness can you assume?  In any practice you're

23   going to get some bogus people.

24        THE COURT:  You're able to make that argument to the

25   jury, that the government alleges 200 patients and we have

1   these ten who we know or the government says lied.  Therefore,

2   there are 150 who didn't, and you make your argument.

3              MR. BACHNER:  But the response is that Mr. Kalkanis

4   said 80 percent.  And then your Honor put him to task, and I'm

5   sure your Honor recalls.

6              THE COURT:  I understand.

7              MR. BACHNER:  The point is, Judge, if you're saying

8   that the government will not be permitted to argue that there

9   were more than ten --

10             THE COURT:  No.  No.  No.  Let me hear from the

11  government.  I understand your point.

12             MS. ROTHMAN:  Your Honor, I think the last point the

13  Court just made is correct.  What we're hearing is a defense

14  argument that I expect we'll hear at trial which the defendants

15  are able to argue to the jury that the examples you saw, ladies

16  and gentlemen, don't prove my client, Andrew Dowd,

17  Mr. Constantine, whoever, are guilty for the reasons we've

18  heard.

19             But that's not the question as to whether the

20  defendants get a bill of particulars where the government has

21  to outline every single witness that we intend to call at trial

22  that we believe is proof of this conspiracy.

23             The law is clear, your Honor, that you don't get a

24  bill of particulars if it's helpful.  It has to be necessary.

25  The law is also clear that in this Circuit, courts distinguish

1    between the needle in the haystack cases, which is *Bortnovsky*,

2    and all or substantially all of a scheme being fraudulent.

3            We're in the latter camp.  So on those facts where the

4    government has alleged that this was just a rotten scheme --

5            THE COURT:  A what?

6            MS. ROTHMAN:  A rotten scheme.  Patients from homeless

7    shelters were recruited who were poor, who were hungry, who

8    didn't have real accidents.  And the whole scheme was bad.

9            On those facts, the defendants are not entitled to the

10   bill of particulars.  As the Court has noted, they already have

11   so much information about this scheme.  They have 3500.  They

12   have testimony from witness.  They have more than enough.

13           THE COURT:  What they're asking for is some more of

14   the patients who you're identifying were clients with each of

15   the defendants so they have more to work with in terms of who

16   was lying to them and who wasn't.

17           MS. ROTHMAN:  Your Honor, I think they want a witness

18   list, and they're not entitled to that when we're months before

19   trial without even a trial date.

20           THE COURT:  Well, we're going to have a trial date.

21   Go ahead.

22           MS. ROTHMAN:  We appreciate that.  But on this record,

23   the defendants are not entitled to the relief that they seek

24   based upon the allegations in the indictment, what we've

25   already given them, and the law in this Circuit.  Thank you.

1              MR. GANN:  Can I briefly be heard, your Honor.

2              THE COURT:  Very briefly.

3              MR. GANN:  Your Honor, we're not asking for a witness

4    list.  We're asking for what we should have received in

5    discovery.  If they make the allegation of hundreds, which is a

6    powerful allegation here, a powerful allegation, why should

7    they not be required to produce discovery on those hundreds?

8              They have not.  They have not done it.  And I am

9    literally powerless.  When Kalkanis gets on the stand and says

10   80 percent, my cross-examination will be --

11             THE COURT:  Wait just a moment.  You're going to have

12   presumably -- you already have extensive 3500 material.  You'll

13   have additional 3500 material.  If there are new witnesses

14   here -- presumably there are new patients, new clients --

15   you'll have all of that in advance of trial.

16             So go ahead.

17             MR. GANN:  No question, your Honor.  But in terms of

18   today, trial prep, there are ten.  And a distinction between

19   *Bortnovsky*, two distinctions, your Honor.  One is this:

20   *Bortnovsky* deals with a paper case.  So in that case, the

21   government indeed had turned over all of the transactions and

22   failed to identify which ones were fraudulent.

23             So that's the needle in the haystack the Circuit is

24   saying.  You're asking the defense to find the needle in the

25   haystack.  We haven't been given the haystack.  We don't have

1    the haystack, number one.

2            Number two, these are live human beings, your Honor.

3    So what it means is we somehow, the defense, somehow has to

4    investigate and find out who these hundreds of people are, not

5    based on discovery or a bill of particulars, somehow learn

6    their addresses, somehow knock on doors --

7            THE COURT:  Well, you've got your clients, sir.

8            MR. GANN:  Excuse me, your Honor?

9            THE COURT:  You have your clients that you can speak

10   with.

11           MR. GANN:  Of course we have our clients.  But the

12   government is alleging hundreds of these people, hundreds of

13   fraudulent cases, which we think is a grossly high estimate

14   and, frankly, is a way out of their obligation to turn over

15   this material.

