# 23-6440(L)

## 23-6474(CON), 23-6879(CON)

*To Be Argued By*:
ALEXANDRA N. ROTHMAN

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket Nos. 23-6440(L), 23-6474(CON), 23-6879(CON)

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

GEORGE CONSTANTINE, ANDREW DOWD,

*Defendants-Appellants*,

MARC ELEFANT, SADY RIBEIRO, ADRIAN ALEXANDER,

*Defendants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

ALEXANDRA N. ROTHMAN,
NICHOLAS S. FOLLY,
DANIELLE KUDLA,
DAVID ABRAMOWICZ,
*Assistant United States Attorneys,
Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.  The Government's Case . . . . . . . . . . . . . . .  3

        1.  The Trip-and-Fall Fraud Scheme . . . . .  4

        2.  The Scheme Divides . . . . . . . . . . . . . . .  8

        3.  The Medical Records and Expert
            Testimony . . . . . . . . . . . . . . . . . . . . . . .  11

        4.  The End of the Scheme . . . . . . . . . . . .  13

    B.  The Defense Case, Verdict, Post-Trial
       Motions, and Sentencings . . . . . . . . . . . . .  13

Argument:

Point I—The District Court Did Not Abuse Its
    Discretion in Denying Dowd's Recusal
    Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  15

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  20

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Point II—The District Court Did Not Abuse Its
    Discretion in Denying Dowd's Motion for a Bill
    of Particulars . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .  27

ii

PAGE

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  28

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  29

POINT III—The Challenged Evidentiary Rulings Were
Correct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

A.  Standard of Review. . . . . . . . . . . . . . . . . . .  33

B.  The District Court Properly Admitted Arce's
Testimony . . . . . . . . . . . . . . . . . . . . . . . . . .  35

1.  Relevant Facts . . . . . . . . . . . . . . . . . . .  35

2.  Applicable Law. . . . . . . . . . . . . . . . . . .  38

3.  Discussion. . . . . . . . . . . . . . . . . . . . . .  39

C.  The District Court Properly Admitted Tax
Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . .  41

1.  Relevant Facts . . . . . . . . . . . . . . . . . . .  41

2.  Applicable Law. . . . . . . . . . . . . . . . . . .  45

3.  Discussion. . . . . . . . . . . . . . . . . . . . . .  46

D.  The District Court Properly Precluded
Constantine's "Good Act" and Other
Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . .  48

1.  Relevant Facts . . . . . . . . . . . . . . . . . . .  48

2.  Applicable Law. . . . . . . . . . . . . . . . . . .  49

3.  Discussion. . . . . . . . . . . . . . . . . . . . . .  50

iii

PAGE

E.   The District Court Properly Admitted
     Testimony About Referral Fees . . . . . . . .   51

     1.   Relevant Facts . . . . . . . . . . . . . . . . . . .   51

     2.   Discussion. . . . . . . . . . . . . . . . . . . . . .   53

F.   Any Error Was Harmless . . . . . . . . . . . . .   55

POINT IV—The District Court Properly Instructed the
Jury About Ethical Rules for Lawyers and
Doctors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

A.   Relevant Facts  . . . . . . . . . . . . . . . . . . . . .   59

B.   Applicable Law . . . . . . . . . . . . . . . . . . . . .   62

C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . .   63

     1.   There Was No Error  . . . . . . . . . . . . .   63

     2.   Any Error Was Harmless . . . . . . . . . .   66

POINT V—Sufficient Evidence Supported
Constantine's Convictions. . . . . . . . . . . . . . . .   67

A.   Applicable Law . . . . . . . . . . . . . . . . . . . . .   67

B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . .   69

POINT VI—Constantine's Sentence Was Procedurally
Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . .   72

A.   Relevant Facts  . . . . . . . . . . . . . . . . . . . . .   72

B.   Applicable Law . . . . . . . . . . . . . . . . . . . . .   76

iv

PAGE

1.  Standard of Review . . . . . . . . . . . . . . .   76

2.  Guidelines Loss Calculations . . . . . . .   78

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . .   79

1.  The District Court Properly Calculated
    the Loss Amount . . . . . . . . . . . . . . . . .   79

2.  The District Court Properly Applied the
    Other Guidelines Enhancements . . . .   82

3.  Any Error Was Harmless . . . . . . . . . .   83

4.  The District Court Did Not Abuse Its
    Discretion by Denying Constantine's
    Request for a *Fatico* Hearing . . . . . . .   84

POINT VII—Dowd's Restitution Order Should Be
Affirmed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   85

1.  Dowd's Restitution Order . . . . . . . . . .   85

2.  The Rule 35 Motion . . . . . . . . . . . . . . .   86

3.  Dowd's Coconspirators' Restitution
    Orders . . . . . . . . . . . . . . . . . . . . . . . . . . .   87

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .   89

1.  Restitution . . . . . . . . . . . . . . . . . . . . . . .   89

2.  Standard of Review . . . . . . . . . . . . . . .   91

v

PAGE

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 91

   1. There Was No Due Process
      Violation . . . . . . . . . . . . . . . . . . . . . . . 91

   2. The Restitution Order Was Not Plainly
      Erroneous . . . . . . . . . . . . . . . . . . . . . . . 94

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

## TABLE OF AUTHORITIES

*Cases*:

*Anderson v. City of Bessemer City,*
   470 U.S. 564 (1985) . . . . . . . . . . . . . . . . . . . . . . . 77

*Apple v. Jewish Hosp. & Med. Ctr.,*
   829 F.2d 326 (2d Cir. 1987) . . . . . . . . . . . . . . . . 22

*Cameron v. City of New York,*
   598 F.3d 50 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 54

*Constantino v. Herzog,*
   203 F.3d 164 (2d Cir. 2000) . . . . . . . . . . . . . . . . 34

*In re Aguinda,*
   241 F.3d 194 (2d Cir. 2001) . . . . . . . . . . . . . . . . 22

*In re Drexel Burnham Lambert, Inc.,*
   861 F.2d 1307 (2d Cir. 1988) . . . . . . . . . . . . 21, 22

*In re Murchison,*
   349 U.S. 133 (1955) . . . . . . . . . . . . . . . . . . . . . . . 24

*Jackson v. Virginia,*
   443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . 67

vi

PAGE

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019). . . . . . . . . . . . . . . . . . . . . 79

*Liteky v. United States*,
    510 U.S. 540 (1994). . . . . . . . . . . . . . . .   20, 21, 23

*LoCascio v. United States*,
    473 F.3d 493 (2d Cir. 2007) . . . . . . . . . . . . . 22, 23

*Neder v. United States*,
    527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . 63

*Taylor v. Illinois*,
    484 U.S. 400 (1988). . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Abelis*,
    146 F.3d 73 (2d Cir. 1998) . . . . . . . . . . . . . . . . 68

*United States v. Abu-Jihaad*,
    630 F.3d 102 (2d Cir. 2010) . . . . . . . . . . . . . . . 33

*United States v. Acevedo*,
    882 F.3d 251 (1st Cir. 2018). . . . . . . . . . . . . . . 64

*United States v. Antar*,
    53 F.3d 568 (3d Cir. 1995) . . . . . . . . . . . . . . . . 24

*United States v. Atuana*,
    816 F. App'x 592 (2d Cir. 2020) . . . . . . . . . . . . . 45

*United States v. Aumais*,
    656 F.3d 147 (2d Cir. 2011) . . . . . . . . . . . . . . . 94

*United States v. Banks*,
    55 F.4th 246 (3d Cir. 2022) . . . . . . . . . . . . . . . 80

*United States v. Barnes*,
    158 F.3d 662 (2d Cir. 1998) . . . . . . . . . . . . . . . 29

vii

PAGE

*United States v. Battista,*
575 F.3d 226 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 95

*United States v. Bayless,*
201 F.3d 116 (2d Cir. 2000) . . . . . . . . . . . . . 20, 24

*United States v. Bengis,*
783 F.3d 407 (2d Cir. 2015) . . . . . . . . . . . . . . . . 94

*United States v. Bergstein,*
788 F. App'x 724 (2d Cir. 2019) . . . . . . . . . . 45, 47

*United States v. Boccagna,*
450 F.3d 107 (2d Cir. 2006) . . . . . . . . . . . . . . . . 96

*United States v. Borst,*
62 F.3d 43 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 83

*United States v. Bortnovsky,*
820 F.2d 572 (2d Cir. 1987) . . . . . . . . . . . . . 30, 31

*United States v. Bryant,*
128 F.3d 74 (2d Cir. 1997) . . . . . . . . . . . . . . 78, 79

*United States v. Carlton,*
534 F.3d 97 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 22

*United States v. Carr,*
880 F.2d 1550 (2d Cir. 1989) . . . . . . . . . . . . . . . 63

*United States v. Chen,*
378 F.3d 151 (2d Cir. 2004) . . . . . . . . . . . . . . . . 28

*United States v. Cho,*
713 F.3d 716 (2d Cir. 2013) . . . . . . . . . . . . . . . . 77

*United States v. Cooks,*
589 F.3d 173 (5th Cir. 2009) . . . . . . . . . . . . . . . 40

viii

PAGE

*United States v. Coplan,*
 703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . 68

*United States v. Coppola,*
 671 F.3d 220 (2d Cir. 2012) . . . . . . . . . .  46, 78, 79

*United States v. Coriaty,*
 300 F.3d 244 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 89

*United States v. Cramer,*
 777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . . 76, 77

*United States v. Cummings,*
 858 F.3d 763 (2d Cir. 2017) . . . . . . . . . . . . . . 35, 58

*United States v. Cuti,*
 720 F.3d 453 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 38

*United States v. Daley,*
 564 F.2d 645 (2d Cir. 1977) . . . . . . . . . . . . . . . . . 27

*United States v. DeLucca,*
 630 F.2d 294 (5th Cir. 1980) . . . . . . . . . . . . . . . . 65

*United States v. Delva,*
 858 F.3d 135 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 34

*United States v. Desnoyers,*
 590 F. App'x 54 (2d Cir. 2014) . . . . . . . . . . . . . . . 90

*United States v. Dhinsa,*
 243 F.3d 635 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 67

*United States v. Diaz,*
 176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . 70

*United States v. Donaghy,*
 570 F. Supp. 2d 411 (E.D.N.Y. 2008) . . . . . . . . . . 94

ix

PAGE

*United States v. Donziger*,
38 F.4th 290 (2d Cir. 2022) . . . . . . . . . . . . . . 24, 25

*United States v. Espaillet*,
380 F.3d 713 (2d Cir. 2004) . . . . . . . . . . . . . . . . 68

*United States v. Florez*,
447 F.3d 145 (2d Cir. 2006) . . . . . . . . . . . . . . . . 68

*United States v. Gansman*,
657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 63

*United States v. Garcia*,
413 F.3d 201 (2d Cir. 2005) . . . . . . . . . . . . . . 39, 40

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) . . . . . . . . . . . . . . . . 77

*United States v. Gasperini*,
894 F.3d 482 (2d Cir. 2018) . . . . . . . . . . . . . . . . 77

*United States v. Gates*,
84 F.4th 496 (2d Cir. 2023) . . . . . . . . . . . . . . 76, 80

*United States v. Gonzalez*,
421 F. Supp. 2d 727 (S.D.N.Y. 2006) . . . . . . . . . . 25

*United States v. Gottlieb*,
493 F.2d 987 (2d Cir. 1974) . . . . . . . . . . . . . . . . 28

*United States v. Grant*,
235 F.3d 95 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 91

*United States v. Grimm*,
568 F.2d 1136 (5th Cir. 1978) . . . . . . . . . . . . . . 50

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) . . . . . . . . . . . . . . . . 90

x

PAGE

*United States v. Hale*,
   106 F.3d 402, 1997 WL 34697 (6th Cir. 1997) . . 40

*United States v. Hall*,
   467 F. App'x 47 (2d Cir. 2012) . . . . . . . . . . . . . . . 93

*United States v. Harris*,
   813 F. App'x 710 (2d Cir. 2020) . . . . . . . . . . . . . 92

*United States v. Jass*,
   569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . 77, 84

*United States v. Jesperson*,
   65 F.3d 993 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 72

*United States v. Kaplan*,
   490 F.3d 110 (2d Cir. 2007) . . . . . . . . . . . . . . . . 51

*United States v. Kellington*,
   217 F.3d 1084 (9th Cir. 2000) . . . . . . . . . . . . . . 65

*United States v. Kelly*,
   888 F.2d 732 (11th Cir. 1989) . . . . . . . . . . . . . . 65

*United States v. Kozeny*,
   667 F.3d 122 (2d Cir. 2011) . . . . . . . . . . . . . . . . 67

*United States v. Lacey*,
   699 F.3d 710 (2d Cir. 2012) . . . . . . . . . . . . . 78, 80

*United States v. Lasanta*,
   978 F.2d 1300 (2d Cir. 1992) . . . . . . . . . . . . . . . 46

*United States v. Lisyansky*,
   806 F.3d 706 (2d Cir. 2015) . . . . . . . . . . . . . . . . 68

*United States v. Machi*,
   811 F.2d 991 (7th Cir. 1987) . . . . . . . . . . . . . . . . 65

xi

PAGE

*United States v. Marcus,*
    560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . . . 23, 76

*United States v. McDermott,*
    245 F.3d 133 (2d Cir. 2001) . . . . . . . . . . . . . . . . 68

*United States v. Milstein,*
    481 F.3d 132 (2d Cir. 2007) . . . . . . . . . . . . . . . . 90

*United States v. Mulder,*
    273 F.3d 91 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 63

*United States v. Muniz,*
    60 F.3d 65 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 69

*United States v. Nachamie,*
    91 F. Supp. 2d 565 (S.D.N.Y. 2000). . . . . . . . . . . 31

*United States v. Nektalov,*
    461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . . . 34

*United States v. Norman,*
    776 F.3d 67 (2d Cir. 2015) . . . . . . . . . . . . . . . . . 77

*United States v. O'Connor,*
    650 F.3d 839 (2d Cir. 2011) . . . . . . . . . . . . . 55, 68

*United States v. Osarenkhoe,*
    439 F. App'x 66 (2d Cir. 2011) . . . . . . . . . . . . . . 45

*United States v. Persico,*
    645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 68

*United States v. Pico,*
    2 F.3d 472 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . 78

*United States v. Powell,*
    831 F. App'x 24 (2d Cir. 2020) . . . . . . . . . . . . . . 80

xii

PAGE

*United States v. Prescott,*
   920 F.2d 139 (2d Cir. 1990) . . . . . . . . . . . . . . . . . 84

*United States v. Prince,*
   110 F.3d 921 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 78

*United States v. Provenzano,*
   615 F.2d 37 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . 71

*United States v. Qurashi,*
   634 F.3d 699 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 89

*United States v. Rajaratnam,*
   No. 09 Cr. 1184 (RJH), 2010 WL 2788168
   (S.D.N.Y. July 13, 2010) . . . . . . . . . . . . . . . . . . . . 31

*United States v. Rea,*
   958 F.2d 1206 (2d Cir. 1992) . . . . . . . . . . . . . . . . 58

*United States v. Reifler,*
   446 F.3d 65 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . 91

*United States v. Rivernider,*
   828 F.3d 91 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . 90

*United States v. Roldan-Zapata,*
   916 F.2d 795 (2d Cir. 1990) . . . . . . . . . . . . . . 46, 48

*United States v. Rose,*
   No. 19 Cr. 789 (PGG), 2021 WL 2117119
   (S.D.N.Y. May 24, 2021) . . . . . . . . . . . . . . . . . . . 32

*United States v. Rossi,*
   592 F.3d 372 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 91

*United States v. Roy,*
   783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . 63, 64

xiii

PAGE

*United States v. Rutigliano*,
614 F. App'x 542 (2d Cir. 2015) . . . . . . . . . . . . . . 84

*United States v. Ryan*,
806 F.3d 691 (2d Cir. 2015) . . . . . . . . . . . . . . . . 77

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 34

*United States v. Salazar*,
485 F.2d 1272 (2d Cir. 1973) . . . . . . . . .  28, 29, 32

*United States v. Savin*,
No. 00 Cr. 45 (RWS), 2001 WL 243533
(S.D.N.Y. Mar. 7, 2001) . . . . . . . . . . . . . . . . . . . . 31

*United States v. Scarpa*,
897 F.2d 63 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . 50

*United States v. Scop*,
846 F.2d 135 (2d Cir. 1988) . . . . . . . . . . . . . . . . 40

*United States v. Siddiqui*,
699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . 34

*United States v. Skelos*,
707 F. App'x 733 (2d Cir. 2017) . . . . . . . . . . . . . 64

*United States v. Temple*,
447 F.3d 130 (2d Cir. 2006) . . . . . . . . . . . . . . . . 67

*United States v. Thompson*,
792 F.3d 273 (2d Cir. 2015) . . . . . . . . . . . . . . . . 89

*United States v. Thorn*,
317 F.3d 107 (2d Cir. 2003) . . . . . . . . . . . . . . . . 82

xiv

PAGE

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990) . . . . . . . . .  28, 29, 30