16           We know a percentage were real cases.  We think a

17   significant percentage were real cases.  And we are powerless.

18   We can't cross-examine Kalkanis or refute the government's

19   assertion that there were hundreds.

20           THE COURT:  All right.  I understand the point.  I

21   will look at *Bortnovsky* again, although I think I have a pretty

22   good understanding of *Bortnovsky*.  You have my ruling.  I'm not

23   going to change it at this point.

24           The last item is Dowd's request for 404(b) and other

25   information.  Far too early.  Denied.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case   (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT
Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | )   **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| ANDREW DOWD | )   Case Number:  01: (S1) 21-Cr-00530-3 (SHS) |
| | )   USM Number:  61642-509 |
| | )   Kevin J. Keating |
| | )   <u>Defendant's Attorney</u> |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

☑ was found guilty on count(s)    One through Six
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Mail and Wire Fraud | 4/30/2018 | 1, 4 |
| 18 U.S.C. § 1341 | Mail Fraud | 4/30/2018 | 2, 5 |
| 18 U.S.C. § 1343 | Wire Fraud | 4/30/2018 | 3, 6 |

     The defendant is sentenced as provided in pages 2 through   **7**   of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)    underlying Indictment    ☑ is    ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

4/25/2023
<u>Date of Imposition of Judgment</u>

<u>Signature of Judge</u>

Sidney H. Stein, U.S.D.J.
<u>Name and Title of Judge</u>

<u>Date</u>   April 26, 2023

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __2__ of __7__

DEFENDANT:  ANDREW DOWD
CASE NUMBER:   01: (S1) 21-Cr-00530-3 (SHS)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

102 months on each count to run concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

1. That defendant be housed in a facility in the tristate area to facilitate visits with his family.
2. That defendant be admitted into the ARDAP Program if he otherwise meets the requirements; the PSR reflects that he has not had a drink in 20 years.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

   ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☑ before 2 p.m. on   6/30/2023   .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**SA24**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___7___

DEFENDANT:  ANDREW DOWD
CASE NUMBER:  01: (S1) 21-Cr-00530-3 (SHS)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

three years on each count to run concurrently.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3A — Supervised Release

Judgment—Page ___4___ of ___7___

DEFENDANT: ANDREW DOWD
CASE NUMBER: 01: (S1) 21-Cr-00530-3 (SHS)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page  5  of  7

DEFENDANT: ANDREW DOWD
CASE NUMBER: 01: (S1) 21-Cr-00530-3 (SHS)

## SPECIAL CONDITIONS OF SUPERVISION

1. You must provide the probation officer with access to any requested financial information.

2. You must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

3. You shall be supervised by the district of residence.

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page    6    of    7

DEFENDANT: ANDREW DOWD
CASE NUMBER: 01: (S1) 21-Cr-00530-3 (SHS)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 600.00 | $ | $ 0.00 | $ 0.00 | $ 0.00 |

☑ The determination of restitution is deferred until _7/24/2023_ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $              0.00 | $              0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**SA28**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __7__ of __7__

DEFENDANT: ANDREW DOWD
CASE NUMBER: 01: (S1) 21-Cr-00530-3 (SHS)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __600.00__ due immediately, balance due

☐ not later than _____ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:

While serving the term of imprisonment, you shall make installment payments toward your restitution obligation and may do so through the Bureau of Prisons' (BOP) Inmate Financial Responsibility Plan (IFRP). Pursuant to BOP policy, the BOP may establish a payment plan by evaluating your six-month deposit history and subtracting an amount determined by the BOP to be used to maintain contact with family and friends. The remaining balance may be used to determine a repayment schedule. BOP staff shall help you develop a financial plan and shall Monitor the inmate's Progress in meeting your restitution obligation

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:

$2,900,905 in U.S. currency.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**SA29**

## STATUTORY AND RULES ADDENDUM

Title 28, section 455 of the United States Code ("28 U.S.C. § 455")

provides (in relevant part):

> **(a)** Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

Rule 7 of the Federal Rules of Criminal Procedure provides (in relevant part):

> **(f) Bill of Particulars.** The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.

Rule 403 of the Federal Rules of Evidence provides:

> **Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons.** The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Rule 404 of the Federal Rules of Evidence provides (in relevant part):

**(b) Other Crimes, Wrongs, or Acts.**

**(1) *Prohibited Uses.*** Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

**(2) *Permitted Uses.*** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

**(3) *Notice in a Criminal Case.*** In a criminal case, the prosecutor must:

**(A)** provide reasonable notice of any such evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;

**(B)** articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and

**(C)** do so in writing before trial — or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Rule 701 of the Federal Rules of Evidence provides:

**Opinion Testimony by Lay Witnesses.** If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

**(a)** rationally based on the witness's perception;

**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.