*United States v. Tzakis*,
  736 F.2d 867 (2d Cir. 1984) . . . . . . . . . . . . . 90, 95

*United States v. Valenti*,
  60 F.3d 941 (2d Cir. 1995) . . . . . . . . . . . . . 45, 47

*United States v. Walker*,
  191 F.3d 326 (2d Cir. 1999) . . . . . . . . . . . . . . . 50

*United States v. Walsh*,
  194 F.3d 37 (2d Cir. 1999) . . . . . . . . . . . . . . . . 29

*United States v. Wedd*,
  993 F.3d 104 (2d Cir. 2021) . . . . . . . . . .  21, 23, 26

*United States v. Wexler*,
  522 F.3d 194 (2d Cir. 2008) . . . . . . . . . . . . . . . 64

*United States v. Whab*,
  355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . 80

*United States v. White*,
  552 F.3d 240 (2d Cir. 2009) . . . . . . . . . . . . . . . 63

*United States v. Yalincak*,
  30 F.4th 115 (2d Cir. 2022) . . . . . . . . . . . . . . . 90

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003) . . . . . . . . . . . . . . . . 35

*United States v. Zangari*,
  677 F.3d 86 (2d Cir. 2012) . . . . . . . . . . .  76, 91, 94

*Washington v. Schriver*,
  255 F.3d 45 (2d Cir. 2001) . . . . . . . . . . . . . . . . 49

xv

PAGE

*Washington v. Texas,*
    388 U.S. 14 (1967). . . . . . . . . . . . . . . . . . . . . . . . 49

*Wong Tai v. United States,*
    273 U.S. 77 (1927). . . . . . . . . . . . . . . . . . . . . . . . 28

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 3663A. . . . . . . . . . . . . . . . . . . . . . . . . . . 89

18 U.S.C. § 3664 . . . . . . . . . . . . . . . . . . . . . 89, 95, 96

28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

N.Y. Educ. § 6530(18). . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Crim. P. 35(a). . . . . . . . . . . . . . . . . . . . . . . 86

Fed. R. Crim. P. 37(a). . . . . . . . . . . . . . . . . . . . . . . 86

Fed. R. Crim. P. 52(a). . . . . . . . . . . . . . . . . . . . . 35, 63

Fed. R. Crim. P. 52(b). . . . . . . . . . . . . . . . . . . . . . . 91

Fed. R. Crim. P. 7(f) . . . . . . . . . . . . . . . . . . . . . . . 28

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . 34, 46

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . 39

U.S.S.G. § 1B1.3. . . . . . . . . . . . . . . . . . . . . . . . 78, 81

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . 72, 73, 78, 82

U.S.S.G. § 3A1.1. . . . . . . . . . . . . . . . . . . . . . . . 73, 83

U.S.S.G. § 3B1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . 73

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 23-6440(L), 23-6474(CON), 23-6879(CON)

―――――――

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

GEORGE CONSTANTINE, ANDREW DOWD,

*Defendants-Appellants,*

MARC ELEFANT, SADY RIBEIRO, ADRIAN ALEXANDER,

*Defendants.*

―――――――

## BRIEF FOR THE UNITED STATES OF AMERICA

―――――――

### Preliminary Statement

George Constantine and Andrew Dowd appeal from judgments of conviction entered on April 25, 2023, and amended on July 20, 2023, in the United States District Court for the Southern District of New York, following a three-week trial before the Honorable Sidney H. Stein, United States District Judge, and a jury. Dowd also appeals from an order of restitution entered on July 20, 2023.

2

Superseding Indictment S1 21 Cr. 530 (SHS) (the "Indictment") was filed on October 19, 2021, in six counts. Count One charged both defendants with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349. Count Two charged both defendants with mail fraud, in violation of 18 U.S.C. §§ 1341 and 2. Count Three charged both defendants with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Counts Four, Five, and Six charged Dowd with an additional count each of conspiracy to commit mail and wire fraud, mail fraud, and wire fraud, respectively.[1]

Trial began on November 28, 2022, and ended on December 16, 2022, when the defendants were convicted on all counts.

On April 25, 2023, Judge Stein sentenced the defendants principally to a term of 102 months' imprisonment. At the time of sentencing, Judge Stein ordered restitution but deferred fixing the amount of restitution for a period of 90 days.

On July 20, 2023, Judge Stein entered an order imposing $8,117,011 in restitution as to Dowd, and $7,320,657 in restitution as to Constantine.

The defendants are released on bail pending appeal.

---

[1] The Indictment also charged defendants Sady Ribeiro, Marc Elefant, and Adrian Alexander, each of whom pleaded guilty before trial.

3

**Statement of Facts**

Constantine, a personal injury lawyer, and Dowd, an orthopedic surgeon, participated in and earned millions of dollars from a massive trip-and-fall fraud scheme from approximately 2013 to 2018. They relied on a team of coconspirators to recruit low-income and, at times, homeless individuals to stage trip-and-fall accidents on commercial properties in New York City. After the accidents were staged, Constantine filed fraudulent lawsuits against the property owners and their insurers, claiming the patients had been seriously injured, while Dowd performed medically unnecessary surgeries on the patients' shoulders and knees. The surgical procedures were designed to inflate the value of the fraudulent lawsuits and extract larger settlements from the insurance company victims. Altogether, nearly 500 patients cycled through the fraud scheme.

## A. The Government's Case

At trial against Constantine and Dowd, the Government called 16 witnesses, including two coconspirators, Kerry Gordon, a former patient who was the principal "runner" who recruited individuals willing to participate in the scheme, and Peter Kalkanis, a former chiropractor who served as a "broker," both of whom testified pursuant to cooperation agreements with the Government and described participating in the scheme directly with the defendants; six patients who had staged accidents and undergone unnecessary medical procedures; a medical expert in orthopedic surgery; a claims investigator for one of the insurance

4

companies; and Dowd's personal accountant. The Government also introduced various exhibits, including emails and text messages in which the defendants discussed the scheme; video clips of staged accidents; Dowd's patient files; and documents reflecting how the scheme was funded and executed, including fraudulent legal filings, contracts, and financial records.

## 1. The Trip-and-Fall Fraud Scheme

The trip-and-fall fraud scheme began around 2013. (Constantine A. 526, 1084, 1756).[2] Kalkanis served as

---

[2] "Constantine Br." refers to Constantine's brief on appeal; "Constantine A." refers to the appendix filed with that brief; "Dowd Br." refers to Dowd's brief on appeal; "Dowd A." refers to the appendix filed with that brief; "Dowd Supp. Br." refers to Dowd's supplemental brief on appeal; "Dowd Supp. SPA" refers to the special appendix filed with Dowd's supplemental brief; "Constantine PSR" refers to the Presentence Investigation Report ("Presentence Report") prepared by the United States Probation Office in connection with Constantine's sentencing; "Dkt." refers to an entry on the District Court's docket for this case; "18 Cr. 289 Dkt." refers to an entry on the District Court's docket for the related case *United States v. Duncan*, No. 18 Cr. 289 (SHS); "17 Cr. 633 Dkt." refers to an entry on the District Court's docket for the related case *United States v. Dewitt*, No. 17 Cr. 633 (SHS); and "GX" refers to a Government trial exhibit. Unless otherwise noted, case quotations omit internal quotation marks, citations, footnotes, and previous alterations.

5

the "broker" or "middleman" for the scheme; he managed the "runners," including Gordon, and worked directly with the lawyers and doctors, including Constantine and Dowd. (Constantine A. 1747-48). The scheme also involved "funders," such as Adrian Alexander, who lent out money from his company, Health Finance LLC, to pay for the surgeries and to provide patients with small incentive payments to go through with the surgeries. (Constantine A. 516).[3] Over time, additional runners became involved, including Bryan Duncan, Ryan Rainford, Reginald Dewitt, and Robert Locust. (Constantine A. 1757, 1809-10).

Runners would recruit "patients" to stage trip-and-fall accidents at particular locations throughout New York City. (Constantine A. 262-65, 432, 525, 1452, 2093). Common accident sites included potholes, grates, and raised cellar doors. (Constantine A. 672, 1758). At first, patients would falsely claim to have fallen at a particular location. (Constantine A. 283). Over time, however, patients were required to go to the accident site and purposely fall before being taken to the hospital, a change designed "to make [the accidents] look real." (Constantine A. 529). Videos introduced as Government exhibits showed patients staging their accidents. (GX 804 (Erica Barton), 837 (Jose Julbe), 838 (same)).

After patients staged their accidents, runners drove them, by the carload, to Constantine's office.

---

[3] Alexander also owned Astoria Medical Imaging, an MRI facility that the scheme used to make sure the "MRIs were positive." (Constantine A. 1790, 1802).

6

(Constantine A. 541). Gordon testified that he brought "hundreds" of patients to Constantine's office, and that "90 percent" of the trip-and-fall cases were "fake or staged accidents." (Constantine A. 511, 539). Constantine paid the runners $1,000 for each patient referred. (Constantine A. 689, 1776).

Kalkanis maintained a small office in Constantine's basement, and the patients met with Kalkanis first. (Constantine A. 543, 1759; GX 222). Kalkanis filled out "intake sheets" that listed basic information about the accidents. (Constantine A. 1763-64). Although Kalkanis knew the accidents were staged, the runners "prepped" the patients to lie about their accidents—claiming they were real—to avoid getting in "trouble with the law." (Constantine A. 1773-74). Kalkanis then brought the patients upstairs to meet with Constantine. (Constantine A. 1774). Constantine's meetings with the patients were brief, typically "less than ten minutes." (Constantine A. 559). Patient Malike Walker testified that Constantine failed to ask even the most basic questions, including where, when, and how he had fallen. (Constantine A. 960). At the time he met with Constantine, Walker did not know where he was supposed to have fallen. (Constantine A. 956).

After taking the patients to meet with Constantine, the runners would drive the patients, again by the carload, to Dowd's office. (Constantine A. 579-80, 591, 1473-74). Dowd knew the patients were coming from runners (Constantine A. 1797-98), and he paid Kalkanis a $1,000 referral fee for each patient (Constantine A. 1795-96). The appointments with Dowd were

7

quick, usually under 10 minutes. (Constantine A. 581). None of the patients appeared seriously injured. (Constantine A. 580). Dowd would at times invite Gordon to sit in during the appointments. (Constantine A. 581). Gordon could recall only one instance, out of hundreds, when he saw Dowd physically examine a patient—and even then, Dowd at most "touched the [patient's] knee." (Constantine A. 583). Each patient who testified at trial denied having been physically examined by Dowd.

From the beginning, Dowd was quick to perform surgery. As Kalkanis wrote in a December 2013 email to Alexander, Dowd "offers no resistance whatsoever. He examines the patient and gets the surgical clearance and surgery completed within a week's time. There is no waste of time and the lawyers we use are aware of this. . . . Trust me. I feel very good about this guy." (GX 402). Dowd even asked Walker, whose severe obesity significantly increased the risk of any surgical procedure, if he "wanted just the scar or the full surgery"—*i.e.*, whether he wanted actual surgery or just the appearance that he had undergone surgery. (Constantine A. 973-74, 1309-10).

Patients were recruited into the scheme with the promise of receiving "[m]oney at surgery and settlement." (Constantine A. 528). They typically received $1,500 after surgery, and were promised larger sums when their cases settled. (Constantine A. 528). Settlements averaged from $100,000 to $150,000. (Constantine A. 598). But patients usually received only a fraction of that amount; most of the money went to the funding companies that had financed the surgeries

8

and to the lawyers and doctors like Constantine and Dowd. (*E.g.*, Constantine A. 1004 (Walker testifying that he was supposed to get $250,000 but received only $10,000 from Constantine)).

The patients were from "poor, low income areas," including "projects" and "homeless shelters." (Constantine A. 533). Gordon recruited from shelters because people there "were desperate, they needed money, they didn't ask a lot of questions." (Constantine A. 533). The patients were poorly dressed, frequently smelled of body odor and alcohol or marijuana, and often asked for money and food. (Constantine A. 535-36). Patients would call Constantine's office and speak with Constantine's wife, who served as his secretary, to request additional loans on their potential settlements. (Constantine A. 608-12; GX 1602AL, 1604A). On other occasions, Constantine's wife would contact the runners, including Gordon, when she could not locate a patient, who perhaps had just been released from jail and was needed for a deposition. (Constantine A. 608-14). Constantine joked that a patient known to be an alcoholic could use his small settlement check to buy "1 bottle of Georgi vodka." (Constantine A. 618, 1107-08; GX 1602O).

## 2. The Scheme Divides

Around 2015, Kalkanis learned that Travelers Insurance was investigating the fraud scheme. (Constantine A. 1802-03; *see also* Constantine A. 598). Kalkanis spoke with Constantine, who was already aware of the investigation and responded, "F them." (Constantine A. 1803). After that, Constantine, Alexander,

9

Gordon, and Duncan separated from Kalkanis, dividing the scheme into two. (Constantine A. 600, 1805). Kalkanis, needing a new lawyer, was referred to Marc Elefant, who agreed to take on his cases. (Constantine A. 1807). Dowd continued to work with both Constantine and Elefant. (Constantine A. 606, 1813).[4]

After the split, Constantine pushed for patients to undergo more invasive and more valuable surgeries. In July 2015, Alexander wrote in an email to coconspirators that "George does not want any more little cases, just the spinal surgery ones." (Constantine A. 1098; GX 465). In October 2016, Duncan sent a text message informing Constantine that two of Constantine's clients, Jose Julbe and Jay Bing, had been prescribed a lumbar fusion, a back surgery that involves using rods and screws the stabilize the spine, without first having a less invasive procedure. (Constantine A. 1106-07; GX 1602AD). Constantine responded, "Perfect." (Constantine A. 1106-07; GX 1602AD).[5]

A transcript of Julbe's deposition was admitted as a Government exhibit. (Constantine A. 1674;

---

[4] Gordon eventually stopped bringing Dowd new patients because Dowd wanted to pay him only $500 per patient, instead of the previous $1,000. (Constantine A. 605-06).

[5] Walker, also a Constantine client, underwent that same procedure and described experiencing "the worst pain in the world" for several weeks afterward. (Constantine A. 985-86).

10

GX 836).[6] Before the deposition, opposing counsel had sent Constantine a 25-second video clip that showed Julbe staging his accident. (Constantine A. 1673-74). Constantine proceeded with the deposition and tried to prevent Julbe from answering questions about the video, including by forcing opposing counsel to call the court to mediate the dispute. (Constantine A. 1683). The deposition ended early after Julbe had a "mental breakdown" and was unable to continue. (Constantine A. 1687; GX 836). Constantine pursued the lawsuit for another year before dropping the case. (Constantine A. 1687, 1707).

Similarly, another Constantine client, Kasheem Jones, testified that before his deposition Constantine "went over the story" with him and "briefed" him "on what not to say and things to say." (Constantine A. 317).

Meanwhile, Dowd, who by late 2015 was working mostly with Kalkanis and Elefant, performed hundreds of surgeries on Elefant's clients, including patients Erica Barton (knee surgery), Keona Norwood (knee surgery), and Willie Barbour (shoulder and knee surgeries), each of whom testified at trial. (GX 1702). Those patients met with Dowd only once before surgery, were not physically examined, were not presented with any alternatives to surgery, and were not assessed for risk factors before surgery. (Constantine

---

6    Julbe fit the profile of the patients recruited into the scheme: He had served 30 years in prison for murder, lived in a shelter, and had schizophrenia. (Constantine A. 1676-78; GX 836).

11

A. 300-05, 448-49, 582-83, 971-72, 1473, 2103-05).
Dowd recommended surgery for all of his patients.
(Constantine A. 306, 582, 974, 1792, 2106; GX 1703).
Kalkanis could not recall a single instance in which
Dowd refused to operate on a patient. (Constantine
A. 1792). Dowd often performed surgery within two
weeks of meeting a patient. (GX 1703). Barton, for ex-
ample, underwent surgery just five days after meeting
Dowd. (Constantine A. 457-59; GX 1715A, 1031Z,
1031K). Even in instances where Dowd's examination
report recommended physical therapy and a follow-up
within a few weeks, Dowd performed surgery before
any follow-up or physical therapy occurred. (Constan-
tine A. 450, 2105).

Funding companies like Health Finance and Sun-
set Properties paid Dowd, by check, roughly $10,000
per surgery. Because surgery was a foregone conclu-
sion, the checks were sometimes issued before Dowd
had received a patient's MRI report. (GX 1031G,
1031K, 1031Z, 1715B-D). Dowd collected an additional
$2,000 fee for physical therapy equipment he sent to
the patients after surgery. (Constantine A. 1477, 1796-
97; GX 1341M). It was Dowd's idea to send the equip-
ment. (Constantine A. 1797). But patients were not
told how to use it; Barton never even opened the box.
(Constantine A. 496).

### 3. The Medical Records and Expert Testimony

Hundreds of Dowd's patient files were admitted as
Government exhibits. Dowd's initial examination re-
ports were replete with vague and repetitive descrip-
tions of pain, consistently documenting patient reports

12

of "clicking," "popping," and "cracking," and often included unrealistic reports of pain in excess of 7 on a pain scale of 10. (Constantine A. 1265-80). One patient's pain level was listed as a "12 on a scale of 1 to 10." (Constantine A. 1280).[7] The reports uniformly described Dowd as having performed physical tests on the patients' knees—but all five patients who testified at trial confirmed that Dowd had never performed those tests. (Constantine A. 302-04, 449, 971-72, 1473, 2104). Also absent from Dowd's reports were injuries related to patients' ankles or wrists, which are commonly injured in trip-and-fall accidents and are within Dowd's area of expertise as a hand surgeon. (Constantine A. 1173-74, 1448-49; GX 1703).

The Government offered expert testimony from Dr. Neil Roth. Dr. Roth, who had reviewed more than 80 of Dowd's files, opined that Dowd relied on MRI reports that were vague and inconsistent with later post-surgical observations; that Dowd's initial examination reports were riddled with repetitive and generic descriptions; that Dowd's pre-surgical diagnosis of "internal derangement" was consistent throughout all patient files and had no clinical meaning; and that Dowd's post-operative reports often described surgical techniques that served no medical purpose. (Constantine A. 1216-17, 1249, 1253-61, 1269, 1285).

---

[7] According to the Government's medical expert, a patient with level-12 pain would "be in utter and complete agony, . . . likely requiring assistance in the emergency room." (Constantine A. 1280).

13

### 4. The End of the Scheme

Around 2017, Elefant stopped taking cases from Kalkanis. (Constantine A. 1819). Dowd tried to find new lawyers for the scheme. (Constantine A. 1819). In a June 2017 text message, for example, Dowd wrote to Kalkanis: "I have two other attorneys in mind who could also be trusted to keep their word and might be prepared to move quick." (Constantine A. 1821; GX 1603B). Dowd also wrote: "I think we would have more control with Victor." (Constantine A. 1821; GX 1603B). Few of the lawyers panned out, and the scheme's operations soon ceased.

In total, Constantine filed approximately 245 fraudulent lawsuits as part of the scheme. (Constantine PSR ¶ 40). He settled those cases for more than $20.9 million, and collected more than $5.3 million in legal fees. (Constantine A. 1609; GX 1703 at 20). Dowd performed 287 surgeries as part of the scheme, and collected at least $3.2 million in surgical fees. (Constantine A. 2144; GX 1703, 1714).

## B. The Defense Case, Verdict, Post-Trial Motions, and Sentencings

Constantine did not call any witnesses. Dowd called one expert witness, Dr. Stuart Springer, who testified that he had reviewed a handful of Dowd's patient files and believed they were consistent with acceptable standards of orthopedic care. (Constantine A. 2275, 2295-97, 2293). On cross-examination, Dr. Springer acknowledged that he had peer-reviewed Dowd's identical surgical procedures on prior occasions in the no-fault insurance context, and had then

14

concluded that Dowd's surgeries were medically un-
necessary. (Constantine A. 2316, 2346-56).

After deliberating for less than five hours, the jury
returned a verdict of guilty on all counts.

Dowd moved after trial for a judgment of acquittal
under Rule 29 of the Federal Rules of Criminal Proce-
dure, arguing that insufficient evidence proved that he
knew or had reason to know that he was a participant
in the scheme. (Dowd A. 2970-3018). On April 10,
2023, the District Court denied the post-trial motion
in a written opinion and order. (Dowd A. 3025-30).

On April 25, 2023, Judge Stein sentenced Constan-
tine and Dowd to 102 months in prison, to be followed
by a three-year term of supervised release. Judge Stein
also imposed forfeiture of $4,774,709 on Constantine
and $2,900,905 on Dowd, and mandatory special as-
sessments of $300 on Constantine and $600 on Dowd.
Subsequently, Judge Stein ordered Constantine and
Dowd to pay restitution of $7,320,657 and $8,117,011,
respectively. Constantine and Dowd are jointly and
severally liable for restitution with one another and
with coconspirators who have also been ordered to pay
restitution. (Dkt. 288 at 7-8; Dowd Supp. SPA 1-2, 11-
12).

Judge Stein initially directed the defendants to sur-
render by June 30, 2023. But Constantine and Dowd
moved for bail pending appeal (Dkt. 253, 271), and
Judge Stein granted their motions (Dowd A. 3105-07).
In so doing, Judge Stein noted that the defendants had
raised a "gallimaufry" of evidentiary challenges and
other issues, and although the District Court "believes

15

that each of its evidentiary decisions during the trial was correct; that there is no basis for a recusal here; that the jury charge was correct; and that the evidence presented at trial against each defendant independent of the challenged evidentiary rulings was substantial . . . [,] some of these issues may properly be characterized as close questions of law or fact." (Dowd A. 3106).

## A R G U M E N T

### POINT I

### The District Court Did Not Abuse Its Discretion in Denying Dowd's Recusal Motion

Both defendants argue that Judge Stein erred by failing to recuse himself based on a handful of pre-trial comments. (Dowd Br. 38-42; Constantine Br. 55-58). But nothing Judge Stein said required recusal, and Judge Stein acted well within his discretion in denying Dowd's recusal motion.

### A.  Relevant Facts

In April 2019, the Government charged five defendants who planned and operated the trip-and-fall fraud scheme with Constantine and Dowd: Kalkanis, Gordon, Duncan, Locust, and Rainford. The case was assigned to Judge Stein. Kalkanis and Gordon pleaded guilty before trial, and Duncan, Locust, and Rainford were each found guilty following a trial in May 2019 (the "Duncan Trial"). The evidence at that trial included testimony from Kalkanis that the doctors and lawyers involved in the scheme, including Dowd and

16

Constantine, knew the accidents were staged. (18 Cr. 289 Dkt. 159, 161).[8]

In June 2019, after the Duncan Trial, the Government presented Judge Stein with a search warrant application and supporting affidavit seeking authorization to search several email accounts belonging to participants in the trip-and-fall scheme, including an email account belong to Dowd. Judge Stein signed the warrant upon a finding of probable cause.

In January 2020, Judge Stein presided over Duncan's sentencing, during which he stated: "[M]ost of the money went to [Duncan], Kalkanis, the funders, the lawyers, and the doctors. And I would urge the government to continue their investigation here, because, based on this testimony, the lawyers and the doctors were heavily involved in this." (Dowd A. 158).

At Locust's sentencing in July 2021, Locust's counsel argued that "the worst people involved in this conspiracy were people who had never, ever been prosecuted." (Dowd A. 183). Judge Stein responded:

> I assume, I would hope, and I made it clear to the government during the trial and at other proceedings in this case, that the government is pursuing the corrupt lawyers, the corrupt doctors who were involved in this scheme. That was a theme during the trial, not in the hearing of the

---

[8] Duncan, Locust, and Rainford appealed their convictions and sentences. That appeal remains pending. (App. Dkt. 20-359).

> jury because I wasn't going to allow the argument that other people should be here and they're not, that's not the issue. I'm not disagreeing with you, but I'm not a prosecutor, I'm a judge. I would hope the government is following through on a continuing investigation. I don't know whether they are or not.

(Dowd A. 183-84).

On August 23, 2021, an initial indictment against Constantine, Dowd, and two co-defendants was returned, and the case was assigned to the Honorable Loretta A. Preska, United States District Judge. Pursuant to the District Court's local rules, the Government filed a related-case letter informing Judge Stein and Judge Preska that the indictment and the Duncan Trial "ar[o]se from the same criminal fraud scheme . . . so that Your Honors can share information relevant to these two matters and decide whether [the indictment] should remain with Judge Preska or be reassigned to Judge Stein." (18 Cr. 289 Dkt. 363). The case was reassigned to Judge Stein.

On September 9, 2021, Judge Stein held an initial conference and stated:

> I'm familiar with the alleged fraud or at least a similar fraud here. As you know, I had the trial of all the parties against Mr. Duncan, Mr. Locust, and Mr. Rainford. This is alleged to be related to that. Mr. Constantine and Mr. Elefant were the attorneys allegedly violating a number of

18

> laws, as well as their professional obliga-
> tions, and Dr. Dowd and Dr. Ribeiro are
> similarly alleged to be violating their pro-
> fessional obligations and a number of
> laws, insofar as they were performing
> whatever alleged to be unnecessary sur-
> geries.
>
> Of course, it will be up to the jury to de-
> cide whether or not the government can
> prove its case beyond a reasonable doubt.

(Dkt. 34 at 5).

Trial was scheduled for November 28, 2022. (Dowd
A. 18). Alexander pleaded guilty before trial, and at his
plea allocution in August 2022, Judge Stein stated:

> This is one of those cases that confounds
> me. Highly educated professionals—doc-
> tors, lawyers, others are involved—were
> involved in a scheme that boggles the
> mind in creating fake slip-and-falls, and
> then having people undergo surgeries
> that were risky and dangerous that were
> totally unnecessary or in some cases
> partly unnecessary.... And the funders
> and the lawyers and the doctors profited
> normally handsomely, and the patients
> did not. It's a frightening insight into hu-
> man nature.

(Dowd A. 221-22).

On October 4, 2022, less than two months before
trial, Dowd moved to recuse Judge Stein under 28
U.S.C. § 455(a), arguing that Judge Stein's

19

impartiality might reasonably be questioned based on his statements during Duncan's and Locust's sentencings and Alexander's plea proceeding. (Dowd A. 122-30).

Judge Stein denied the motion orally on November 17, 2022 (Dowd A. 24), and in a subsequent written opinion (Dowd A. 3019-24). Judge Stein explained:

> [I]n response to questions of relative culpability in a multi-defendant conspiracy, this Court stated that it assumed and hoped the Government would "pursu[e] the corrupt lawyers, the corrupt doctors," and "follow[ ] through on a continuing investigation" of those actors. The Court made plain that the source of its view that the lawyers and doctors were heavily involved in the trip-and-fall conspiracy was the testimony adduced during the Duncan trial concerning how the conspiracy functioned, and recalled that that was "a theme during the trial."
>
> The Court made clear that the decision of whether to investigate and charge potential defendants was not for the Court, when it said, "I'm not the prosecutor, I'm the judge," and "those people are not in front of me." . . . No reasonable person apprised of the facts in that case, which was the source of the Court's opinion, would conclude, based on these comments, that the Court harbors the requisite

20

"antagonism that would make fair judg-
ment impossible" to warrant recusal.

(Dowd A. 3022).

Judge Stein also questioned the eleventh-hour na-
ture of Dowd's motion:

> Dowd filed this motion more than a year
> after this Court made the core of the com-
> ments that Dowd now challenges, and
> over a year after Dowd was indicted and
> made aware of the charges against him.
> The distance of this motion from the al-
> legedly offended comments as well as the
> proximity to Dowd's trial provides a quin-
> tessential example of the gamesmanship
> that a preference for prompt filing of
> recusal motions is meant to avoid.

(Dowd A. 3024).

## B.  Applicable Law

A judge must "disqualify himself in any proceeding
in which his impartiality might reasonably be ques-
tioned." 28 U.S.C. § 455(a). The relevant inquiry under
Section 455 is whether "an objective, disinterested ob-
server fully informed of the underlying facts" would
"entertain significant doubt that justice would be done
absent recusal." *United States v. Bayless*, 201 F.3d
116, 126 (2d Cir. 2000).

The Supreme Court discussed the standards for ju-
dicial disqualification in *Liteky v. United States*, 510
U.S. 540 (1994). After noting that "opinions held by
judges as a result of what they learned in earlier

21

proceedings" are not "subject to deprecatory characterization as 'bias' or 'prejudice,'" *id.* at 551, the Court stated that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," *id.* at 555. Accordingly, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

Ordinarily, Section 455(a) will not require recusal based on "a judge's comments during a proceeding that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases." *United States v. Wedd*, 993 F.3d 104, 115 (2d Cir. 2021). Partiality cannot be established through "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Liteky*, 510 U.S. at 555-56.

"A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988). In deciding whether to recuse, a judge "must carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his presiding over their case." *Id.* Thus, "[w]here the standards governing disqualification have not been met,

22

disqualification is not optional; rather, it is prohibited." *In re Aguinda*, 241 F.3d 194, 201 (2d Cir. 2001).

Recusal motions be made "at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim." *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.3d 326, 333 (2d Cir. 1987). That promptness requirement "avoids the risk that a party is holding back a recusal application as a fall-back position in the event of adverse rulings on pending matters." *LoCascio v. United States*, 473 F.3d 493, 497 (2d Cir. 2007). In considering the timeliness of a recusal motion, a court must consider whether "(1) the movant has participated in a substantial manner in trial or pre-trial proceedings; (2) granting the motion would represent a waste of judicial resources; (3) the motion was made after the entry of judgment; and (4) the movant can demonstrate good cause for delay." *Apple*, 829 F.2d at 334.

"Recusal motions are committed to the sound discretion of the district court, and this Court will reverse a decision denying such a motion only for abuse of discretion." *LoCascio*, 473 F.3d at 495. Because the district judge "is in the best position to appreciate the implications of those matters alleged in a recusal motion," reversal of a decision denying a recusal motion is an "extraordinary remedy" requiring a showing that the district court "indisputably abused its discretion." *In re Drexel Burnham*, 861 F.2d at 1312, 1314.

A recusal argument that was not raised below, however, is reviewable only for plain error. *See United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008). To satisfy that standard, the appellant must show that

23

"(1) there is an error (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010).

## C. Discussion

Constantine did not seek Judge Stein's recusal below, so his claim is reviewable only for plain error. *See Wedd*, 993 F.3d at 115. Because Dowd sought recusal, his claim is reviewed for abuse of discretion. *See LoCascio*, 473 F.3d at 495. Under either standard, the defendants' recusal arguments fail.

There was no basis for recusal. As Judge Stein recognized in denying Dowd's recusal motion, Judge Stein made the challenged comments about the lawyers and doctors involved in the scheme after he had presided over the Duncan Trial and in response to arguments that the doctors and lawyers were more culpable than other defendants. (Dowd A. 3022); *see Wedd,* 993 F.3d at 116-17 (noting that judges are frequently and appropriately called upon to assess relative culpability before trials and jury verdicts). Judge Stein encouraged the continued investigation into a category of defendants—the lawyers and doctors—but expressed no particular goal about the result of such an investigation, and displayed no "deep-seated favoritism or antagonism that would make fair judgment impossible." *Litkey*, 510 U.S. at 555. Given the context in which

24

Judge Stein made the challenged comments, no reasonable person, knowing all the facts, could "conclude that the trial judge's impartiality could reasonably be questioned." *Bayless*, 201 F.3d at 126.

Dowd and Constantine argue that Judge Stein's comments about additional investigation "created the appearance of impropriety by impermissibly blending the judicial and prosecutorial roles." (Dowd Br. 39; *see also* Constantine Br. 57). To the contrary, after expressing his "hope" that the Government was continuing its investigation, Judge Stein expressly stated: "I'm not a prosecutor, I'm a judge." (Dowd A. 184). A reasonable observer would take Judge Stein's words at face value—that he had no control over the Government's investigation—and not as what Dowd characterizes as some sideways remark designed to "underscore the seriousness of [the] statement directed to another branch of government." (Dowd Br. 40).

The cases Dowd and Constantine cite are far afield. (Dowd Br. 40-41; Constantine Br. 57-58). In *United States v. Antar*, 53 F.3d 568 (3d Cir. 1995), a district judge who had presided over a related civil proceeding stated in "stark, plain and unambiguous language" that "his goal in the criminal case, from the beginning, was . . . to enforce a repatriation order and final judgment issued during a concurrent civil proceeding and give back the proceeds recovered to the public." *Id.* at 576. *In re Murchison*, 349 U.S. 133 (1955), involved a Michigan law that impermissibly authorized the judge to act as a "one-man grand jury." *Id.* at 133-34. And in *United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022), this Court *affirmed* a conviction after a district judge

25

appointed a special prosecutor. *See id.* at 294, 306. If anything, *Donziger* reaffirms that Judge Stein did not abuse his discretion in declining to recuse himself based on comments about continued investigation of the scheme at the heart of the Duncan Trial.

Dowd further argues that "timing reinforces the appearance of impropriety" because the initial indictment was returned six weeks after one of the District Court's comments and, upon indictment, the Government "promptly suggested reassignment" to Judge Stein. (Dowd Br. 41). But there was nothing improper about the District Court's comments, and that one challenged comment occurred six weeks before indictment is irrelevant. Moreover, the Government did not "suggest[ ]" reassignment to Judge Stein. Rather, consistent with the rules and practice in the district, the Government wrote a letter informing Judge Preska and Judge Stein of the overlap in the cases and left it to the judges' discretion on how to proceed. *See United States v. Gonzalez*, 421 F. Supp. 2d 727, 732 (S.D.N.Y. 2006) ("Judges often volunteer to take cases from one another; the [local] rules permit that practice."), *order vacated in part on other grounds*, 291 F. App'x 392 (2d Cir. 2008); *see also* SDNY Rules for the Division of Business Among District Judges, Rule 13, Related Cases. The reassignment to Judge Stein was neither surprising nor nefarious. Judge Stein had significant familiarity with the fraud scheme from the Duncan Trial, so it was most efficient for him to preside over this case, as well.

This Court's decision in *Wedd* is instructive. Following the conviction at trial of Wedd's co-defendant,

26

the district judge told that co-defendant's counsel, regarding the co-defendant's impending sentencing: "if I were to rank people in terms of their levels of culpability, [the co-defendant] would be at the very bottom of all of these defendants, including [two other co-defendants], and far below Mr. Wedd." *Wedd*, 993 F.3d at 112. On appeal, Wedd argued that the district court's statement comparing the culpability of a co-defendant and Wedd "created the appearance of partiality." *Id.* at 116. The trial court judge had denied a recusal motion, and this Court affirmed, writing that "[a] judge cannot be said to have manifested partiality simply by expressing a view of a particular defendant's culpability based on information that has been presented to the court." *Id.* at 117.

Judge Stein went no further than the district judge in *Wedd*: Based on the evidence "presented to the court" during the Duncan Trial and in the search warrant affidavit, Judge Stein agreed that the lawyers and doctors appeared to be more culpable than the convicted defendants, and urged the Government to continue its investigation. Dowd tries to distinguish *Wedd* by arguing that Judge Stein urged action regarding "unindicted non-parties," then "reached out to preside over their prosecution." (Dowd Br. 42). But that distinction is meaningless because Judge Stein had no power to—and did not—affect the Government's investigation. Moreover, Judge Stein handled Dowd's prosecution and trial in a fair and balanced manner, even precluding evidence the Government sought to admit (Dkt. 132 at 26) and permitting Dowd to offer evidence to which the Government objected (Constantine A. 2156-57).

27

Finally, the District Court fairly questioned the timing of Dowd's motion, which came on the eve of trial. (Dowd A. 3024). Although Dowd suggested the motion was timely based on a delayed review of prior sentencing transcripts (Dowd A. 3019-20), he was well aware of the Duncan Trial and the sentences of his co-conspirators and had no excuse for filing his motion so late. *See United States v. Daley*, 564 F.2d 645, 651 (2d Cir. 1977) (motion for recusal was untimely because the facts upon which it was based, "as a matter of public record, were at all times ascertainable by counsel").

## POINT II

### The District Court Did Not Abuse Its Discretion in Denying Dowd's Motion for a Bill of Particulars

Dowd contends that the District Court erred by denying his motion for a bill of particulars. (Dowd Br. 42-51). But Dowd had ample notice of the facts needed to prepare his defense, avoid surprise at trial, and protect his double-jeopardy rights. The District Court acted well within its discretion in denying the motion.

### A. Relevant Facts

Before trial, Dowd moved for a bill of particulars. (Dkt. 62). The Government opposed the motion, arguing that no bill of particulars was necessary given the "substantial evidentiary detail that ha[d] already been shared with the defense, including the trial transcript and exhibits" from the Duncan Trial and substantially all of the witness notes in the Government's possession at the time. (Dkt. 68).

28

On June 2, 2022, the District Court held argument on Dowd's motion. (Dowd A. 88-121). The District Court stated it was "a bit surprised by th[e] motion" because Dowd had been given a "tremendous number of particulars about specific patients, dates, surgeries, legal advice," and thus had a "very specific roadmap to what this trial is going to look like." (Dowd A. 99-100). After hearing from the parties, the District Court denied Dowd's motion. (Dowd A. 112).

## B. Applicable Law

A court "may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). The sole legitimate purpose of a bill of particulars is to furnish facts needed to apprise a defendant of the charges against him with sufficient precision to (1) enable him to prepare his defense, (2) avoid unfair surprise at trial, and (3) preclude a second prosecution for the same offense. *See Wong Tai v. United States*, 273 U.S. 77, 80-82 (1927); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010); *United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir. 1973). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234; *accord United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004).

"Acquisition of evidentiary detail is not the function of the bill of particulars." *Torres*, 901 F.2d at 234; *see United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974). Nor is a bill of particulars a general

29

investigative tool for the defense. *Salazar*, 485 F.2d at 1278. No bill of particulars is necessary where the Government has made sufficient disclosures concerning its evidence and witnesses by other means. *See United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (affirming denial of particulars where Government adequately informed defendant of nature of charges through discovery).

A district court's denial of a bill of particulars is reviewed for abuse of discretion. *Walsh*, 194 F.3d at 47. "So long as the defendant was adequately informed of the charges against him and was not unfairly surprised at trial as a consequence of the denial of the bill of particulars, the trial court has not abused its discretion." *Torres*, 901 F.2d at 234. Even where a court erred by denying a bill of particulars, a defendant must demonstrate that he was prejudiced; otherwise, the denial amounts to harmless error. *See United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998); *accord Walsh*, 194 F.3d at 45 ("[W]e have repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity.").

## C. Discussion

The District Court did not abuse its discretion in denying Dowd's motion for a bill of particulars. The initial indictment gave Dowd sufficient notice of the Government's allegations. (Dowd A. 49-67). It included a detailed description of how the fraud scheme operated (Dowd A. 49-57) and of Dowd's role in the scheme (Dowd A. 52-53, 56). And that initial indictment was only the beginning. The Government provided Dowd

30

with the testimony and exhibits from the Duncan Trial, as well as notes from dozens of interviews with witnesses and patients. (Dkt. 68 at 5, 8). Taken together, that information more than adequately advised Dowd of the nature of the charges against him and permitted him to prepare his defense, obviating the need for a bill of particulars. *See Torres*, 901 F.2d at 234.

This case is nothing like *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987), which Dowd relies on (Dowd Br. 44). There, the Court reversed convictions for mail fraud involving false insurance claims for burglary losses because after a pretrial production of "mountains of documents," the defendants were "left unguided as to which documents would be proven falsified [at trial] or which of some fifteen burglaries would be demonstrated to [have been] staged." *Bortnovsky*, 820 F.2d at 574-75. At trial, the prosecution had introduced evidence of 12 burglaries and numerous documents relating to those burglaries, but attempted to prove that only four of the burglaries were staged and that only three of the documents were false. *See id*. This Court found that the denial of particularization identifying which burglaries were staged and which documents were false left the defendants in the untenable position of having to establish their innocence by proving that the eight other burglaries, which the prosecution was uncertain were fake, had in fact not been staged. *See id*.

Here, by contrast, the initial indictment itself alleged that Dowd participated in a fraud scheme in which nearly all of the patients had fraudulent cases,

and that Dowd "almost invariably recommended that the [p]atients undergo surgery, irrespective of medical need." (Dowd A. 52). The Government also produced, among other things, Dowd's patient files for the hundreds of patients involved in the scheme. Thus, far from being left "unguided," *Bortnovsky*, 820 F.2d at 574, Dowd understood what he was alleged to have done and he had the records needed to prepare his defense.[9]

---

[9]   The various district cases Dowd cites (Dowd Br. 43 n.5) are also distinguishable. In *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *4-9 (S.D.N.Y. July 13, 2010), an insider trading case, the district court granted a bill of particulars where the indictment provided little to no detail beyond the name of the securities at issue. In *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001), the district court granted a bill of particulars in part where the defendant, an investment advisor, was alleged to have "pilfered his client's money through an unspecified series of 'intercompany transfers,'" but the prosecution had not identified "the amounts, dates, means, corporate entities, or co-conspirators involved." And in *United States v. Nachamie*, 91 F. Supp. 2d 565, 571-72 (S.D.N.Y. 2000), the district court granted a bill of particulars where the Government had produced data concerning "2,000 Medicare claims" but had failed to specify which claims were false or how they were false. Here, by contrast, the allegation was that Dowd's actions were almost entirely illegitimate. (*E.g.*, Dowd A. 52 (alleging that Dowd "almost invariably

32

Dowd argues that a bill of particulars was necessary because the "scope of [his] alleged fraud was an ever-changing target." (Dowd Br. 45). He complains that the patients for whom the Government produced early witness statements were different from the patients who testified at trial (Dowd Br. 45-46)—which is essentially a complaint that Dowd did not receive a witness list months before trial. But no such list was required, and a bill of particulars is not designed as an investigatory tool. *See Salazar*, 485 F.2d at 1278.

Nor can Dowd show prejudice from the District Court's failure to grant his motion for a bill of particulars. In arguing otherwise, Dowd raises a hodge-podge of complaints about the sufficiency of the Government's proof. (*E.g.*, Dowd Br. 48 (claiming Dowd was the "only" defendant against whom the Government did not present "direct evidence showing knowledge"); *id.* at 49 (claiming patients "who actually testified lied to Dowd about their injuries"); *id.* at 51 (claiming Dowd "saw an enormous volume of patients in his ten offices")). But as the District Court found in denying Dowd's motion for a judgment of acquittal under Rule 29, the Government presented considerable evidence that Dowd knowingly and intentionally participated in the scheme. (Dowd A. 3027-30). Dowd fails to

──────────

recommended that the Patients undergo surgery, irrespective of medical need")). Such allegations of widespread fraud do not present the "needle in a haystack" problem that might otherwise require a bill of particulars. *United States v. Rose*, No. 19 Cr. 789 (PGG), 2021 WL 2117119, at *15 (S.D.N.Y. May 24, 2021).

33

articulate how the denial of his motion for a bill of particulars prejudiced him.

## POINT III

### The Challenged Evidentiary Rulings Were Correct

Dowd and Constantine contest various evidentiary rulings. Specifically, Dowd claims that Judge Stein abused his discretion by admitting (1) opinion testimony from insurance claims investigator Tara Arce; (2) tax-related evidence; and (3) expert testimony on medical ethical rules that prohibit referral fees. (Dowd Br. 52-75). Constantine also challenges the admission of Arce's testimony, and further claims that Judge Stein abused his discretion by precluding Constantine from offering, through witnesses and cross-examination, testimony to rebut Arce's testimony. (Constantine Br. 27-43).

There was no abuse of discretion in the District Court's evidentiary rulings. Moreover, given the length of the trial and the volume of evidence proving the defendants' guilt, any error in admitting or excluding a particular piece of evidence could not have affected the verdict.

### A.  Standard of Review

Federal Rule of Evidence 401 defines "relevant evidence" as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; *see United States v. Abu-Jihaad*, 630 F.3d

34

102, 132 (2d Cir. 2010). Federal Rule of Evidence 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

A district court's evidentiary rulings are reviewed for abuse of discretion and will be reversed "only when the court acted arbitrarily or irrationally." *United States v. Nektalov*, 461 F.3d 309, 318 (2d Cir. 2006). Under that "deferential" standard, an evidentiary ruling may be disturbed "only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Delva*, 858 F.3d 135, 156 (2d Cir. 2017). Deference is particularly broad in the context of Rule 403 determinations, because trial courts are in the best position to evaluate the impact of disputed evidence upon jurors. *See Constantino v. Herzog*, 203 F.3d 164, 173 (2d Cir. 2000) ("Because the trial judge is in the best position to evaluate the evidence and its effect on the jury, his Rule 403 rulings are entitled to considerable deference and will not be overturned absent a clear abuse of discretion."). Consequently, this Court will not second-guess a district court's Rule 403 determination unless "there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998).

Even a "manifestly erroneous" evidentiary ruling does not warrant a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir.

35

2012). An evidentiary error is harmless if this Court determines with "fair assurance that the evidence did not substantially influence the jury." *United States v. Cummings*, 858 F.3d 763, 771 (2d Cir. 2017); *see also* Fed. R. Crim. P. 52(a).

This Court is "free to affirm an appealed" evidentiary ruling "on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *United States v. Yousef*, 327 F.3d 56, 156 (2d Cir. 2003).

## B. The District Court Properly Admitted Arce's Testimony

Constantine and Dowd both contend that Arce provided testimony that was inappropriate from a lay witness. (Constantine Br. 27-36; Dowd Br. 42-51). Their arguments misconstrue the record and fail to identify any improperly admitted testimony.

### 1. Relevant Facts

Dowd moved *in limine* to preclude the testimony of Arce, a Travelers Insurance claims investigator who investigated potential fraud. (Dkt. 113).[10] Dowd argued that Arce was an "unnoticed expert witness," and that it was improper for Arce to opine that the defendants' cases "bore hallmarks of fraud." (Dkt. 113 at 1). The Government opposed the motion, arguing that Arce was a fact witness who had personally investigated Constantine's cases, and that any opinions she

_____

[10] Constantine joined in Dowd's motion. (Dkt. 116).

36

might offer were admissible as lay opinion testimony under Rule 701 of the Federal Rules of Evidence. (Dkt. 117).

After considering the issue (Constantine A. 197), Judge Stein denied the motion to preclude Arce's testimony, noting, among other things, that an appropriate jury instruction could cure any potential for unfair prejudice:

> Arce can talk to what she did. . . . I think she has to say what her job title is. If she's a fraud investigator, she's a fraud investigator. I don't think . . . we can get entirely away from it, her using the word "fraud." But I want that minimized.
>
> . . . .
>
> And there will be a charge. And the parties can try to draft a charge if they wish, which I then will review. But the charge will say, in essence: You have heard from this witness, who's a fraud investigator . . . , you've heard what she did. But the issue of whether or not there was fraud here and whether or not the defendants committed the fraud is for you, the jury, and not for her. She was simply describing what she did.

37

(Constantine A. 214-15).[11]

Arce began testifying near the end of the fourth trial day. She identified herself as a "claims investigator" for Travelers's "major case unit," and said her responsibilities included "investigat[ing] organized fraud." (Constantine A. 867). When reviewing personal injury claims, Arce testified, she looks for "red flags," such as

> unwitnessed accidents, late reporting, no medical treatment at the loss scene, no incident report to the insured, questionable medical records or incomplete medical records.

> We looked at funding company involvement with high interest rates, and we looked at provider—possible provider attorney relationships.

(Constantine A. 881; *see also* Constantine A. 882-86). Arce testified that she had a "major case" concerning Constantine, which she opened after a "claims handler began seeing multiple slip-and-fall claims with George Constantine, where there were red flags on the claims." (Constantine A. 887). But Judge Stein directed the jury to disregard Arce's testimony "that there were red flags on the claims." (Constantine A. 888).

---

[11] Ultimately, neither defendant requested a jury instruction on Arce's testimony, despite Judge Stein's offer to give one.

38

Trial recessed for the night. That evening, Dowd moved to preclude Arce from testifying based on hearsay, and specifically, based on any "conclusions of medical experts employed by Travelers." (Dkt. 142). The next morning, the Government explained that it did not intend to elicit such testimony, and instead would limit the direct examination to information Arce learned from legal filings prepared by Constantine, which were admissible as party admissions under Federal Rule of Evidence 801(d)(2)(A). (Constantine A. 905). The District Court agreed that the testimony was admissible under that rule. (Constantine A. 916).

When Arce resumed her testimony that morning, she explained that she had reviewed 41 Travelers cases involving Constantine and noticed certain similarities, including that the same homeless shelter was linked to three claimants; that patients had used the same medical providers; and that patients had traveled far distances to the providers. (Constantine A. 888, 923-25). Arce had visited the homeless shelter during her investigation. (Constantine A. 922-23). She had also notified the National Insurance Crime Bureau of her investigation and, later, met with the FBI. (Constantine A. 926-27).

### 2. Applicable Law

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, while opinion testimony can be presented by either a lay or expert witness." *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013). Opinion testimony from a lay witness is admissible when it is

39

"(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other special knowledge within the scope of Rule 702." Fed. R. Evid. 701. Ultimately, lay witness opinion testimony is admissible so long as it is rationally based on the witness's perception or is the "product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005).

### 3. Discussion

The defendants' arguments on appeal mischaracterize Arce's testimony. Arce did not opine that Constantine's cases were fraudulent or that they bore the "red flags" of fraud. The defendants rely upon a single line of testimony to claim otherwise. (Constantine Br. 29 (citing Constantine A. 887); Dowd Br. 56-57 (citing Dowd A. 1086)). But Arce testified only that she opened her investigation after a claims handler saw "red flags" in Constantine's cases. (Constantine A. 887). Moreover, the District Court struck that testimony from the record. (Constantine A. 888 ("[L]adies and gentlemen, earlier in the answer, part of the answer was that 'there were red flags on the claims.' I'm directing the jury to disregard that part of the answer.")). The premise of the defendants' argument is therefore flawed.

Arce's generalized testimony about the "red flags" she looks for when investigating claims was properly admitted as background testimony about her responsibilities at Travelers; Arce did not offer an opinion, lay

40

or expert, about those "red flags." (Constantine A. 881). But even if that testimony were construed as opinion testimony, it was proper lay opinion testimony under Rule 701 because Arce's opinion was based on her personal perception, was helpful to the jury, and was not based on specialized knowledge. Courts have upheld the admission of similar testimony on similar facts. *See, e.g.*, *United States v. Cooks*, 589 F.3d 173, 180 (5th Cir. 2009) (concluding that testimony from non-expert investigator "was merely descriptive and summarized the factual information and documents gathered throughout the investigation of Cooks and thus constituted permissible lay testimony"); *United States v. Hale*, 106 F.3d 402, 1997 WL 34697, at *5 (6th Cir. 1997) (affirming admission of testimony from in-surance and postal investigators because "each man discussed a subject of which he had intimate personal knowledge, to wit, his own investigation of fraud").

Dowd's remaining arguments fare no better. Arce did not impermissibly opine on the "ultimate issue" at trial. (Dowd Br. 56-58). Unlike the witnesses in the cases Dowd cites, *see, e.g.*, *Garcia*, 413 F.3d at 210 (expert impermissibly opined that defendant was a "part-ner . . . in receiving cocaine"); *United States v. Scop*, 846 F.2d 135, 138 (2d Cir. 1988) (expert impermissibly opined that defendants "engaged in a manipulative and fraudulent scheme"), Arce offered no legal conclu-sions regarding Dowd's or Constantine's knowledge or guilt. Indeed, Arce offered barely any testimony at all about Dowd, which explains why Dowd barely cross-examined her. (Constantine A. 945-48). Nor was Arce's testimony based on improper hearsay. (Dowd Br. 58-59). Arce testified about similarities she noticed in

41

Constantine's cases, but that information derived from the complaints or other filings prepared by Constantine himself—documents the District Court rightly deemed admissible as party admissions under Rule 801(d)(2)(A). (Constantine A. 920-21, 924-26).

## C. The District Court Properly Admitted Tax Evidence

Dowd argues that the District Court erred by admitting his tax returns, which revealed that he had failed to report approximately half of the income he made from the fraud scheme. (Dowd Br. 61-67). But the tax returns were admissible both as direct evidence of Dowd's illegal conduct and, alternatively, under Federal Rule of Evidence 404(b) as evidence of Dowd's knowledge, intent, and absence of mistake.

### 1. Relevant Facts

The Government moved *in limine* to admit Dowd's tax returns from 2014 through 2016, which demonstrated that Dowd had failed to report approximately $1.4 million, roughly half his income from the fraud scheme, to the Internal Revenue Service ("IRS"). (Dkt. 107). The Government explained that the returns were admissible as "direct evidence of Dowd's knowledge that he was acting illegally," and noted that Dowd's "underreporting (and non-reporting) of his income is part of the same transactions or series of transactions as the Scheme." (Dkt. 107 at 16 (quotation marks omitted)). In the alternative, the Government argued that the tax returns were admissible under Federal Rule of Evidence 404(b) as evidence of Dowd's knowledge, intent, and absence of mistake, explaining that "Dowd's

42

tax filings demonstrate that he knew that the 'income' he derived from the Scheme was illegitimate because he reported other medical income earned during the same period," and that "[t]he tax filings also show an absence of mistake or accident in that Dowd took active steps to plan and conceal his fraud and the income he earned from it." (Dkt. 107 at 17). Dowd opposed the motion, arguing principally that the evidence was irrelevant and unduly prejudicial. (Dkt. 109).[12]

Judge Stein granted the Government's motion after weighing the tax evidence's relevance and potential for unfair prejudice:

> Now, in terms of failure to report income on income taxes. I've thought about this. I am going to allow the government to introduce evidence that he did not pay taxes on this income. That's traditional. It's quite common in fraud cases. . . .
>
> I think it's quite appropriate for the government to introduce the fact that he was not reporting income on the referrals in this fraud scheme. It does show

---

[12] Dowd argued, in the alternative, that if the Government were permitted to introduce the evidence, he should be permitted to introduce evidence that he filed amended tax returns after learning that he was the subject of an IRS investigation. (Constantine A. 167-68, 1730-33). The District Court denied that motion (Constantine A. 167-68, 1730-33), and Dowd does not challenge that ruling on appeal.

43

> knowledge. It's quite permissible for a proper purpose. It's relevant. It has probative value that is not substantially outweighed by unfair prejudice. So I am going to permit that.
>
> I am going to instruct the jury that he's not being charged with tax evasion, that's for sure. And this has nothing to do with tax evasion. It's only there for the purposes of his knowledge or lack of knowledge. The probative value of the introduction of this evidence substantially outweighs the prejudice of allowing the jury to hear that he concealed portions of his income from the IRS.
>
> The government is correct that when tax evasion is less serious than the crimes for which this defendant is on trial, these defendants are on trial, the risk of undue prejudice to the defendants from introducing evidence of tax evasion is low.

(Constantine A. 166-67). Judge Stein rejected Dowd's counsel's argument that Dowd's amended tax returns should be admitted to rebut an allegation "that he was trying to shield the source of this income." (Constantine A. 168). "This has nothing to do with the source," Judge Stein said. "[I]t's allowing the jury to hear—if the government can prove it—that he didn't pay his taxes on this income and, therefore, they should draw the inference that he knew that what he was doing was not legitimate." (Constantine A. 168).

44

At trial, the Government called Dowd's accountant, Robert Martin. Martin testified that Dowd had not informed him of three buckets of business income: (1) checks cashed at Citibank in 2014 (Constantine A. 1721); (2) checks deposited into Scottrade and Charles Schwab accounts (Constantine A. 1720, 1728); and (3) checks deposited into a Bank of America account (Constantine A. 1726-27). As a result, Martin testified, that income was not included on the tax returns Martin prepared for Dowd. (Constantine A. 1716-28).

The District Court provided the following limiting instruction regarding the tax evidence:

> Dr. Dowd is not on trial here for anything having to do with the IRS or his taxes. . . . He is charged only in the crimes set forth in the indictment. This issue of whether or not he was paying taxes is not presented to you to show that he's of poor character or he has propensity to commit crimes—that's not the purpose at all. And it's certainly not to prove whether or not he was committing some income tax crime with the IRS. It's presented to you for a much more limited purpose, that is, his knowledge or lack of knowledge of the crimes that are charged.

(Constantine A. 1722).

The Government also presented testimony from an FBI forensic accountant, Darren Jones. (Constantine A. 2141-53). Jones tallied checks Dowd had received

45

from six funding companies that were used to facilitate the fraud scheme, and calculated that Dowd earned approximately $3.2 million in roughly $10,000 checks, $1.6 million of which had either not been deposited into a bank account or had been deposited into an account that Dowd had failed to report to Martin. (Constantine A. 2141-53; GX 1714). In sum, the tax evidence demonstrated that Dowd had failed to report $1.6 million in income that he had derived from the scheme.

## 2. Applicable Law

This Court routinely upholds the admission of tax evidence in fraud cases, whether as direct evidence or under Rule 404(b) as probative of a defendant's knowledge, consciousness of guilt, or lack of mistake. *See, e.g.*, *United States v. Atuana*, 816 F. App'x 592, 595 (2d Cir. 2020) (defendant's failure to file tax returns admissible under Rule 404(b) with a limiting instruction to show knowledge and intent that defendants' businesses were not legitimate); *United States v. Bergstein*, 788 F. App'x 724, 745 (2d Cir. 2019) (tax returns admissible to refute defendant's claim that income was legitimate); *United States v. Osarenkhoe*, 439 F. App'x 66, 68 (2d Cir. 2011) (approving admission of tax returns under Rule 404(b)); *United States v. Valenti*, 60 F.3d 941, 946 (2d Cir. 1995) ("The tax returns were obviously probative to refute [the defendant's] defense that the contested funds were legitimate compensation.").

Federal Rule of Evidence 404(b) allows evidence of uncharged crimes, wrongs, or other acts for any

46

relevant non-propensity purpose, such as to show motive, opportunity, intent, or knowledge. This Court "follows an inclusionary approach to the admission of other act evidence," so that "evidence of prior crimes, wrongs or acts is admissible for *any* purpose other than to show a defendant's criminal propensity." *United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999). Evidence must also satisfy Rule 403, which provides that evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. The touchstone of the prejudice analysis is whether the proffered evidence "involve[s] conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

Review of evidentiary rulings under Rules 401 and 403 "is highly deferential in recognition of the district court's superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *United States v. Coppola*, 671 F.3d 220, 244 (2d Cir. 2012).

### 3. Discussion

The District Court did not abuse its discretion in admitting evidence that Dowd failed to pay taxes on approximately $1.6 million, representing roughly half of his income from the scheme. Dowd's failure to report a significant portion of his income to the IRS was probative of Dowd's knowledge that the income was

47

illegitimate, and rebutted Dowd's defense that he be-
lieved the accidents and his surgeries were legitimate.
This Court has repeatedly affirmed the admission of
tax-return evidence for similar purposes. *See Berg-
stein*, 788 F. App'x at 745; *Valenti*, 60 F.3d at 946. The
District Court's limiting instruction prevented any
risk of unfair prejudice. Judge Stein explained clearly
that Dowd was not on trial for anything having to do
with his taxes and that the tax evidence was presented
to the jury for the limited purpose of establishing
whether Dowd had knowledge of the charged crimes.
(Constantine A. 1722).

Dowd contends that he only "intermittent[ly] un-
derreport[ed]" a "fraction" or "small portion" of his sur-
gical income, so the tax returns could not have been
probative of an attempt to "hide his relationship with
litigation funders." (Dowd Br. 61-64). But jurors could
rationally conclude that Dowd's decision to hide
roughly half of his income from the scheme—amount-
ing to approximately $1.6 million, a substantial sum
by any measure—reflected Dowd's intent to avoid
drawing unwanted attention to money he knew he
made through fraud. To be sure, evidence that Dowd
had failed to report all of his income from the scheme
would have had even more probative value. But evi-
dence that Dowd omitted $1.6 million in fraud pro-
ceeds from his tax returns was nonetheless relevant
under Rule 401.

Finally, the District Court acted well within its con-
siderable discretion in analyzing the evidence's admis-
sibility under Rule 403. Evidence that Dowd underre-
ported some of his income to the IRS was far less

48

inflammatory that the charged crimes, which involved Dowd performing unnecessary medical procedures on vulnerable individuals in order to profit from fraud. *See Roldan-Zapata*, 916 F.2d at 804.

### D. The District Court Properly Precluded Constantine's "Good Act" and Other Evidence

#### 1. Relevant Facts

The Government moved *in limine* to preclude the defendants from offering evidence that they worked with purportedly legitimate patients or clients outside the fraud scheme. (Dkt. 107 at 18-20). Constantine opposed the motion, arguing that evidence of his "numerous meritorious personal injury claims from within and without the alleged conspiracy" were relevant to whether he "knew that he was part of a criminal scheme." (Dkt. 110 at 4).[13]

Judge Stein granted the motion, ruling that "if this is a legitimate trip-and-fall within the context of this conspiracy that is referred by Kalkanis or the runners, I would think it's permissible," but "if it's not trip-and-fall through this network, it can't come in." (Constantine A. 176, 181). Constantine later proffered that he intended to call three patients whose testimony would

---

[13] Dowd also opposed the Government's *in limine* motion, but he sought to introduce only evidence of the volume of his business. Judge Stein ruled that that evidence would be admissible, but Dowd ultimately declined to present it. (Constantine A. 1893, 2364-65).

49

fit the District Court's criteria for admissibility. (Constantine A. 2157). Judge Stein permitted Constantine to call these witnesses (Constantine A. 2158), but Constantine declined to do so (Constantine A. 2259).

Constantine also sought to introduce testimony from two lawyers who took over and, at times, settled Constantine's cases. (Constantine A. 177-78). The Government opposed. (Constantine A. 179). Judge Stein precluded the testimony, explaining that whether or not "other lawyers took on Constantine's cases" was "not relevant to anything before this jury." (Constantine A. 182).

Finally, Constantine sought to cross-examine Tara Arce about the fact that Travelers had settled Constantine's cases. (Constantine A. 216-17). The Government opposed. (Constantine A. 217-18). Judge Stein precluded Constantine's proposed line of questioning, explaining that "[w]hat happens in the civil sphere and what a business decision is of an insurance company and what happens after these cases are done, that is, your client is out of it, are irrelevant." (Constantine A. 219).

### 2. **Applicable Law**

While a defendant has a fundamental due process right to present a defense, *Washington v. Texas*, 388 U.S. 14, 19 (1967), that right is not absolute, for a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability," *Washington v. Schriver*, 255 F.3d 45, 56 (2d Cir. 2001). For example, a defendant does not have an unfettered right to offer testimony that is

inadmissible under the rules of evidence. *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

"A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Thus, evidence that a defendant engaged in legal, honest business conduct on some occasions is irrelevant to whether he engaged in charged offenses involving fraud on other occasions. *See, e.g.*, *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.").

### 3. Discussion

As the District Court rightly concluded, Constantine's proffered evidence was irrelevant to the issues at trial. Evidence that Constantine filed non-fraudulent lawsuits on behalf of legitimate clients who were not referred to him through the network of "brokers," "runners," and other coconspirators involved in this case was precisely the type of "good act" evidence that this Court has held inadmissible. *See Scarpa*, 897 F.2d at 70 ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts

51

on specific occasions."). Similarly, evidence that other lawyers or insurance companies settled some of Constantine's cases was irrelevant to whether Constantine possessed the requisite knowledge of the fraud scheme. *See United States v. Kaplan*, 490 F.3d 110, 121 (2d Cir. 2007) (finding that the "relevance of others' knowledge was at best minimal in proving [the defendant's] knowledge").

### E.  The District Court Properly Admitted Testimony About Referral Fees

#### 1.  Relevant Facts

Before calling its medical expert, Dr. Neil Roth, the Government previewed that it intended to ask Dr. Roth whether New York medical professional rules permitted paying for patient referrals. (Constantine A. 1127-28). Dowd objected to that proposed line of questioning, arguing that it was irrelevant and prejudicial. (Constantine A. 1128-30). The Government responded that Dowd had opened the door by claiming, in opening statements, that Dowd's payment of fees to Kalkanis was proper. (Constantine A. 257-59, 1128-31). The District Court permitted the testimony. (Constantine A. 1132-33).

At trial, Dr. Roth gave the following testimony, in relevant part:

> Q. Dr. Roth, can an orthopedic surgeon provide any form of compensation in exchange for patient referrals?
>
> A. No.

52

> Q. Is this true for all patient referrals regardless of the source?
>
> A. Yes.
>
> Q. Are there any professional rules prohibiting this conduct?
>
> A. Yes.
>
> Q. Now, are there any consequences[,] Dr. Roth[,] for violating these rules?
>
> A. Ye[s].
>
> Q. Can you provide the range of consequences that you're aware of?
>
> A. The range of consequences could be having your license censored, revoked, suspended, fines.

(Constantine A. 1166). The District Court gave a limiting instruction regarding that testimony:

> Ladies and gentlemen, I do wish to tell you that there was just a reference to professional rules. These two defendants are not on trial for violating any professional rules. They are only on trial for the crime[s] that[] are charged in the indictment.

(Constantine A. 1167).

Dowd later called his own expert, Dr. Stuart Springer. On cross-examination, the Government asked Dr. Springer a similar set of questions about referral fees:

53

> Q. Dr. Springer, you don't pay for patient referrals, do you?
>
> A. Oh, no.
>
> Q. And that would be a violation as well for doctors; correct?
>
> A. Yes, ma'am, big-time.

(Constantine A. 2309). Dowd did not object to the Government's questions.

### 2. Discussion

Dowd does not challenge the reliability of Dr. Roth's (or Dr. Springer's) testimony that professional rules prohibit doctors from paying for patient referrals. Instead, Dowd contends that the testimony was irrelevant and unduly prejudicial. (Dowd Br. 68-73).

In particular, Dowd argues that the Government never proved that the particular payments Dowd made to Kalkanis violated professional rules. (Dowd Br. 68-69). But that argument ignores the record. Dr. Roth and Dr. Springer both testified that professional rules prohibit doctors from paying for patient referrals. (Constantine A. 1166, 2309). The District Court permitted Dr. Roth to testify regarding that limited fact after Gordon had testified that Dowd paid Kalkanis for patient referrals and that when Gordon requested referral fees from Dowd, Dowd quoted him $500. (Constantine A. 605-06). And after Dr. Roth's testimony, Kalkanis testified that Dowd paid him $1,000 per patient referral and instructed him to keep the referrals coming even after Kalkanis disclosed that the patients were "coming from runners." (Constantine A. 1795-98).

54

Dowd was free to argue—as he did through cross-examination—that the fees were in exchange for administrative duties, such as driving patients to appointments. (Constantine A. 2023-26). But whether Dowd's repeated $1,000 payments to Kalkanis were for lucrative patient referrals or for administrative tasks was a factual determination for the jury, not a basis to preclude Dr. Roth's testimony.

Dowd cites no authority for his novel proposition that evidence he violated his professional ethical rules required specific testimony to that legal conclusion or a final order from a medical licensing board. (Dowd Br. 68-71). Witness testimony stating such a legal conclusion would have likely been inadmissible. *See Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010) (neither expert nor lay witnesses may "present testimony in the form of legal conclusions" because such testimony "undertakes to tell the jury what result to reach, and thus attempts to substitute the [witness's] judgment for the jury's"). Given the ample evidence that Dowd paid money for patient referrals, evidence that paying referral fees violated medical professional rules was plainly relevant.

Moreover, the evidence was not unduly prejudicial. Proof that Dowd violated a medical regulation was far less inflammatory than the charged conduct, which involved Dowd performing unnecessary surgeries on vulnerable patients for financial gain. And the District Court's clear instruction that "[t]hese two defendants are not on trial for violating any professional fees" (Constantine A. 1167) ensured that jurors would not consider the evidence for an improper purpose.

55

## F. Any Error Was Harmless

Even assuming that Judge Stein erred in one or more of the challenged evidentiary rulings, the error was harmless given the mountain of evidence proving that Constantine and Dowd knowingly and intentionally participated in the fraud scheme.

As for Dowd, the trial evidence established that for five years, Dowd paid Kalkanis $1,000 referral fees for patients who were financially desperate enough to undergo unnecessary knee and shoulder surgeries despite being uninjured. (Constantine A. 1796-98). Paid runners brought patients to Dowd's office by the carload. (Constantine A. 579-80, 591, 1473-74, 1797-98). Dowd typically met with the patients only once before surgery, and only briefly. He conducted no physical exams, provided no alternatives to surgery, and recommended surgery time and time again, often operating within two weeks of meeting a patient. (Constantine A. 300-06, 448-49, 581-82, 971-74, 1252-57, 1473, 2103-04). He even offered to give patient Malike Walker "just the scar" instead of "the full surgery." (Constantine A. 973-74).[14] Dowd routinely falsified his medical records, and relied on MRI reports that were vague and inconsistent with post-surgical observations. (Constantine A. 450, 454-55). In 2017, when the

_____

[14] Dowd calls Walker's testimony on that point "so utterly implausible that no reasonable juror could have relied on it." (Dowd Br. 24 n.3). But credibility determinations are squarely within the province of the jury. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011).

56

scheme needed a new attorney, he aggressively looked for new attorneys who "could be trusted to keep their word," "might be prepared to move quick," and over whom he and coconspirators "would have more control." (Constantine A. 1821; GX 1603B).

As for Constantine, the Government's evidence established that for nearly five years, Constantine paid runners $1,000 per client to bring him carloads of the same low-income patients who falsely claimed to have had trip-and-fall accidents, and were willing to undergo surgery in order to receive small incentive payments with the prospect of a larger settlement payment down the road. (Constantine A. 689, 1776-77). The evidence further established that Constantine let Kalkanis work out of his basement (Constantine A. 543, 757, 1757); that Constantine directed patients to lie during depositions (Constantine A. 1667, 1674, 1683); that Constantine continued to pursue cases like Julbe's even after viewing video evidence showing that a claimed accident had been staged (Constantine A. 1674, 1687, 1707); that Constantine pushed clients to undergo more invasive and valuable surgeries (Constantine A. 1098); that clients routinely called Constantine's office looking for money (GX 1602AL, 1604A); that Constantine joked about how poor and desperate his clients were (Constantine A. 618; GX 1602O); and that Constantine filed hundreds of cookie-cutter lawsuits alleging the same type of accident and resulting in the same type of medical treatment, making it obvious to everyone, including Constantine, that the cases were fraudulent (GX 151-69, 1716).

57

The evidence Constantine and Dowd challenge on appeal amounts to a fraction of the total proof in a nearly 2,700-page trial transcript. Moreover, contrary to the defendants' assertions, the Government made limited use of the challenged testimony at trial. The Government did not "emphasize Arce's testimony in closing argument" (Dowd Br. 61; Constantine Br. 35);[15] the Government mentioned the "red flags" Arce had identified just once (Constantine A. 2490), then talked about other "flashing red lights" and "red flags" that would have been obvious to Constantine and Dowd, such as "patients asking for money, patients coming from shelters, patients disappearing, patients being in jail, everyone getting surgery from these trip-and-falls, [and] MRI scans that don't match the surgeries" (Constantine A. 2494, 2501). Nor did the Government make the tax evidence a "focal point" at trial. (Dowd Br. 65). The Government called two witnesses (Martin and Jones) to prove that Dowd hid his money only because each witness knew only half the story of how Dowd tried to hide a significant portion of his fraud proceeds. And the Government's reference to Dowd's breach of professional rules in summation (Constantine A. 2486-87) was just one of nine separate reasons the Government listed as proof that the defendants acted with the requisite knowledge and

---

[15] Dowd claims prejudice from "Arce's two days of testimony." (Dowd Br. 61). But Arce's direct testimony took up roughly 30 transcript pages, some of which reflect nothing more than the reading of Constantine's legal filings and text messages into the record. (Constantine A. 866-90, 919-27).

58

intent (Constantine A. 2457-500). Moreover, the District Court told jurors explicitly that neither defendant was on trial for violating professional rules. (Constantine A. 2736-37).

Nor did Constantine's inability to call clients with purportedly legitimate cases (none of whom he identified) or lawyers who settled Constantine's cases, or to cross-examine Arce on the fact that Travelers settled certain of Constantine's cases, "substantially influence the jury." *Cummings*, 858 F.3d at 771. Constantine argues that he needed the testimony to rebut the Government's claim that he was guilty under at least a conscious-avoidance theory because his cases exhibited obvious "red flags." But the jury did not need to rely on conscious avoidance to find Constantine guilty given all the evidence of his actual knowledge at trial, and Constantine cross-examined Arce about the "red flags" she identified and obtained concessions that some of the "red flags" were "not uncommon." (Constantine A. 931-34).

In light of the strength of the Government case and the limited nature of the challenged testimony, any error was assuredly harmless. *See United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992) ("To say that the erroneously admitted testimony did not substantially influence the jury we are not required to conclude that it could not have had any effect whatever; the error is harmless if we can conclude that that testimony was unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.").

59

## POINT IV

### The District Court Properly Instructed the Jury About Ethical Rules for Lawyers and Doctors

Constantine and Dowd argue that the District Court deprived them of a fair trial by instructing the jury on rules of professional conduct for lawyers and doctors. (Constantine Br. 44-48; Dowd Br. 72). But there was no error in the District Court's instructions, let alone an error that affected the verdict.

### A. Relevant Facts

At trial, Constantine and Dowd argued that they had acted good faith and been deceived by patients. (Constantine A. 240-47 (arguing that "Constantine is a victim of those fraudsters and con artists . . . [t]hey hid the truth from . . . Constantine"), 256-57 (arguing that "these people have lied to 911 operators, to hospitals, to EMTs . . . and eventually . . . to . . . Dowd.")). In response, the Government presented considerable proof that the defendants had guilty knowledge. The proof included, among other things, evidence that Constantine and Dowd had paid for patient referrals, despite such payments being in violation of certain professional rules. Constantine had paid runners a $1,000 referral fee. (Constantine A. 530 (Gordon testifying that he received $1,000 cash per patient in a white envelope from Kalkanis); Constantine A. 1776-77 (Kalkanis testifying that Constantine "supplied the money to pay the runners")). Dowd, too, paid a $1,000 referral fee for each patient. (Constantine A. 1795-96).

60

The Government asked Judge Stein to instruct the jury on professional rules applicable to doctors and lawyers that prohibit referral fees: the New York State Board for Professional Medical Conduct, which provides, under N.Y. Educ. § 6530(18), that a physician may not "directly or indirectly offer[ ], giv[e], solicit[ ], or receiv[e] or agree[ ] to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services"; and Rule 7.2 of the New York's Rules of Professional Conduct, which states that "a lawyer shall not compensate, give or promise anything of value to a person for recommending the lawyer's services," ABA Rule 7.2(b). (Dkt. 150; Constantine A. 2408).

At the charge conference, the defendants objected to the proposed instruction. Dowd argued that the instruction was inappropriate because violating a professional rule was not an element of the charged offense. (Constantine A. 2424). He also argued, in the alternative, that if the District Court gave such an instruction, it should use specific language that Dowd proposed. Judge Stein adopted Dowd's proposal nearly verbatim. (*Compare* Constantine A. 2426-27 (Dowd's proposed charge) *with* Constantine A. 2737 (the charge as given)). Constantine argued that there was nothing in the record about the "professional propriety of paying runners." (Constantine A. 2410). The Government pointed Judge Stein to the testimony about referral fees from Gordon and Kalkanis (Constantine A. 530, 1776-77), as well as Constantine's arguments to the jury that there was nothing improper about paying such fees (Constantine A. 1848-49, 1857-58). The

61

Government added that it was proper, and common, for courts to instruct the jury on a lawyer's ethical obligations. (Constantine A. 2414-20).

The District Court agreed to give an instruction regarding professional rules. Judge Stein carefully explained to jurors the relevance of his instruction, and the limited purpose for which the jury could use it:

> I want to explain certain ethical rules that you may consider in connection with the issue of whether each defendant here, Constantine and Dowd, knowingly participated in the alleged scheme to defraud with the intent to defraud. Proof that a lawyer, such as Constantine, violated a rule of professional conduct does not, without more, mean that he committed mail fraud or wire fraud. However, such proof may be considered by you if you find such a violation has occurred in determining whether Constantine engaged in a scheme to defraud and whether he did so with knowledge and the intent to defraud. New York Rule of Professional Conduct 7.2, which governs lawyers, provides that a lawyer cannot pay or reward someone in exchange for a referral of a client.
>
> You heard testimony regarding the ethical rules applicable to medical doctors in New York. Dr. Dowd is not on trial for any violation of New York State's medical ethical rules, and you can't find him

> guilty on any count simply because you believe he may have violated those ethical obligations. But you may consider the testimony on these ethical rules to the extent you find it sheds light on whether or not Dr. Dowd acted knowingly and with the intent to defraud.

> Now, ladies and gentlemen, I wish to emphasize that to you because there's been discussion here about these ethical obligations. I repeat again: These defendants are not charged here with violating any of the ethical obligations of lawyers or doctors. It's not at issue here. The evidence in regard to that was presented to you as being relevant solely to the issue of these defendants' knowledge and intent in regard to engaging in the crimes charged, but for no other reason. They are not charged with violations of professional ethical rules.

> Is that clear? Okay.

> The only rule that is to happen here is whether or not it sheds light on whether they knew what they were doing in allegedly engaging in the scheme.

(Constantine A. 2736-37).

## B.  Applicable Law

"To secure reversal on a flawed jury instruction, a defendant must demonstrate both error and ensuing

63

prejudice." *United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009). In reviewing jury instructions, this Court must look not only to the particular words or phrases challenged by the defendant, but also to "the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989); *see also United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2001).

An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015).

Even if an instruction is erroneous, reversal will not be warranted if the error was harmless. Fed. R. Crim. P. 52(a); *see United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

## C.  Discussion

### 1.  There Was No Error

Constantine and Dowd do not argue that any part of Judge Stein's jury instruction was legally incorrect. Instead, they claim that the instruction on professional rules of conduct for attorneys and physicians was irrelevant to the issues at trial. (Constantine

64

Br. 44-48; Dowd Br. 72).[16] But the District Court rightly gave the challenged instruction.

As this Court has recognized, evidence that a defendant violated professional rules can be relevant to establishing criminal intent. *See, e.g.*, *United States v. Skelos*, 707 F. App'x 733, 740 (2d Cir. 2017) (upholding admission of testimony regarding defendant's knowledge of New York state ethics rules as relevant to defendant's intent to defraud; vacating defendant's conviction on other grounds); *cf. United States v. Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) ("[O]nly after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the 'usual course' of professional practice that his actions become criminal.").

Numerous other circuits have held the same. *See, e.g.*, *United States v. Acevedo*, 882 F.3d 251, 266 (1st Cir. 2018) (noting that "precedent supports the conclusion that proof of a violation of a professional rule may

---

[16] Dowd complains that the District Court never defined the term "referral fee." (Dowd Br. 69-70). But the District Court gave an instruction almost identical to the one that Dowd himself proposed in the event his objection to giving any instruction on professional rules was overruled. Dowd never asked the District Court to define "referral fee," so his suggestion that the District Court erred by not doing so fails. *See Roy*, 783 F.3d at 420 ("A defendant challenging a jury instruction must demonstrate that he requested a charge that accurately represented the law in every respect . . . .").

65

play an evidentiary function in assessing the mens rea of a lawyer charged with criminal conduct"); *United States v. Kellington*, 217 F.3d 1084, 1098 (9th Cir. 2000) ("It is well settled that in the prosecution of a lawyer for conduct stemming from his or her representation of a client, expert testimony on the lawyer's ethical obligations is relevant to establish the lawyer's intent and state of mind."); *United States v. Kelly*, 888 F.2d 732, 743-44 (11th Cir. 1989) (collecting cases recognizing relevance of professional standards for attorneys where offered to establish intent of lawyer-defendants even where the alleged crime, narcotics conspiracy, was not specific to a professional rule); *United States v. Machi*, 811 F.2d 991, 1000-02 (7th Cir. 1987) (probative value of state Supreme Court rules governing ethical obligations of a licensed attorney outweighed possible prejudicial effect on defendant-attorney where ethical rules were relevant to defendant's criminal intent given that defendant's actions would have "most assuredly jeopardized his professional (legal) career"); *United States v. DeLucca*, 630 F.2d 294, 301 (5th Cir. 1980) (professional responsibility standards for an attorney was relevant to the defendant's willing participation in a narcotics conspiracy).

Here, the District Court correctly instructed the jury on the professional rules prohibiting both lawyers and doctors from paying for referrals. The instruction was appropriate in light of Constantine's argument that his methods of getting clients through so-called "runners" was above board (Constantine A. 243-44), and Dowd's argument that payments to Kalkanis were somehow proper (Constantine A. 1857-58). Moreover,

66

the professional rules were relevant on the issue of knowledge and conscious avoidance. Constantine and Dowd repeatedly argued that they each had no reason to think that there was anything wrong with this particular set of clients or patients. (Constantine A. 242, 257, 2528, 2553, 2580, 2585, 2604). That Constantine and Dowd had to risk professional sanctions in order to obtain those clients or patients was relevant to show that they knew or had reason to know that those individuals' cases were not legitimate. The instruction was therefore appropriate.

### 2. Any Error Was Harmless

Even if the District Court should not have instructed the jury on professional ethical rules, it is clear that the error did not contribute to the jury's verdict. The District Court instructed jurors repeatedly and forcefully that they could not convict based on a finding that the defendants had violated professional rules. (Constantine A. 1167 ("[T]here was just a reference to professional rules. These two defendants are not on trial for violating any professional rules. They are only on trial for the crimes that are charged in the indictment."); Constantine A. 2736 ("Proof that a lawyer, such as Constantine, violated a rule of professional conduct does not, without more, mean that he committed mail fraud or wire fraud."); Constantine A. 2737 ("Dr. Dowd is not on trial for any violation of New York State's medical ethical rules, and you can't find him guilty on any count simply because you believe he may have violated those ethical obligations."); Constantine A. 2737 ("Now, ladies and gentlemen, I wish to emphasize that to you because there's been

discussion here about these ethical obligations. I repeat again: These defendants are not charged here with violating any of the ethical obligations of lawyers or doctors.")). Moreover, independent evidence of the defendants' guilt was strong. *See United States v. Dhinsa*, 243 F.3d 635, 650 (2d Cir. 2001) ("The strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict."). Any instructional error was therefore harmless.

## POINT V

### Sufficient Evidence Supported Constantine's Convictions

Constantine contends that insufficient evidence proved he acted with the requisite knowledge and intent. (Constantine Br. 49-55). But the evidence, viewed in the light most favorable to the Government, amply supported the jury's verdict.

### A.  Applicable Law

A defendant claiming there was insufficient evidence to support a jury's verdict "bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011); *accord United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006). A jury verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable

68

jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012). The Court must analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Lisyansky*, 806 F.3d 706, 710 (2d Cir. 2015). It is not the Government's burden to "disprove every possible hypothesis of innocence." *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998). To the contrary, this Court must "credit[ ] every inference that the jury might have drawn in favor of the government," *Persico*, 645 F.3d at 104, because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105. The credibility of a testifying witness is particularly within the province of the jury. *See O'Connor*, 650 F.3d at 855; *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge.").

69

A sufficiency challenge raised for the first time on appeal is reviewed only for plain error. *See United States v. Muniz*, 60 F.3d 65, 70-71 (2d Cir. 1995).

## B. Discussion

Constantine did not contest the sufficiency of the evidence in the District Court, so his sufficiency claim is reviewable only for plain error. Ample evidence established that Constantine knowingly and intentionally participated in the fraud scheme, so the sufficiency argument would fail even if it had been preserved.

Taken together, the Government's evidence proved that for nearly five years, Constantine paid runners $1,000 per client to bring him carloads of poor and at times homeless or drunk individuals who falsely claimed to have had trip-and-fall accidents, and were willing to undergo unnecessary surgeries in order to receive small incentive payments with the prospect of a larger settlement payment later. (Constantine A. 689, 1776-77). The evidence further established that Constantine let Kalkanis work out of his basement (Constantine A. 543, 757, 1757); that Constantine directed patients to lie during depositions (Constantine A. 1667, 1674, 1683); that Constantine continued to pursue cases like Julbe's even after viewing video evidence showing that a claimed accident had been staged (Constantine A. 1674, 1687, 1707); that Constantine pushed clients to undergo more invasive and valuable surgeries (Constantine A. 1098); that clients routinely called Constantine's office looking for money (Constantine A. 608-12; GX 1602AL, 1604A); that

70

Constantine joked about how poor and desperate his clients were (Constantine A. 618; GX 1602O); and that Constantine filed hundreds of cookie-cutter lawsuits alleging the same type of accident and resulting in the same type of medical treatment, making it obvious to everyone, including Constantine, that the cases were fraudulent (GX 151-69, 1702).

Notably, there was also this testimony from Kalkanis:

> Q. Mr. Kalkanis, did you agree with Mr. Constantine that he would file fraudulent personal injury lawsuits as part of this scheme?

> A. Yes.

(Constantine A. 1750). That testimony alone, viewed in the light most favorable to the Government, proves that Constantine knowingly and willfully participated in the fraud scheme. *See United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) ("A conviction may be sustained on the basis of the testimony of a single accomplice.").

Constantine asserts that Kalkanis's testimony should "not be considered evidence of Constantine's guilty knowledge." (Constantine Br. 51). That argument fails several times over. First, there was no contemporaneous objection to the question, and there was no error—let alone plain error—in permitting Kalkanis to answer whether he agreed with Constantine

71

to commit the crimes charged in the Indictment.[17] Second, there was nothing confusing or ambiguous about Kalkanis's answer. To the contrary, the answer established clearly and unequivocally that Constantine agreed to file the fraudulent lawsuits at the heart of the fraud scheme. Third, Kalkanis's answer was hardly the sum of the Government's proof at trial. Rather, as explained above, the Government presented a mountain of evidence that Constantine knowingly participated in the scheme. The Government was not obligated to present the type of explicit conversations dreamed up by Constantine. *See, e.g.*, *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980) ("It is a rare case indeed where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel. A conspiracy by its very nature is a secretive operation.").

Nor did any "inconsistencies and contradictions" with other evidence (Constantine Br. 32) undermine the probative value of Kalkanis's testimony. Constantine notes that patients admitted having lied to Constantine (Constantine Br. 52), but Kalkanis acknowledged as much, explaining that patients were "prepped" to lie "to lessen the risk of getting in trouble with the law" (Constantine A. 1774). In other words, the scheme participants wisely cautioned patients not to advertise that they had staged their accidents—

––––––––––

[17] Constantine offers no support for his claim that Dowd's objection to a different question should "cover the question concerning Constantine." (Constantine Br. 51). It does not.

72

even though it was obvious to all. Constantine's remaining arguments resort to attacking Kalkanis's credibility. But questions of witness credibility are for the jury, not the Court. *See United States v. Jesperson*, 65 F.3d 993, 998 (2d Cir. 1995) ("No more need be said than that [the witness] so testified, and that we are required to resolve any issue regarding his credibility in the government's favor.").

## POINT VI

### Constantine's Sentence Was Procedurally Reasonable

Constantine contends that the District Court committed procedural error in calculating the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") at sentencing. (Constantine Br. 58-71). Specifically, he claims the District Court erred by (1) relying on intended loss to calculate the total loss amount; (2) engaging in speculation to calculate a total loss amount; (3) treating patients as "victims" for purposes of the Guidelines; and (4) denying his request for a *Fatico* hearing to resolve disputed factual issues. None of Constantine's arguments have merit.

### A.   Relevant Facts

Constantine appeared for sentencing on April 25, 2023. His Presentence Report calculated a total Guidelines offense level of 37, based on a base offense level of seven under U.S.S.G. § 2B1.1(a)(1); a 22-level increase under U.S.S.G. § 2B1.1(b)(1)(L) because the offense involved loss of at least $25 million; a two-level increase under U.S.S.G. § 2B1.1(b)(2)(A)

73

because the offense involved at least 10 victims; a two-level increase under U.S.S.G. § 2B1.1(b)(16)(A) because the offense involved conscious or reckless risk of death or serious bodily injury; a two-level increase under U.S.S.G. § 3A1.1(b)(1) because Constantine and his coconspirators recruited destitute and homeless persons, who were vulnerable victims, to help carry out the scheme; and a two-level increase under U.S.S.G. § 3B1.3 because Constantine, a lawyer, abused a position of public or private trust or used a special skill in a manner that significantly facilitated the commission of the offense. (Constantine PSR ¶¶ 74-86).

Based on the total offense level of 37 and Constantine's Criminal History Category of I, the Presentence Report calculated a Guidelines range of 210 to 262 months' imprisonment. (Constantine PSR ¶ 127).

Constantine objected to the Presentence Report's Guidelines analysis, arguing that the loss calculation was speculative and unsupported by the trial record. (Dkt. 230 at 13). Constantine also challenged the enhancements for offenses involving 10 or more victims, reckless risk of death or serious bodily injury, and vulnerable victims. (Dkt. 230 at 14-20; Constantine PSR at 32). Constantine asked the District Court to hold a *Fatico* hearing to resolve any factual disputes relevant to the challenged Guidelines enhancements. (Dkt. 230 at 20-21).

At sentencing, Judge Stein denied the request for a *Fatico* hearing, explaining that "[t]here's enough in the record here for me to proceed." (Constantine A. 2774-

74

75). He also rejected each of Constantine's Guidelines objections.

First, the District Court calculated a 22-level loss enhancement based on a total loss amount of $27,440,325. (Constantine A. 2775-79). That amount consisted of:

- actual losses of $20,989,250, based on trial evidence that Constantine had settled 150 cases for that total amount (Constantine A. 1609, 1642-43);

- intended losses of $9,500,000 for 95 cases that Constantine had filed but not settled (GX 1702), assuming an average settlement amount of $100,000 per case, which was the bottom of the average settlement range described in trial testimony (Constantine A. 598); and

- a 10 percent reduction from the sum of those actual and intended losses, based on trial testimony from Gordon and Kalkanis that 90 percent (or, according to Kalkanis, "[u]pwards of" 90 percent) of all cases were fraudulent (Constantine A. 539, 1825).

(Constantine A. 2775-79).

Second, the District Court determined that a two-level enhancement for 10 or more victims was appropriate because "it's quite safe to say, there are ten or more insurance companies that were defrauded here, and certainly ten or more patients." (Constantine

75

A. 2782; *see* Dkt. 299 (reflecting restitution claims from more than 10 insurance companies)).

Third, the District Court applied the two-level enhancement for an offense involving the conscious or reckless risk of death or serious bodily injury, finding that patients were "encourag[ed] and requir[ed] to have surgery if they wished to participate in the fraud" and that there was "expert testimony on the risk when anyone is put under anesthesia." (Constantine A. 2785-86; *see also* Constantine A. 262-65, 295-96, 298, 432-33, 519, 528, 973, 1461, 1476 (testimony that patients needed to undergo surgery to participate in the fraud); Constantine A. 1228-29, 1239-40, 1310-11 (expert testimony regarding surgery and anesthesia risks)).

Finally, the District Court applied the two-level vulnerable-victim enhancement, finding based on trial testimony that the patients were "down and out and vulnerable," in that they "clearly were poor, some were homeless, they were hungry, some were recruited from homeless shelters," and that "people would normally not accept a thousand or fifteen hundred or a couple of thousand dollars that they would receive for having surgeries, sometimes multiple surgeries, unless they were susceptible to this fraud." (Constantine A. 2791-92).

Judge Stein adopted the Presentence Report's factual findings and Guidelines calculation, concluding that the applicable Guidelines range was 210 to 262 months' imprisonment. (Constantine A. 2792). After hearing from the parties, Judge Stein sentenced Constantine principally to a below-Guidelines term of 102

months' imprisonment. (Constantine A. 2822). Judge Stein stated that the "sentence would be the same even if there were no enhancement for the vulnerable victims or serious bodily injury, or indeed, even if the loss was less than 25 million under 2B1.1." (Constantine A. 2829).

## B. Applicable Law

### 1. Standard of Review

This Court reviews the "district court's application of the Guidelines *de novo*, while factual determinations underlying a district court's Guidelines calculation are reviewed for clear error." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). A claim of Guidelines-calculation error raised for the first time on appeal, however, is subject to "plain-error review." *United States v. Gates*, 84 F.4th 496, 503 (2d Cir. 2023). To establish plain error, the defendant must show that:

> (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Marcus*, 560 U.S. at 262; *United States v. Zangari*, 677 F.3d 86, 95 (2d Cir. 2012).

77

A district court's "factual findings at sentencing need be supported only by a preponderance of the evidence." *United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015). Like a jury, the sentencing court "may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

In reviewing factual findings made at sentencing, this Court "must view the evidence in the light most favorable to the government." *United States v. Gasperini*, 894 F.3d 482, 485 (2d Cir. 2018). "A finding of fact is clearly erroneous only if, after reviewing all of the evidence, this Court is left 'with the definite and firm conviction that a mistake has been committed.'" *Cramer*, 777 F.3d at 601 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," this Court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *United States v. Cho*, 713 F.3d 716, 722 (2d Cir. 2013). Where "there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015).

Where the Court "identif[ies] procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing." *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009).

78

### 2. Guidelines Loss Calculations

Under Section 2B1.1 of the Guidelines, a defendant's offense level is based in part on the amount of "loss" involved in the offense. U.S.S.G. § 2B1.1(b)(1). A Guidelines loss amount represents "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(a)). The "offense" includes the defendant's "relevant conduct" and all acts and omissions of a defendant and his coconspirators (if reasonably foreseeable to the defendant) "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

A sentencing court is "only required to make a 'reasonable estimate of the loss.'" *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012) (quoting U.S.S.G. § 2B1.1, comment. (n.3(c))). A Guidelines loss determination "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information." *Coppola*, 671 F.3d at 250; *see also United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997).

"[B]ecause the sentencing court 'is in a unique position to assess the evidence and estimate the loss based upon that evidence,' the sentencing court's 'loss determination is entitled to appropriate deference.'" *Lacey*, 699 F.3d at 720 (quoting U.S.S.G. § 2B1.1, comment. (n.3(c))). The district court has "broad discretion" to consider "all relevant information" when making factual findings related to sentencing. *United States v. Pico*, 2 F.3d 472, 475 (2d Cir. 1993); *cf. United States v. Prince*, 110 F.3d 921, 925 (2d Cir. 1997) (noting that "a sentencing court may rely on any

information it knows about" in calculating drug quantities under the Guidelines).

In particular, "it is permissible for the sentencing court, in calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *Bryant*, 128 F.3d at 76. The district court need not "specifically reference" evidence in estimating loss. *Coppola*, 671 F.3d at 250 n.25. Instead, a reviewing court may assume the district court's familiarity with the record and, provided it "can identify evidence in the record supporting the challenged loss estimate," reject any argument that the district court relied on mere speculation. *Id.*

## C. Discussion

The District Court did not err in calculating the Guidelines. In any event, any error was assuredly harmless given Judge Stein's clear statement that he would have imposed the same sentence even if he had calculated a lower loss amount or not applied the enhancements for vulnerable victims or causing risk of serious bodily injury. (Constantine A. 2829).

### 1. The District Court Properly Calculated the Loss Amount

Constantine raises two challenges to the District Court's calculation of loss amount. First, relying on the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), he argues the District Court erred by relying in part on intended loss. (Constantine Br. 58-63).

80

Second, he argues that the District Court's calculation was unreasonably speculative. (Constantine Br. 63-66). Both arguments should be rejected.

Because Constantine did not raise his intended-loss argument below, it is reviewed for plain error. *See Gates*, 84 F.4th at 503. Constantine cannot satisfy that standard.

This Court has continued to apply the commentary on "intended loss" when calculating the Guidelines even since *Kisor*. *See United States v. Powell*, 831 F. App'x 24, 25 (2d Cir. 2020) ("For the purposes of calculating the Guidelines range, loss is defined as the greater of actual loss or intended loss."). That makes sense because "the larger intended amount is a better measure for the defendant's culpability." *Lacey*, 699 F.3d at 720. At a minimum, the "absence of binding precedent" barring the inclusion of intended losses in Guidelines loss calculations precludes a finding that any error was "plain." *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) ("Certainly, an error cannot be deemed 'plain,' in the absence of binding precedent, where there is a genuine dispute among the other circuits.").

The Third Circuit's decision in *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), on which Constantine relies, rests on a flawed analysis. In interpreting "loss," the Third Circuit overlooked at least two Guidelines provisions that shed light on how to interpret the word: (1) the relevant-conduct Guideline, which states that specific offense characteristics like those in § 2B1.1 "shall be determined on the basis of . . . all harm that was the object of such acts and omissions,"

81

U.S.S.G. § 1B1.3(a)(3); and (2) the attempt and con-spiracy Guideline, which states that the base offense level is calculated using the base offense level from the guideline for the substantive offense "plus any adjust-ments from such guideline for any *intended* offense conduct that can be established with reasonable cer-tainty," *id.* § 2X1.1(a) (emphasis added). Those provi-sions show that the word "loss" in § 2B1.1 encom-passes intended loss—or, at a minimum, that the term is "genuinely ambiguous" under *Kisor*. Thus, the Dis-trict Court did not err, let alone plainly err, in relying upon intended loss.[18]

Constantine's argument that the District Court re-lied on improper speculation fares no better. The trial evidence established that Constantine settled his cases for roughly $20.9 million dollars (Constantine A. 1609, 1642-43; GX 1703 at 20), that Constantine filed at least 95 additional cases that did not settle (GX 1702), that the average settlement per case was $100,000 to $150,000 (Constantine A. 598), and that 90 percent of all cases supplied by Gordon and Kal-kanis were fraudulent (Constantine A. 539, 1825). Ac-cordingly, the District Court estimated the loss amount by adding 90 percent of the actual settlement amount to 90 percent of an intended settlement amount of $100,000—the low end of the average set-tlement range—for the 95 cases that had not settled. Far from being unduly speculative, that calculation

---

[18] Of course, the vast majority of the loss for Con-stantine consisted of *actual* loss because he settled cases for a total of $20.9 million.

82

was a conservative estimate based on clear evidence in the record.

## 2. The District Court Properly Applied the Other Guidelines Enhancements

Constantine next argues that the District Court erred by counting his clients as victims for purposes of some Guidelines enhancements. (Constantine Br. 66-69). Once again, however, there was no error.

To the extent Constantine challenges the two-level enhancement under U.S.S.G. § 2B1.1(b)(2) for offenses involving at least 10 victims, his argument fails because the District Court applied that enhancement based on its independent finding that "there are ten or more *insurance companies*"—not clients—"that were defrauded here." (Constantine A. 2782 (emphasis added)).

To the extent Constantine challenges the two-level enhancement under U.S.S.G. § 2B1.1(b)(16)(A) for offenses involving the conscious or reckless risk of death or serious bodily injury, his argument fails because that enhancement applies even where the risk of death or serious bodily injury is caused to a participant in the offense; the enhancement does not mention "victims" at all. *See* U.S.S.G. § 2B1.1(b)(16)(A); *United States v. Thorn*, 317 F.3d 107, 118 (2d Cir. 2003) (concluding that similar enhancement under U.S.S.G. § 2Q1.2(b)(2) "is not limited to situations in which the conduct created a substantial risk of death or serious bodily injury to persons other than participants in the offense," and noting that "the Sentencing Commission knows how to limit an enhancement based on the

substantial risk of death or serious bodily injury to the victims of an offense and not to permit an enhancement when those put at risk were co-conspirators").

And to the extent Constantine challenges the vulnerable-victims enhancement under U.S.S.G. § 3A1.1, his argument fails because knowing participation in a defendant's illegal scheme does not preclude a finding that one is a vulnerable victim. *See United States v. Borst*, 62 F.3d 43, 48 (2d Cir. 1995) (holding, in bank-fraud case, that loan applicants who "were exploited and suffered harm as a result of [the defendant]'s actions" counted as vulnerable victims "whether or not [they] were unwitting instrumentalities of [the defendant]'s criminal conduct in light of their apparent knowledge of [the defendant]'s misrepresentations to the bank," and even though "the harm" they suffered "was not an element of any of the crimes of which [the defendant] was convicted").

### 3. Any Error Was Harmless

Assuming *arguendo* the District Court erred in calculating the Guidelines (though it did not), resentencing is not required because the error did not affect the sentence imposed. Constantine's sentence was not driven by the Guidelines; his 102-month prison term was far below the bottom of the Guidelines range of 210 to 262 months' imprisonment. Moreover, Judge Stein expressly stated that the "sentence would be the same even if there were no enhancement for the vulnerable victims or serious bodily injury, or indeed, even if the loss was less than 25 million under 2B1.1." (Constantine A. 2829). Thus, the record "indicates

84

clearly" that Judge Stein "would have imposed the same sentence in any event," *Jass*, 569 F.3d at 68, so any error was harmless.

### 4. The District Court Did Not Abuse Its Discretion by Denying Constantine's Request for a *Fatico* Hearing

Finally, the District Court did not err in denying Constantine's request for a *Fatico* hearing. "There is no *per se* right to a *Fatico* hearing, and trial courts enjoy broad discretion in determining what procedures to employ at sentencing." *United States v. Rutigliano*, 614 F. App'x 542, 547 (2d Cir. 2015) (citing *United States v. Prescott*, 920 F.2d 139, 144 (2d Cir. 1990)). The record before the District Court at sentencing included voluminous evidence from Constantine's trial and from the Duncan Trial. Judge Stein's ruling that the existing record enabled him to calculate the Guidelines was not an abuse of his broad discretion.

### POINT VII

### Dowd's Restitution Order Should Be Affirmed

Dowd challenges his joint and several restitution obligation of $8,117,011, arguing that the District Court's restitution order afforded him no due process, contains obvious legal errors, and should be reduced to no more than $4,732,864.18. (Dowd Supp. Br. 10-22). Dowd's arguments, which he failed to raise below, are meritless.

85

## A. Relevant Facts

### 1. Dowd's Restitution Order

At Dowd's sentencing on April 25, 2023, the District Court imposed a term of 102 months' imprisonment and ordered forfeiture in the amount of $2,900,905. (Dowd A. 3096-102). The District Court notified Dowd that it intended to order restitution, and gave the Government 90 days—or until July 24, 2023—to submit a proposed restitution order. (Dowd A. 3088-89).

On June 27, 2023, the Government notified Dowd's counsel by email that it intended "in the next few days" to file a request for restitution of $8,117,511, and provided materials supporting its request, along with a proposed order. (Dkt. 294). The proposed order listed a total restitution amount of $14,830,955, but apportioned Dowd's obligation downward to $8,117,511 based on claims for patients on whom Dowd had performed surgery. (Dkt. 294).

Dowd's counsel acknowledged receipt of the Government's email on June 28, 2023, and emailed the Government a list of questions concerning the restitution amount on July 7, 2023. (Dkt. 294). Three days later, the Government submitted its proposed restitution order and a memorandum in support of that proposal to the District Court. (Dkt. 294). Ten days after that, on July 20, 2023, the District Court, having received no objection from Dowd regarding the Government's proposed restitution order, entered the

restitution order against Dowd. (Dowd Supp. SPA 1-4).[19] The District Court entered an amended judgment that same day. (Dowd Supp. SPA 5-12).

### 2. The Rule 35 Motion

On August 2, 2023, Dowd moved under Federal Rule of Criminal Procedure 35(a) to reduce the restitution order by $1,101,034.60, for a total restitution payment of $7,015,976.40. (Dkt. 291). He argued that the District Court's order "attribute[d] a disproportionate level of contribution against" him relative to other scheme participants, such as the back surgeon Sady Ribeiro, and that the District Court had entered the order without "giving [him] the opportunity to respond to the government's restitution submission." (Dkt. 291 at 4). Dowd argued that each alleged error was properly raised under Rule 35(a) because it was an "arithmetical, technical or other clear error." (Dkt. 291 at 4). Dowd filed a notice of appeal from the amended judgment the following day. (Dkt. 293). The Government opposed the motion on August 18, 2023, and filed a supplemental response on August 28, 2023. (Dkt. 294, 298).

On October 10, 2023, the District Court denied Dowd's motion as an indicative ruling under Federal Rule of Criminal Procedure 37(a). (Dkt. 300). The District Court determined that it lacked jurisdiction over

––––––––––––

[19]  The restitution order also included a $7,320,657 restitution obligation for Constantine, who does not challenge the restitution order on appeal. (23-6440 Dkt. 69.1).

the motion due to Dowd's pending appeal, but that Rule 37(a) authorized it to deny the motion. (Dkt. 300 at 2). The District Court found that Dowd had failed to satisfy the Rule 35(a) standard because (1) Dowd had been given adequate notice and an opportunity to object to the Government's proposed restitution order, and failed to do so (Dkt. 300 at 3-4), and (2) Dowd's criticism of the restitution order's apportionment methodology was not a basis for correction under Rule 35(a) (Dkt. 300 at 4-6). In the alternative, the District Court held that even if an incorrect apportionment of restitution liability constituted an arithmetic error under Rule 35(a), no such error existed because the District Court "utilized a logical and appropriate methodology to determine restitution." (Dkt. 300 at 5).

### 3. Dowd's Coconspirators' Restitution Orders

Judge Stein ordered all but one of Dowd's charged coconspirators to pay restitution. (*See* 18 Cr. 289 Dkt. 267 (Rainford); 18 Cr. 289 Dkt. 352 (Locust); 18 Cr. 289 Dkt. 416 (Kalkanis); 18 Cr. 289 Dkt. 420 (Gordon); Dkt. 283 (Elefant, Alexander, Ribeiro); 17 Cr. 633 Dkt. 30 (Dewitt)). Each restitution order provided that the restitution obligation was "joint and several" with that of specified coconspirators against whom restitution had been ordered, and that each defendant's liability to "pay restitution shall continue unabated until either the defendant has paid the full amount of restitution ordered here, or every victim set forth" in the respective orders has "recovered the total amount of its loss." (*See, e.g.*, 18 Cr. 289 Dkt. 416, 420).

88

In 2020 and 2021, the District Court ordered Rainford and Locust to pay restitution of $3,928,133.60, an amount based on claims from insurance companies the Government had received at the time. (18 Cr. 289 Dkt. 267, 352).[20]

In the fall of 2022, Ribeiro, Elefant, and Alexander pleaded guilty pursuant to plea agreements in which they agreed to make restitution. The restitution amounts, calculated based on victim information the Government had at the time, were $3,808,133 for Ribeiro and Alexander, and $1,486,000 for Elefant, who had been involved in the scheme for a shorter period. On June 27, 2023, Judge Stein entered a restitution order for Ribeiro, Elefant, and Alexander in the amount of $14,830,955, but apportioned liability consistent with the terms of the defendants' plea agreements. (Dkt. 283).

In the fall of 2023, Judge Stein entered a restitution order for Kalkanis in the amount of $14,830,955, for Gordon in the amount of $7,320,657, and for Dewitt

---

[20] In their pending appeal, Rainford and Locust challenge their restitution orders. The Government conceded that the restitution totals should be reduced by $120,000 to correct for the erroneous inclusion of one settlement in the restitution calculation, but argued that the orders should otherwise be affirmed. (Gov't Br. at 68-76, *United States v. Rainford*, No. 20-359). The Government did not include that $120,000 settlement in Dowd's order.

89

in the amount of $1,486,00.31. (18 Cr. 289 Dkt. 416, 420; 17 Cr. 633 Dkt. 30).

## B. Applicable Law

### 1. Restitution

The Mandatory Victim Restitution Act ("MVRA") provides for mandatory restitution by a defendant convicted of a property offense under Title 18, "including any offense committed by fraud or deceit," where "an identifiable victim" has suffered a "pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). Under the MVRA, anyone "directly and proximately harmed as a result of the commission of an offense" or "directly harmed by the defendant's criminal conduct in the course of [a] scheme, conspiracy, or pattern" of criminal activity is a "victim" entitled to restitution. 18 U.S.C. § 3663A(a)(2). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *see United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011). "The primary and overarching goal of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *Qurashi*, 634 F.3d at 703; *see United States v. Coriaty*, 300 F.3d 244, 253 (2d Cir. 2002) ("statutory focus" of MVRA is "making victims whole").

"[T]he MVRA caps the restitution award at the actual amount of the victim's loss," *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015), but "the

90

calculation of these losses need not be mathematically precise," *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016). A district court must make only "a reasonable estimate" of a victim's loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007); *see also United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) ("[A] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable.").

"It is within the discretion of the district court to hold a defendant jointly and severally liable or to apportion liability." *United States v. Desnoyers*, 590 F. App'x 54, 57 (2d Cir. 2014) (citing 18 U.S.C. § 3664(h)). For instance, where a defendant is convicted for participating in a conspiracy "encompassing the entire fraudulent scheme," he may be required to make restitution for the full amount of damage caused to all of the scheme's victims. *See United States v. Tzakis*, 736 F.2d 867, 871 (2d Cir. 1984). Alternatively, the district court may exercise its discretion to apportion liability. *Id.* Under what is sometimes called the "hybrid approach," the district court may combine apportionment of liability to limit the restitution obligation for some participants in a crime while concurrently holding other participants liable for the full amount of the loss. *United States v. Yalincak*, 30 F.4th 115, 126 (2d Cir. 2022). Ultimately, "district courts are granted considerable discretion by the MVRA to order full restitution by all participants in a crime, to apportion the liability among defendants, to use the hybrid approach . . . , or to create variant hybrid approaches in order to

effectuate the goals of the MVRA in particular cases." *Id.* at 130 n.5.

### 2. Standard of Review

This Court "review[s] a district court's order of restitution generally for abuse of discretion." *United States v. Reifler*, 446 F.3d 65, 120 (2d Cir. 2006). Review of restitution orders is "extremely deferential." *United States v. Grant*, 235 F.3d 95, 99 (2d Cir. 2000). Extreme deference is warranted "because ordering restitution requires a delicate balancing of diverse, sometimes incomparable, factors, some of which not only lack certainty but may indeed be based on mere probabilities, expectations, guesswork, even a hunch." *United States v. Rossi*, 592 F.3d 372, 376 (2d Cir. 2010).

Where challenges to a restitution order were not raised below, this Court's review is for plain error. *See* Fed. R. Crim. P. 52(b); *Zangari*, 677 F.3d at 91 ("[W]here, as here, a defendant fails to object to the restitution order at the time of sentencing, our review is for plain error.").

## C. Discussion

### 1. There Was No Due Process Violation

The District Court's restitution order did not, as Dowd contends (Dowd Supp. Br. 10-14), violate Dowd's due process rights. As the District Court found in denying Dowd's Rule 35(a) motion, Dowd was afforded adequate notice and an opportunity to respond to the Government's proposed order. (Dkt. 300 at 3-4). The

92

District Court notified Dowd on April 25, 2023, that it intended to order restitution by July 24, 2023. (Dowd A. 3088-89). That "created a timeline, known to both Dowd and the Government," for the submission of a proposed order. (Dkt. 300 at 3). The Government then sent Dowd its proposed restitution order with supporting materials, and Dowd responded to the Government. (Dkt. 294). Dowd thus knew that a restitution order was coming. Despite seeing the Government submit its proposed order to the District Court, Dowd declined to respond.

Dowd's reliance on *United States v. Harris*, 813 F. App'x 710 (2d Cir. 2020), is misplaced. (Dowd Supp. Br. 10, 11). In *Harris*, this Court vacated a restitution order where the district court "fail[ed] to satisfy the minimal requirement of notice and an opportunity to be heard" before imposing restitution. *Harris*, 813 F. App'x at 714. The *Harris* defendant, who was *pro se*, "was provided with no further notice of the restitution amounts being considered by the district court, and had no occasion to object or make any argument with respect to restitution, whether at his codefendant's *Fatico* hearing or in another format." *Id*. Here, by contrast, Dowd was put on notice, repeatedly, that the Government sought restitution in the amount of $8,117,011, and he had a meaningful opportunity to respond to the Government's request before the District Court ordered restitution.

Dowd asserts that he was prejudiced because he was unable to challenge "important factual issues in the government's submission." (Dowd Supp. Br. 12-13). But Dowd's arguments amount to little more than

93

nit-picking over the insurance company victims' submissions, and provide no basis to disturb the restitution order. For instance, Dowd complains that insurance companies did not submit sworn affidavits (Dowd Supp. Br. 12)—but no such affidavits were required, *see United States v. Hall*, 467 F. App'x 47, 49 (2d Cir. 2012) ("the production of [victim] affidavits is not required under the statute"). Dowd cites one submission from an insurance company that describes a particular claim as "not part of the pattern" (Dowd Supp. Br. 13)—but no restitution was ordered for that claim.[21] And finally, Dowd points to purported discrepancies between claims submitted in connection with the Duncan Trial and more recent claims. (Dowd Supp. Br. 13-14). But the District Court had all of that information, and it is reasonable that, with the passage of time, insurance company victims gathered additional information to supplement their earlier restitution claims.

---

[21] Dowd's argument that the insurance company records may "constitute exculpatory evidence" that the Government possessed during the Duncan Trial is baseless. (Dowd Supp. Br. 13 n.3). Even assuming an insurance company's belief about a particular case could be exculpatory, there was no discovery violation here because, as the Government explained to Dowd, the Government received the records *after* trial. (Dkt. 294).

94

### 2. The Restitution Order Was Not Plainly Erroneous

Because Dowd failed to challenge his restitution order before the District Court, his claim on appeal is reviewed for plain error. *Zangari*, 677 F.3d at 91. Dowd's Rule 35 motion does not preserve his arguments on appeal. But even if assuming otherwise, the restitution order should be affirmed because the District Court did not abuse its considerable discretion to fashion a restitution order.

Relying on *United States v. Aumais*, 656 F.3d 147 (2d Cir. 2011), Dowd claims that the order incorrectly imposes joint and several liability on Dowd and his co-conspirators. (Dowd Supp. Br. 15-18). But *Aumais* involved issues that arise with imposing joint and several liability on a defendant who possessed an image of child pornography that hundreds of other defendants, appearing before hundreds of judges across the country, had also possessed. *See Aumais*, 656 F.3d at 151, 154. *Aumais* has no application to this case, where just *nine* defendants were split across *three* cases, and the same judge sentenced each of them for their participation in the same conspiracy. Because the defendants here participated in the same scheme, and contributed to the same harm, imposing restitution jointly and severally is entirely reasonable. *See, e.g.*, *United States v. Bengis*, 783 F.3d 407, 414 (2d Cir. 2015) (affirming restitution order's imposition of joint and several liability for harm caused by a conspiracy where defendants were charged in multiple indictments); *United States v. Donaghy*, 570 F. Supp. 2d 411, 437 (E.D.N.Y. 2008) (imposing joint and several liability

95

for harm caused by a conspiracy where one defendant waived indictment, and the other two were indicted jointly), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009).

Dowd also challenges the District Court's apportionment of restitution. (Dowd Supp. Br. 18-22). Citing Section 3664(h), he argues that the restitution order erroneously attributes a "disproportionate" portion of the harm to Dowd because the largest recoveries were driven by the complex and more invasive back surgeries performed by Ribeiro. (Dowd Supp. Br. 21). But as the District Court found in denying Dowd's Rule 35(a) motion, "the Court utilized a logical and appropriate methodology to determine restitution." (Dkt. 300 at 5). Specifically, Dowd was proportionally ascribed liability for settlements that resulted from lawsuits brought on the basis of claims for which Dowd was a surgeon. Dowd claims that the settlements were greater when a patient had surgery by both Ribeiro and Dowd, but that is unsurprising; a patient who has surgery on two body parts is likely to appear more injured than a patient who had only one surgery. It in no way suggests that Dowd's surgeries were any less valuable than Ribeiro's surgeries. Nor does it mean that the District Court erred, let alone plainly erred, in adopting the methodology that it did.

Notably, Dowd does not challenge the calculation of total victim losses. He instead takes issue with the *portion* of the total losses that he is required to pay—a curious position when the District Court could have ordered him to pay a far greater share—or even all—of the losses. *See Tzakis*, 736 F.2d at 871; 18 U.S.C.

96

§ 3664(h) ("If the court finds that more than 1 defend-
ant has contributed to the loss of a victim, the court
may make each defendant liable for payment of the full
amount of restitution or may apportion liability among
the defendants to reflect the level of contribution to the
victim's loss and economic circumstances of each de-
fendant.").

Dowd's remaining arguments should be rejected.
Without explanation, Dowd seeks a $2,709,790 reduc-
tion in restitution for the amount the Government has
recovered in the Duncan case. (Dowd Supp. Br. 17).
But the existence of that order—for which the restitu-
tion obligation is joint and several—provides no basis
to reduce Dowd's obligation. Nor should the Court hold
the Government to its "initial calculation" of restitu-
tion of $3.8 million dollars. (Dowd Supp. Br. 18 n.4).
That amount was tallied years ago, before dozens of
insurance company victims submitted claims to the
Government. The MVRA requires district courts to "or-
der restitution to *each victim* in the *full amount* of each
victim's losses as determined by the court." 18 U.S.C.
§ 3664(f)(1)(A) (emphases added). As this Court has
explained, "the purpose of restitution is essentially
compensatory: to restore a victim, to the extent money
can do so, to the position he occupied before sustaining
injury." *United States v. Boccagna,* 450 F.3d 107, 115
(2d Cir. 2006). Freezing a defendant's restitution obli-
gation based on outdated numbers that do not fully re-
flect victims' total losses would violate the MVRA.

97

## CONCLUSION

**The judgments of the District Court should be affirmed.**

Dated:  New York, New York
December 29, 2023

Respectfully submitted,

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*

ALEXANDRA N. ROTHMAN,
NICHOLAS S. FOLLY,
DANIELLE KUDLA,
DAVID ABRAMOWICZ,
*Assistant United States Attorneys,*
*Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its December 19, 2023 order granting the Government leave to file an oversize brief of no more than 24,000 words. As measured by the word processing system used to prepare this brief, there are 22,300 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: DAVID ABRAMOWICZ,
*Assistant United States Attorney*